1  Lenore L. Albert, Esq.   SBN 210876
2  LAW OFFICES OF LENORE ALBERT
   7755 Center Avenue, Suite #1100
3  Huntington Beach, CA 92647
4  Telephone (714) 372-2264
   Facsimile (419) 831-3376
5  Email: lenorealbert@msn.com
6
7  Attorney for Plaintiffs and the Class
8
9            UNITED STATES DISTRICT COURT
10          CENTRAL DISTRICT OF CALIFORNIA
11
12 EDDIE YAU and GLORIA YAU, on   CASE NO.
   behalf of themselves and all others
13 similarly situated,                    SACV11-6 JVS(RNBx)
14         Plaintiffs,
                                    CLASS ACTION COMPLAINT
15 vs.
                                    1.  Breach of Contract
16 DEUTSCHE BANK NATIONAL          2.  Breach of Contract
   TRUST COMPANY AMERICAS, and     3.  Specific Performance
17 AURORA LOAN SERVICES, LLC,      4.  Unjust Enrichment
18 Inclusive,                      5.  Unlawful/Unfair Acts §17200
                                    6.  Fraud
19         Defendants.             7.  Fraud
                                    8.  Fraud
20                                  9.  Declaratory Relief/Injunction
                                    10. Declaratory Relief
21                                  11. Constructive Trust
22
23                                     [Demand for Jury Trial]
24
25                                          ***
26                              *Request for IMMEDIATE RELIEF:*
                              *TEMPORARY RESTRAINING ORDER and*
27                            *INJUNCTION filed Concurrently herewith*
                                          ***
28

---

**Class Action Complaint**                    i
*Yau v. Deutsche Bank National Trust Company Americas*

# TABLE OF CONTENTS

1. Introduction ........................................................................... 1

2. Jurisdiction and Venue ........................................................ 6

3. The Parties ........................................................................... 7

4. The Nonparty Actors and Relationships to the Parties ......... 7

5. Conditional Notice of Rescission ......................................... 9

6. Factual Background .............................................................. 9

7. Statutory and Regulatory Scheme ...................................... 15

8. Factual Allegations of the Yaus ......................................... 19

    a. The Original Loan ........................................................ 19

    b. Transfer of the Loan .................................................... 21

    c. The Temporary HAMP Modification ........................... 24

    d. The Post-HAMP Special Forbearance ......................... 27

    e. 2010 HAMP Application Attempts through Counsel ...... 28

9. Class Action Allegations .................................................... 32

10. Claims for Relief ............................................................... 38

    a. First Cause of Action (Breach of Temp HAMP Agmt) ........... 38

    b. Second Cause of Action (Breach of Written Contracts) .......... 40

    c. Third Cause of Action (Specific Performance) ...................... 41

    d. Fourth Cause of Action (Unjust Enrichment) ........................ 42

    e. Fifth Cause of Action (Unlawful/Unfair Acts §17200) ........... 44

    f. Sixth Cause of Action (Fraud-Concealment of Mtl Fact) ........ 50

    g. Seventh Cause of Action (Fraud & Deceit- Induce Consent) .. 53

    h. Eighth Cause of Action (Fraud & Deceit-No Consideration) .. 56

    i. Ninth Cause of Action (Declaratory Relief/Injunction) .......... 58

    j. Tenth Cause of Action (Declaratory Relief) ......................... 59

    k. Eleventh Cause of Action (Constructive Trust) .................... 60

11. Prayer for Relief ............................................................. 61

12. Demand for Jury Trial ................................................... 63

    a. EXHIBITS

        1. Servicer Participation Agreement for HAMP under the Emergency Economic Stabilization Act of 2008

        2. Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement

        3. Home Affordable Modification Trial Period Plan

        4. Home Affordable Modification Program Guidelines March 4, 2009

        5. Rejection letter dated March 6, 2010

        6. Special Forbearance Agreement dated April 7, 2010

        7. Notice of Default and Election to Sell Under Deed of Trust dated June 16, 2009

        8. Substitution of Trustee notarized June 24, 2009

        9. Notice of Trustee's sale dated September 18, 2009

11. Prayer for Relief .......................................................................... 61

12. Demand for Jury Trial ................................................................ 63

a. EXHIBITS

1. Servicer Participation Agreement for HAMP under the Emergency Economic Stabilization Act of 2008

2. Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement

3. Home Affordable Modification Trial Period Plan

4. Home Affordable Modification Program Guidelines March 4, 2009

5. Rejection letter dated March 6, 2010

6. Special Forbearance Agreement dated April 7, 2010

7. Notice of Default and Election to Sell Under Deed of Trust dated June 16, 2009

8. Substitution of Trustee notarized June 24, 2009

9. Notice of Trustee's sale dated September 18, 2009

Plaintiffs, by and through their attorney, bring this action on behalf of themselves and all others similarly situated against Deutsche Bank National Trust Company Americas ("Deutsche Bank" or "Defendant") and Aurora Loan Services, LLC. ("Aurora" or "Defendant"). Plaintiffs allege the following on information and belief, except as to those allegations which pertain to the named Plaintiffs:

### 1. Introduction

1. Plaintiffs bring this action to challenge the defendants' manipulation and use of the federal and state programs that includes loan modification and other foreclosure prevention services.

2. Plaintiffs and the Class entered into temporary Home Affordability Modification Program agreements (HAMP) on their Deutsche Bank loans being serviced by Aurora and although they made their payments under the temporary plan as requested by the defendants, the defendants never-the-less denied the permanent modification on the grounds they couldn't get the loan to work.

3. The program guidelines state that if the Net Present Value ("NPV") of the loan modification is greater than the NPV at foreclosure, then the lenders must modify the loan.

4. Plaintiff is informed and believes and alleges thereon that the NPV of his loan modified under HAMP was greater than the NPV at foreclosure.

5. The defendants denied modification of the named plaintiffs on the grounds the excessive forbearance. Plaintiff is informed and believes and alleges thereon that what the defendants really mean is that they were already made whole upon default because these loans were securitized with credit default swaps ("CDS") and the CDS were factored into the NPV and not merely the amount that the defendants may receive on a foreclosure sale.

6. Plaintiff is informed and believes and alleges thereon that the lender knew when they made these negative ARM loans that the borrower would not be able to sustain the monthly payments. The lender covered the future calculated losses from the beginning through credit default swaps ( "CD" or "CDS") and other security/insurance and now they are cashing in at the expense of the borrower.

7. The securitization of their loans with CDS was never revealed to the plaintiffs and the Class prior to their default.

8. The market size for credit default swaps by 2008 in the United States was estimated to be *$3.86 Trillion dollars.*

> **Critics assert that naked CDS should be banned, comparing them to buying fire insurance on your neighbor's house, which creates a huge incentive for arson.**
>
> …
>
> Credit default swaps are often used to manage the risk of default which arises from holding debt. A bank, for example, may hedge its risk that a borrower may default on a loan by entering into a CDS contract as the buyer of protection. If the loan goes into default, the proceeds from the CDS contract will cancel out the losses on the underlying debt.

...

Forms of credit default swaps had been in existence from at least the early 1990s,     with early trades carried out by Bankers Trust in 1991.
    J.P. Morgan & Co. is widely credited with creating the modern credit default swap in 1994.[1] [emphasis added]

9.   In essence the defendants bet against the borrower from the beginning then used the Federal Government through the federal HAMP program to take even more money from the defaulting homeowner in this class knowing that they would never grant this class of homeowners a permanent loan modification or any other type of relief.  The defendants never fully disclosed or adequately explained this to Fannie Mae/Freddie Mac.  The entire program failed to the assist the very class of homeowners it was intended to protect.

10. The plaintiffs and the Class and Subclass in this Complaint are the class of homeowners the federal/state foreclosure alternative programs, including the HAMP program was intended to protect.

11. The plaintiffs and the Class were led to believe that they would have the opportunity to cure their default, but no matter how much they paid the defendants each month or what they signed, it never happened and they were kept in constant foreclosure status the entire time while doling out money and their private financial information to the defendants.

---

[1] http://en.wikipedia.org/wiki/Credit_default_swap

**Class Action Complaint**                    **3**
*Yau v. Deutsche Bank National Trust Company Americas*

12. As part of this scheme, the Defendants intentionally failed to place the plaintiffs and the Class into a temporary HAMP program until after a Notice of Default (NOD) and Notice of foreclosure Sale (NOS) were served and filed on the plaintiffs and the Class homes although there was ample time to do so.

13. Defendants knew they would make more money by forcing at risk/distressed homeowners into default and foreclosure than placing these plaintiffs into a permanent loan modification or other foreclosure prevention service when they entered into the agreement with Fannie Mae and the California Commissioner but failed to disclose this material fact to them.

14. Plaintiff alleges defendants intended to, did and still continue to use these Programs to manipulate more money from the Plaintiffs and the Class.

15. After obtaining the agreements with Fannie Mae and the California Commissioner, the defendants used the guise of offering these "Programs" to lure homeowners into default, drag out the process and confuse the homeowners on the type of alternative temporary program they were placing the homeowner in just to get them to shell out more money to the defendants after a Notice of Default and Notice of Sale was filed and served.

16. Plaintiff is informed and believes and alleges thereon that defendant Aurora knew or had reason to know that defendant Deutsche Bank bought credit default swaps or other types investment security/insurance that were either worth more than making the

loan modifications permanent prior to default on these blocks of homes when entering to the contract with Fannie Mae or defendants failed to properly calculate the Net Present Value ("NPV") on these loan modifications.  But Aurora never disclosed these facts to Fannie Mae/Freddie Mac.

17. Plaintiff is informed and believes and alleges thereon that these CD swaps and other financial arrangements and the NPV calculations as applied to these asset-backed loans were material facts and as such Defendants had a duty to disclose these material facts under the agreement with Fannie Mae/Freddie Mac or comply with the terms with regard to NPV calculations.

18. Even if such material facts were disclosed to Fannie Mae/Freddie Mac, these material facts were never disclosed to the intended beneficiaries of the agreements between Fannie Mae/Freddie Mac and Aurora, the plaintiffs and the Class.

19. If it is later interpreted that the facts were disclosed to Fannie Mae/Freddie Mac but the defendants were forbidden from using the gains they could expect to receive from the CDS by defaulting the homeowners, then the plaintiffs allege that the defendants breached that covenant to the injury of the plaintiffs.

20. As intended beneficiaries of the agreements between Fannie Mae/Freddie Mac and Aurora, the Plaintiffs and the Class were injured due to the failure to disclose these material facts and/or comply with the terms of the agreement.

21. CDS is not insurance, but the holder (owner) defendant Deutsche Bank had the ability to cause the default.  The impact of defendants' practice and/or scheme as more fully described below was nothing more than a financial "Death Spiral" to the borrower resulting in making extortion like payments after giving a complete disclosure of their remaining financial assets, and allowing their credit to be decimated or face foreclosure sale.

22. Even if the borrowers did not understand the economic realities of these loans when the economy declined, the lenders understood what would happen.  And even if these borrowers had the ability to reinstate their loans, under this scheme the proceeds the defendants received on default would not be applied to the loan but become a windfall to the defendants, still leaving the homeowner's credit and financial health badly battered, making the entire scheme outrageous, despicable and deserving of punitive or exemplary damages.

## 2. Jurisdiction and Venue

23. The Court has subject matter jurisdiction over this action under 28 USC § 1331 wherein the action arises under the Constitution, laws or treaties of the United States.

24. The Court has personal jurisdiction over the defendants in this action by the fact that the Defendants are corporations conducting business in the state of California.

25. Venue is proper in this Court pursuant to 28 USC § 1392 because the action involves real property located in both the Central and Southern District of California; and

pursuant to 28 USC § 1391(b) inasmuch as defendant Deutsche Bank National Trust

Company Americas resides in the Central District of California, and a substantial part of

the events or omissions on which the claims are based occurred in this District.

### 3. The Parties

26.Plaintiffs Eddie Yau and Gloria Yau (the "Yaus," "plaintiff," "plaintiffs" or

"borrowers") are a married couple residing in Vista, California.

27.Defendant DEUTSCHE BANK NATIONAL TRUST COMPANY

AMERICAS ("Deutsche Bank" or "lender") has its principal place of business at 1761

Saint Andrews Place, Santa Ana, CA 92705.

28.Defendant AURORA LOAN SERVICES, LLC ("Aurora" or "loan servicer") is

headquartered in Littleton, Colorado and regularly conducts business in the state of

California.

### 4. The Nonparty Actors and Relationship to the Parties

29.Mr. Yau's loan is owned by Deutsche Bank National Trust Company

Americas, as Trustee for Mortgage Asset-Backed Pass-Through Certificates, Series

2007-QH9. The Class' loans are owned by defendant Deutsche Bank National Trust

Company Americas, but the Bank may be acting as trustee for any Mortgage Asset-

Backed Pass-Through Certificate, and the series is not limited to 2007-QH9.

30.Nonparty RESIDENTIAL ACCREDIT LOANS, INC. ("RALI" or "investor")

has its principal place of business in Minnesota. Plaintiff is informed and believes and

alleges thereon RALI is the investor of the loans held by defendant Deutsche Bank.

Plaintiff is informed and believes and alleges thereon defendant Aurora and defendant

Deutsche Bank was responsible for RALI's conduct through any agency or contractual

relationship. As such, RALI's actions or failure to act are the actions or failure to act of

defendant Aurora and/or defendant Deutsche Bank.

31.Nonparty QUALITY SERVICE CORP. ("Quality" or "Aurora's agent") has its

principal place of business in San Diego, California. Plaintiff is informed and believes

and alleges thereon that all times mentioned in this Complaint Quality Services Corp.

was defendant Aurora's agent and defendant Aurora was responsible for Quality

Services Corp.'s conduct. As such, Quality Services Corp.'s actions or failure to act are

the actions or failure to act of defendant Aurora.

32.Nonparty FANNIE MAE/FREDDIE MAC ("Fannie Mae") entered into an

agreement with defendant Aurora of which the plaintiffs and the Class were intended

beneficiaries.

33.Plaintiff is informed and believes and alleges thereon that each defendant is

responsible in some manner for the occurrences alleged in this complaint, and that

plaintiff's damages were proximately caused by the defendants and at all times

mentioned in this complaint, were the agents, servants, representatives, and/or employees

of their co-defendants, and in doing the things hereinafter alleged were acting in the

scope of their authority as agents, servants, representatives, family members and/or employees, and with the permission and consent of their co-defendants.

34. Additionally, plaintiff is informed and believes and alleges thereon that each defendant assisted, aided and abetted, adopted, ratified, approved, or condoned the actions of every other defendant and that each corporate defendant, if any, was acting as the alter ego of the other in the acts alleged herein.

### 5. Conditional Notice of Rescission

35. Plaintiffs and the Class (excluding potential Class members who opt out of the Class), by service of this Class Action Complaint on Defendant Aurora, hereby provide notice to Defendant Aurora, its subsidiaries and affiliates that the temporary HAMP agreements, the Promissory Notes, Mortgages, and all other agreements signed after Notice of Default as described in this complaint are subject to rescission and rescinded for the reasons set forth herein.  Should the court or trier of fact determine that the agreements are enforceable then this notice shall be of no force or effect.

### 6. Factual Background

36. Each and every allegation made in paragraphs 1 through 22 is incorporated as though fully set forth herein.

37. Mr. Yau is a home loan borrower that was enrolled in the HAMP program whose loan was serviced by Aurora; owned by Deutsche Bank and the investor was Resident Accredit Loans, Inc.

38. In the particular case of the Yaus, Defendant DEUTSCHE BANK NATIONAL TRUST COMPANY AMERICAS acted as trustee for Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QH9 which encompassed a block of mortgages including the Yaus.

39. However, the fact that Deutsche Bank National Trust Company Americas, as trustee for mortgage asset-backed pass through certificates, series 2007-QH9 was the holder of Mr. Yau's mortgage was not disclosed to him until September 2010.

40. Plaintiffs allege on information and belief that Defendant Deutsche Bank acts as trustee for the Class in this series 2007-QH9 and other similar series of asset-backed pass-through certificates.

41. Over the last several years, the United States has been in a foreclosure crisis. On October 9, 2009 the Congressional Oversight Panel reported that approximately one in eight mortgages in the United States is currently in foreclosure or default.[2]

42. In 2009, 632,573 California properties had some type of foreclosure filed on its property record.[3]

43. According to a California Consumer Banking article dated December 13, 2010, the outlook for 2011 is worse.

---

[2] (www.cop.senate.gov/reports/library/report100909-cop.cfin.)

[3] (www.realtytrac.com/contentmanagement/pressrelease.aspx ?Channelid=9&itemid=8333).

**Class Action Complaint**                              10
*Yau v. Deutsche Bank National Trust Company Americas*

The number of foreclosures is expected to increase in 2011 as more mortgage defaults work their way through the pipeline. Rick Sharga, a senior vice president for RealtyTrac, said there were approximately 1.2 million bank repossessions in 2010, 900,000 in 2009, and "We expect we will top both of those numbers in 2011," he said.[4]

44. Quality Loan Service Corporation, agent of defendant Aurora Loan Services, LLC recorded over **4,943** foreclosure type filings in **Orange County, California** in 2010 alone.

45. Recently, the Attorney General of Arizona was quoted by Business Week as stating

What I'm most angry about is the simultaneous modifications and foreclosures... We need to look for a stipulated judgment in all 50 states, that if someone is in modification, they can't be foreclosed. (www.businessweek.com/news/2010-10-28/arizona-seeks-changes-to-banks-home-loan-modification-process.html).

46. Here, the plaintiffs and the Class were actually placed in temporary HAMP agreements and although the plaintiffs and the Class made the temporary payments as requested, they were denied permanent modification of their loans and kept simultaneously in foreclosure. The plaintiffs and the Class were led to believe that they would have an opportunity to cure their default, but no matter how much they paid the defendants each month or what they signed, it never happened. Attached hereto and fully incorporated herein as **Exhibit 3** is a true and correct copy of the Yaus' Temporary HAMP Agreement.

---

[4] http://californiaconsumerbanking.com/2010/12/13/2011-foreclosures-expected-to-increase.html

**Class Action Complaint**                            11
*Yau v. Deutsche Bank National Trust Company Americas*

47. Defendant Aurora contracted with Fannie Mae to provide foreclosure prevention services intending to benefit homeowners with affordable loan modifications. In return Aurora would be compensated over **$2.873 Billion dollars** in taxpayer funds as incentive to do so. Attached hereto and fully incorporated herein as **Exhibit 1** is a true and correct copy of the original Agreement between Aurora and Fannie Mae.

48. Plaintiff is informed and believes and alleges thereon that Aurora Loan Services made and/or is making more money on defaults and/or foreclosures than on the loan modifications and knew it would do so when entering into the contract with Fannie Mae.

49. Plaintiff is informed and believes and alleges thereon that defendant Aurora knew or had reason to know that defendant Deutsche Bank bought credit default swaps or other types investment security/insurance that were either worth more than making the loan modifications permanent prior to default on these blocks of homes when entering to the contract with Fannie Mae or they failed to report the way they were calculating NPV under the agreement. But Aurora never disclosed these facts to Fannie Mae.

50. Plaintiff is informed and believes and alleges thereon that these CDS and other financial arrangements were material facts and as such Defendants had a duty to disclose these material facts under the agreement or the NPV calculations violated the terms of the agreement with Fannie Mae/Freddie Mac. Attached hereto and fully incorporated

herein as **Exhibit 4** is a true and correct copy of the March 4, 2009 Home Affordable

Modification Program Guidelines including the NPV calculations.

51. But defendants never disclosed or adequately explained these material facts.

52. Assistant Treasury Secretary Herbert M. Allison admitted that modifying

mortgages has been more difficult than administration officials had anticipated."

> "Certainly we've seen a lot of frustration with this program since its
> inception," he told lawmakers. "We did not fully envision the
> challenges we would encounter." (http://rismedia.com/2010-03-
> 28/white-house-to-adjust-troubled-mortgage-modification-program/)

53. Section 5 of the Servicer agreement between Aurora and Fannie Mae contains

the representations, warranties and covenants which state in part:

> (b) Servicer is in compliance with, and covenants that all
> Services will be performed in compliance with all applicable
> Federal, state and local law, regulations, regulatory guidance,
> statutes, ordinances, codes and requirements, including, but not
> limited to, the Truth in Lending Act, 15 USC 1601 et seq., the
> home Ownership and Equity Protection Act, 15 USC 1639, the
> Federal Trade Commission Act, 15 USC 41 et seq., the Equal
> Credit Opportunity Act, 15 USC 701 et seq., the Fair Credit
> Reporting Act, 15 USC 1681 et seq., the fair Housing Act and
> other Federal and state laws designed to prevent unfair,
> discriminatory or predatory lending practices and all applicable
> laws governing tenant rights...Servicer is not aware of any
> other legal or financial impediments to performing its
> obligations under the Program in which Servicer participates or
> the Agreement and shall promptly notify Fannie Mae of any
> financial and/or operational impediments which may impair its
> ability to perform its obligations under such Programs or the
> Agreement...
>
> (c) Servicer covenants that:...all data ...that is relied upon by
> Fannie Mae or Freddie Mac in calculating the Purchase Price or

in performing any compliance review will be true, complete and accurate in all material respects, and consistent with all relevant business records, as and when provided.

(d) Servicer covenants that it will(i) perform the Services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed operation…

(f) Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie mac in connection with any of the Programs or pursuant to the Agreement may constitute a violation of: (a) Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (b) the civil False Claims Act (31 USC § 3729-3733). Servicer covenants to disclose to Fannie Mae and Freddie Mac any credible evidence, in connection with the Servicers, that a management official, employee, or contractor of Servicer has committed, or may have committed, a violation of the referenced statutes.

(g) Servicer covenants to disclose to Fannie Mae and Freddie Mac any other facts or information that the Treasury, Fannie Mae or Freddie Mac should reasonably expect to know about Servicer and its contractors to help protect the reputational interests of the Treasury, Fannie Mae and Freddie Mac in managing and monitoring the Programs in which Servicer participates." (**Exhibit 1** page A-2 to A-4 ; Exhibit 2 page B-3 to B-4)

54. Plaintiff alleges that defendants breached these covenents.

55. Defendants used the offering of the federal HAMP Program as an incentive to get the homeowners to default on their loans which would trigger payment on the CDS without any care about placing the homeowners at risk of a foreclosure sale and then have the homeowners like the plaintiffs in this case continue to make monthly payments on them while in default facing a foreclosure sale all to the defendants' financial benefit.

**Class Action Complaint**                    14
*Yau v. Deutsche Bank National Trust Company Americas*

## 7. Statutory and Regulatory Scheme

56. On March 4, 2009 President Obama signed into law the Making Home Affordable Plan as part of the Emergency Economic Stabilization Act of 2008.  It is in two parts: the Home Affordable Refinance program ("HARP") and the Home Affordable Modification program ("HAMP").

57. Under these programs, the U.S. Department of the Treasury directed the large national bank servicers to take corrective action by providing loan modifications that produced more sustainable loan payments.

58. On March 4, 2009 the U.S. Department of the Treasury explained,

> With the information now available, servicers can begin immediately
> to modify eligible mortgages under the Modification program so that
> at-risk borrowers can better afford their payments.

59. Aurora entered into a Servicer Participation Agreement for the HAMP program with Fannie Mae; the latter acted as Financial Agent of the United States. (**Exhibit 1**).

60. However, Aurora failed and refused to put Mr. Yau immediately into a modification program until they first defaulted and gave Notice of Sale of Mr. Yau's home.  Plaintiff is informed and believes and alleges thereon that defendant Aurora first caused Notices of Default and Notice of Foreclosure Sale to be served on the Class prior to placing the Class into a temporary HAMP also.

61. By March 2010, the White House fortified the HAMP program because only **170,000** borrowers out of the **3 to 4 million borrowers** it was aimed at were placed in a more affordable home loan.

62. Thereafter, the contract between Aurora and Fannie Mae was amended and restated on or about September 1, 2010. The Amended and restated contract is attached hereto and fully incorporated herein as **Exhibit 2**.

63. The United States Treasury, Office of the Comptroller of Currency (hereinafter the "OCC") regulates the banking industry such as defendant Deutsche Bank.  The OCC mandated that the largest banks institute HAMP programs.

64. The Office of Thrift Supervision (hereinafter the "OTS") regulates loan services such as defendant Aurora.

65. According to the Aurora Loan Services – Issuer Profile dated June 24, 2008 by Analyst Kathleen Tillwitz, Aurora Loan Services was a wholly owned subsidiary of Lehman Brothers Bank, FSB, servicing 20,000 to 110,380 (or 21.4% of their loans) in California. As of February 29, 2008 Aurora serviced 514,831 mortgage loans totaling $113.2 billion dollars.

66. On 11/19/10 the OCC supplied the following written testimony:

HAMP guidelines now preclude the servicer from initiating a foreclosure action until the borrower has been determined to be ineligible for a HAMP modification.

67. Aurora actions in working with the borrowers on the loans at issue in this complaint violated and continue to violate these directives.

68. Under the contract, the Servicer of the loan must perform a Net Present Value (NPV) Test to compare the value of the money that it would receive if the loan were modified with the value it could expect from foreclosure.

69. If the servicer and owner of the loan can expect a greater return from modifying the loan, the loan is considered NPV positive and the servicer and owner *must* then modify the loan. (**Exhibit 4**)

70. In plaintiff's case, plaintiff is informed and believes and alleges thereon that the defendants as the servicer and owner of the loan could have expected no more than one-third of what the plaintiff would have paid under the HAMP loan modification which would have been anywhere from $934,560.00 to over $1 million dollars.

71. As servicer of the loan, Aurora must modify the loan unless the contractual agreement it has with the actual holder of the loan prohibits modification. In that case, the servicer is required to use reasonable efforts to obtain waivers or approval of a modification from the owner and/or investor.

72. Plaintiff is informed and believes and alleges thereon that Aurora failed to disclose to Fannie Mae that loans like the Yau's which appear to nicely fit under the program's protected class, were actually the loans that would never become permanently

modified because these loans were backed by CDS and such. Signing up as a servicer of the HAMP program, was a carrot to lure distressed homeowners into default.

73. The defendants signed up for exemptions with the California Commissioner for the same reason, motive or to assist in effectuating this plan.

74. CDS are not currently regulated, but plaintiff is informed and believes and alleges thereon that defendant Deutsche Bank covered the default of plaintiff's loan with a CDS or some other security/insurance.

75. Plaintiff is informed and believes and alleges thereon defendant failed to make these material disclosures to Fannie Mae and the California Commissioner, so the defendants could use the guise of being able to offer these "Programs" to maximize their own profit by luring homeowners into default, dragging out the process and obtaining more money from the defaulted homeowner than otherwise would likely occur if the homeowner did not have hope they may qualify for one of the foreclosure alternatives, such as HAMP.

76. In the Yau's case, who were initially only behind by $5,000.00, if they had known and understood the truth to this scheme, they would have had an incentive to find a short term loan or other capital to cure the late payment prior to default instead of relying on their lender to place them in a foreclosure alternative program; they most likely would have never entered into the mortgage in the first place; and surely would

have never paid a dime to the defendants after they gave notice of default and foreclosure.

77. The impact of Aurora's practice of defaulting before processing a foreclosure alternative request by a homeowner, then dragging out the process while the homeowner is making monthly payments and denying blocks of HAMP modifications after obtaining a temporary modification is nothing more than a financial "Death Spiral" for the homeowner.

78. At all times herein mentioned, plaintiff and the Class was eligible for HAMP.

79. Plaintiff and the Classes' homes were a single family property and their primary residence or otherwise qualified.

80. The total amount of the unpaid balance of the loan did not exceed the program's maximum amount of $729,750 for qualification as of the time the plaintiffs and the Class initially requested or were placed in the temporary HAMP program.

81. Although the plaintiffs and the Class were eligible for the HAMP and complied with the terms of the temporary HAMP agreement, Defendants refused to offer such a permanent modification under the program or to take corrective action by providing loan modifications that produced more sustainable loan payments to plaintiff.

**8. Factual Allegations of the Yaus**

**A. The Original Loan**

82. On July 7, 2007 plaintiff Eddie Yau borrowed $608,000.00 from Homecomings Financial, LLC on a 30 year negative adjustable rate note to purchase his home where he lives with his wife. His payments were supposed to be fixed at $2,402.34 per month for the first five years of the loan.

83. Mr. Yau, a retired military veteran and mechanic, has no mortgage or home lending financial experience beyond basic financial matters.

84. Plaintiff relied on and placed his trust and confidence in the lender and broker, expecting an honest and accurate representation of the Loan terms and documents; neither the Lender nor its agent represented the Loan and terms accurately. At the time of taking out the Loan, Plaintiff was deceived by the lender and its agent to the true nature and ramifications of the Loan. For example, the disclosure provided a payment example of a loan never changing from the minimum of $832 per month to $1,459 per month in the first three years and the borrower who elected to make only the minimum payment of $832 per month had their loan increase by $62 to $894 after the first three years. Furthermore, at no time was it disclosed that Mr. Yau's wife, Gloria Yau (who was not a borrower on the Note or loan) would be included as a co-borrower when title was recorded for default and non-judicial foreclosure sale purposes. It was never disclosed that the lender or any future holder of his note could purchase a CDS which would pay off the lender if he defaulted on his loan and if he reinstated, the CDS proceeds would simply be a windfall to the owner.

**B. The Transfer of the Loan**

85. On or about April 1, 2008 Homecomings Financial, LLC assigned, sold or transferred the right to collect payments from plaintiff Eddie Yau to defendant Aurora Loan Services.

86. By that time his principal balance increased approximately $20,000.00, but the monthly payment was still fixed at $2,402.34 until the year 2012 at 8.375%.

87. Mr. Yau missed his July 2008 payment and on September 19, 2008 Aurora Loan Services sent Mr. Yau a letter explaining to him that he was in default and in order to cure the default had to remit $5044.92 within thirty day of the date of the letter.

88. Mr. Yau telephoned defendant Aurora Loan Services and explained he was experiencing financial difficulties due to a decrease in his income and inquired as to alternatives to foreclosure.

89. On or about September 24, 2008 defendant Aurora Loan Services sent a letter explaining the following programs it offered and that by entering into the programs the borrower "will avoid the loss of your home through foreclosure or further impairment on your credit."

"Repayment Plan: If you recently experienced a temporary reduction in income or an increase in living expenses, a repayment plan will allow you to repay the past due amount over a specified period of time.

Forbearance Plan: You may be able to suspend or reduce your mortgage payments for a short period of time. Thereafter, we would

review your current financial situation and determine what home retention option would best assist you in bringing your loan current.

Loan Modification:  A loan modification may offer you the ability to change on or more of the terms of your mortgage.  This may assist you with providing an affordable payment and avoiding foreclosure. Again, we would need to review your financial situation and ability to pay.  If your loan is current and you anticipate that you may have difficulty in making the increased monthly payment, we may be able to assist you with a loan modification that will provide you with an affordable payment based on your current financial information.

90. Then on December 02, 2008 defendant Aurora Loan Services wrote Mr. Yau which stated:

"Based upon the information that you provided during your telephone conversation with Aurora, your loan may qualify for a loan modification….You must provide documentation to support your inability to reinstate the mortgage loan in one lump sum…under some circumstances, *you may be expected to pay a loan modification fee.*" [Emphasis added]

91. Then on December 19, 2008 Aurora Loan Services sent Mr. Yau a letter noting Mr. Yau's was in default in the amount of $4,828.68 and that

"If you do not bring your loan current within thirty (30) days of the date of this letter, Aurora Loan Services may demand the entire balance outstanding under the terms of your Mortgage/Deed of Trust."

92. Aurora then followed up with the same letter of September 24, 2008 again on December 24, 2008 and January 20, 2009.

93. Instead of sending Mr. Yau a loan modification plan, defendant Aurora Loan Services sent him a Repayment Agreement expecting him to pay an additional $802.78 per month ($3,207.12 per month for 6 months) which equaled a 33% increase in his

monthly mortgage payment. This payment plan did not create a "more sustainable payment plan."

94. In 2009 the Yau's financial situation became worse as their investments were depleted from what was later characterized as a "Ponzi scheme."

95. From that time up to June 2009, plaintiff would telephone defendant Aurora seeking a modification and Aurora would take down information representing the defendants would start the process, but the process was never started.

96. Mrs. Yau spoke to a person at Aurora Loan Services named Steve who promised that someone from Aurora Loan Services would call them back no later than June 1st about the Making Home Affordable Loan Program.

97. On June 16, 2009 defendant Quality Loan Service Corp. served and recorded a purported Notice of Default and Election to Sell under Deed of Trust (NOD) stating that Mr. Yau was in default $12,655.67 as of 6/15/09.[5] Attached hereto and fully incorporated herein as **Exhibit 7** is a true and correct copy of the Defendants' Notice of Default on the Yaus' home. Attached hereto and fully incorporated herein as **Exhibit 9** is a true and correct copy of the Defendants' Notice of Sale of the Yaus' home.

---

[5] However, that Notice of Default was outside the chain of title because Lawyers Title Company, as the original trustee and Mortgage Electronic Registration Systems, Inc. as the nominee did not assign this right until June 24, 2009. Attached hereto and fully incorporated herein as **Exhibit 8** is a true and correct copy of the Assignment to Quality Loan Service which was not notarized until 6/24/09.

## C. The Temporary HAMP Modification

98.*After* the Notice of Sale was served and set, finally on or about September 24, 2009 defendant Aurora Loan Services faxed a "customized Home Affordable Modification Trial Period Plan ("Trial Period Plan")" under HAMP wherein Mr. Yau was supposed to make payments of $1,943.70 on 10/01/09, 11/01/09, and 12/01/09. (**Exhibit 3**)

99. The temporary HAMP agreement which is attached hereto and incorporated herein as **Exhibit 3** stated in part

> "If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Lender will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date."

100.   Aurora promised:

> "If you qualify under the federal government's Home Affordable Modification program and comply with the terms of the Trial Period Plan, we will modify your mortgage loan and you can avoid foreclosure."

101.   Plaintiff is informed and believes and alleges thereon he was qualified under the federal government's Home Affordable Modification program.

102.   Mr. Yau made the payments as laid out in the agreement under Section 2, provided the necessary documents and his representations in Section 1 continued to be true in all material respects, yet defendant Aurora Loan Services failed and refused to

**Class Action Complaint**                    24
*Yau v. Deutsche Bank National Trust Company Americas*

send the Modification Agreement to him for signature and refused to modify Mr. Yau's loan.

103.   When plaintiff did not hear anything from Aurora on December 1, 2009, he continued to make his monthly payment to Aurora.

104.   On or about March 6, 2010 defendant Aurora Loan Services sent a letter to Mr. Yau explaining,

> "Unfortunately, we are unable to offer you a Home Affordable Modification for the following reasons: Excessive Forbearance. We are unable to offer you a Home Affordable Modification because we are unable to create an affordable payment equal to 31% of your reported monthly gross income without changing the terms loan beyond the requirements of the program."

105.   Defendant's representation in that letter was false. According to Aurora Loan Service's Customer Account Activity Statement the principal balance on the loan was at $643,178.83 when he entered the temporary payment plan. Attached hereto and fully incorporated herein as **Exhibit 5** is a true and correct copy of the March 2010 letter.

106.   The true facts are that if the defendants had modified Mr. Yau's loan to the $1943.70 per month, defendants would have received at least $699,732.00 over the following 30 years or $932,976.00 over the following 40 years without having to forgive any principal or forebear any principal on the loan at all and without factoring in any of the monies it would have received from the U.S. Government under the HAMP program.

107.   The contract required Aurora to place the Yaus into a permanent modification if the NPV was greater under modification than a foreclosure sale. Plaintiffs allege the defendants breached by failing to place them in the permanent modification.

108.   Plaintiff is informed and believes and alleges thereon that Plaintiff's home at foreclosure would not have resulted in a sale in excess of the NPV of the modification.

109.   Plaintiff through counsel, demanded defendant's calculations used to deny plaintiff's modification and NPV.  To date, defendant failed to provide plaintiff with a HAMP-compliant modification or any documentation showing its calculations to justify why a permanent modification was not offered to Plaintiff.

110.   Mr. Yau's loan accelerated from $643,178.83 to $649,482.15 during the interim.

111.   Along with the notice that Mr. Yau did not qualify for the loan modification, defendant Aurora stated that Mr. Yau may qualify for other foreclosure alternatives such as

"Repayment Plan: allows you to repay the past due amount over a specified period of time.

Forbearance Plan:  allows you to suspend or reduce your mortgage payments for a short period of time until a long term solution is available.

Loan Modification:  allows us to modify one or more of your original mortgage terms which will provide you with an affordable payment based on your current financial information.

Pre-foreclosure Sale (short sale):  allows you to sell your property, pay off your mortgage for an amount less than total pay off to avoid foreclosure and minimize damage to your credit rating.

Deed in lieu of foreclosure:  allows you to voluntarily deed your property to Aurora Loan Services to payoff your mortgage.  Taking this action may not save your home, but it may help your ability to qualify for another mortgage in the future." (**Exhibit 5**)

## D. The Post-HAMP Special Forbearance:

112.   The Yaus telephoned Aurora and were assured that the defendants would work with the Yaus and that they could cure their default by having the lender temporarily forebear the terms of the agreement so that the Yaus could catch up.

113.   Consequently, Mr. Yau continued making monthly payments on his home and entered into a Special Forbearance Plan with defendant Aurora when they sent him the application to sign.

114.   On or about April 7. 2010 Defendant Aurora sent Plaintiffs a letter stating it had enclosed a "Special Forbearance Agreement which has been prepared on your behalf." On page 2 of the agreement it stated "WHEREAS, customer has requested and Lender has agreed to allow Customer to repay the Arrearage pursuant to a loan work-out arrangement on the terms set forth herein." Attached hereto and fully incorporated herein as **Exhibit 6** is a true and correct copy of the Yaus' Special Forbearance Agreement entered into post-temporary HAMP Agreement.

115.   However, there was no real consideration and the agreement was illusory because the Lender had been given the right to proceed with a foreclosure sale during the

**Class Action Complaint**                    27
*Yau v. Deutsche Bank National Trust Company Americas*

term of the agreement at its discretion and the terms never gave the Yaus an opportunity to repay the arrearage.

116.   The Plan was not the same as advertised in its prior letters to Mr. Yau or as represented on the telephone.  The forbearance Plan did not allow Mr. Yau to suspend or reduce his mortgage payments for a short period of time until a long term solution was available.

117.   Mr. Yau made the required $4,804.72 initial payment and monthly payments of $2,875.00 but he was only getting further in debt.

118.   The true facts were that his payments were increased to $2,875.00 per month and no other terms of his loan were modified or suspended during the forbearance period.  He was still in default and the foreclosure sales were still pending.

119.   Furthermore, the terms of the Agreement violated California law. There was no notice in the NOD that defendant received an exemption from the California Commissioner so that defendant was not bound to create foreclosure alternatives within the confines of California law. (Exhibits 7 & 9).

**E. 2010 HAMP Application Attempts through Counsel**

120.   Mr. Yau continued to make the $2,875.00 monthly payments and sought counsel who prepared and submitted another HAMP application requesting modification or other alternatives to foreclosure in September 2010 explaining time was of the essence

due to the fact that Mr. Yau's negative amortization on Mr. Yau's loan was putting him dangerously close to the HAMP cap.

121.   A package was prepared with all documents required under the HAMP program and submitted to Aurora Loan Services on or about September 22, 2010.

122.   Defendant sent several responses alleging they did not have all paperwork and on or about November 8, 2010 it sent a letter stating the HAMP application was denied on the grounds "we have not received the documents/information requested from you."

123.   On September 30, 2010 Plaintiff's gross monthly income was approximately $6,700; a monthly payment based on 38% of Mr. Yau's gross monthly income would be $2,546 and $2,077 based on 31%.

124.   After deducting $525 for tax and insurance payments, $2,021 would have applied to the loan each month (2546-525= $2021 for 40 years).  Amortized over 30 years, a stream of $2021 monthly payments under the program results in a Net Present Value in excess of approximately $700,000.00.  Alternatively, amortized over 40 years, a stream of $2021 payments under the program result in a Net Present Value in excess of approximately $900,000.00.

125.   Instead of putting Mr. Yau into a temporary modification, they delayed processing, requesting the same documents they already had over and over again.

126.   As a result of defendants' unlawful practices, unfair acts and failure to place Mr. Yau into a permanent HAMP loan modification on December 1, 2009, his loan as of October 10, 2010 approached the HAMP cap.

| | |
|---|---:|
| Total Unpaid principal | $664,711.59 |
| Interest from 12/1/09 to 10/10/10 | 47,916.49 |
| Escrow/Impound Overdraft | 12,983.09 |
| Corporate advance | 3,652.84 |
| Unpaid Late Charges | 120.12 |
| Recording Fee | 37.00 |
| Suspense Balance | -2,345.75 |
| Total: | $727,075.38 |

127.   On November 5, 2010 defendant Aurora sent notice that it intended on increasing Mr. Yau's monthly loan payment to $5,466.57 on 3/01/11.

128.   Defendant then notified Mr. Yau it intended to sell his home on 12/13/10.

129.   Consequently, Mr. Yau's counsel sent a third HAMP application in November 2010, requesting other alternatives including principal reduction.

130.   On November 17, 2010 defendant Aurora acknowledged receipt of the application and then on that same date sent another letter stating that items were missing.

131.   Plaintiff, through their counsel, sent the information again. Defendants demanded more bank statements, plaintiff, through their counsel sent them. To date

defendant Aurora still contends it needs even more bank statements before they can process the request.  Defendants then denied that HAMP application on the grounds the investor considered it to be excessive forbearance in December 2010.

132.   From September 2008 when Mr. Yau was behind by approximately $5,000.00 through present plaintiff has paid defendants approximately $54,293.08. This is very close to the amount he would have paid the defendants if he had never defaulted on the loan in the first place ($2402.34*24 months = $57,656.16).

133.   Plaintiff further alleges the defendants were deceptive and unlawful in their handling of the loans and business practices.  Examples in the Yaus' case, include but are not limited to the fact that defendant has not rescinded the Notice of Default or Notice of foreclosure sale although the Notice was filed before Quality Loan Services received assignment and as such is outside the chain of title.  Failing to send the plaintiffs a loan modification application until after they filed a Notice of Default. Additionally, flood hazard insurance was not required on the Yaus loan but the defendants charged Mr. Yau $1592.00 for flood hazard insurance after the loan went into default in addition to other fees and charges for allegedly driving by the home and such.  Also, Defendant obtained an exemption to allow defendant Aurora to offer modifications and other programs in excess of 38% of the borrower's income from the California Commissioner but defendant never notified plaintiff of that fact as required under California law and never took the foreclosure off of the home when it was notified of this failure to notify.

Defendants failed and refused to request partition even after being notified only Mr. Yau was on the Note and Mrs. Yau at most was a trustee and was given no consideration for her name to be placed on their filed recordings as a "co-borrower" for non-judicial foreclosure purposes.

## 9.Class Action Allegations

134.   Plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of the themselves and on the following Class and Subclass consisting of:

> California homeowners who were denied permanent HAMP loan agreements after entering in a temporary HAMP agreement with defendant Aurora whose loans are owned by defendant Deutsche Bank, and making their payments as requested under the temporary HAMP agreement.

> Subclass:

> All members of the Class who entered into a Special Forbearance agreement with Aurora and made additional payments under the Special Forbearance agreement after the termination of the temporary HAMP agreement.

135.   Excluded from the Class are governmental entities, defendants, and their affiliates, subsidiaries, current or former employees, officers, directors, agents, representatives, their family members, the members of this Court and its staff.

136.   Plaintiffs do not know the exact size or identities of the members of the proposed class, since such information is in the exclusive control of the Defendants. Plaintiffs believe that the Class encompasses over 25 individuals California homeowners

**Class Action Complaint**
*Yau v. Deutsche Bank National Trust Company Americas*

which could reach into the thousands whose identities can be readily ascertained from Defendant's books and records. Defendants filed over 4,000 foreclosure documents with the Orange County Recorder's office in 2010 alone. Therefore, the proposed Class are so numerous that joinder of all members is impracticable.

137.   Based on the market value of these homes in foreclosure and the size of the payments made by the Class members under the temporary HAMP agreements and thereafter, plaintiffs believe the amount in controversy could range anywhere from $1,250,000 for the first 25 members to over $2 billion dollars for the entire anticipated class.

138.   All members of the Class have been subject to and affected by the same conduct. The claims are based on wrongfully forcing the Class into default before implementing a temporary modification under HAMP then wrongfully denying the permanent HAMP modification after the Class made the payments under HAMP.

139.   There are questions of law and fact that are common to the Class, and predominate over any questions affecting only individual members of the Class. These questions include, but are not limited to the following:

    a.   The validity of the contracts at issue in this case (*See, Black Gold Marine, Inc. v Jackson Marine Co.* (5th Cir 1985) 759 F2d 466, 471);

    b.   The nature, scope and operation of defendants' obligations to the borrowers under the Servicer Participation Agreements entered into between Aurora

and Fannie Mae (*See, Topps Chewing Gum, Inc. v Fleer Corp.* (2nd Cir 1986) 799 F.2d 851, 856);

c.  The defendants' obligations to the borrowers when the borrower holds a CDS or some similar type of security/insurance against default on the borrower's loan;

d.  Whether the existence of a CDS or similar type of security/insurance to a borrower should be disclosed at the time the borrower signs the promissory note and mortgage or as soon as the lender obtains a CDS contract that could cover the loan.

e.  Whether the failure to disclose the existence of a CDS or similar type of security/insurance to a borrower before default is a breach of good faith and fair dealing;

f.  The Class' right to terminate and rescind the contracts at issue in this action (*See, Leisure Time Productions, B.V. v Columbia Pictures Indus. Inc.* (2nd Cir. 1994) 17 F3d 38, 39-40).

g.  The nature, scope and operation of defendants' obligations to the borrowers under the temporary HAMP agreements;

h.  Whether the temporary HAMP agreements created any legally binding obligation on the defendants;

i.  Whether the agreements entered into by the borrowers after they were denied a permanent HAMP agreement were void ab initio for failure or partial failure of consideration;

j.  Whether the agreements entered into by the borrowers after they were denied a permanent HAMP agreement were illusory;

k.  Whether the promissory note and mortgage agreements entered into by the borrowers after the owner purchased a CDS or similar security/insurance were void ab initio for failure to disclose this adverse interest or partial failure of consideration;

l.  Whether defendants actions failed to take corrective action by providing loan modifications that produced more sustainable loan payments;

m. Whether the plaintiffs and the Class ("borrowers'") payments after the Notice of Default were the result of fraud of duress;

n.  Whether the borrowers are entitled to rescind the temporary HAMP agreements;

o.  Whether the borrowers are entitled to rescind all payments made to the defendants after the temporary HAMP agreements ended;

p.  Whether the borrowers are entitled to rescind all agreements entered into after the temporary HAMP agreement;

q.  Whether, following rescission, the borrowers are entitled to the return of the consideration paid to the defendants under the agreements after default;

r.  Whether Aurora violated California law by using false, deceptive, and misleading statements and omission in connection their collection of Plaintiffs' and the Class's mortgage debt;

s.  Whether defendants actions or failure to act constituted a breach of their obligation of good faith and fair dealing;

t.  Whether contracts implied in fact were created when Aurora required the borrowers to continue to make payments after the temporary HAMP agreement expired;

u.  Whether Aurora was required to rescind or otherwise nullify the pending foreclosure proceedings for all borrowers who were still being considered for a HAMP modification after the OCC stated "HAMP guidelines now preclude a servicer from initiating a foreclosure action until the borrower has been deemed ineligible for a HAMP modification."

v.  Whether the disclosure of the credit default swaps or other types of investment security/insurance were "material" under federal law;

w.  Whether the plaintiff and the Class members are intended beneficiaries of the agreement between defendant Aurora and Fannie Mae/Freddie Mac;

x. Whether defendant Aurora breached its agreement with Fannie Mae/Freddie Mac;

y. Whether defendant Aurora failed to disclose a material fact to Fannie Mae/Freddie Mac as required under its contract with them to the detriment of its intended beneficiaries;

z. Whether defendants conduct as described in this Complaint constituted fraud or duress;

aa. Whether defendants were unjustly enriched;

bb. Whether defendants acts and practices described herein constitute unfair or deceptive business practices under California Unfair Competition Law ("UCL")

cc. Whether injunctive relief is appropriate

dd. Whether specific performance is appropriate

ee. Whether punitive or exemplary damages are appropriate

140.   The claims of the individual named Plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that both the Plaintiffs and the other members of the Class were subjected to the same conduct, were subjected to the terms of the same agreement and were all served a Notice of Default before being allowed into the temporary HAMP agreement which was met with denial of permanent modification.

141.   The individually named Plaintiffs will fairly and adequately protect the interests of the Class.  They are committed to the vigorous prosecution of the Class' claims and have retained attorneys who are qualified to pursue this litigation.

142.   A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

143.   The putative class action meets the requirements of Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

144.   The nature of notice to the proposed class required and/or contemplated is the best practicable method possible and contemplated the defendant's list when disclosed would most likely be mailing to the property addresses affected by the filed foreclosures and internet and other general notices are contemplated to ensure notice.

145.   Defendants have acted or refused to act on grounds that apply generally to the Class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## 10. Claims for Relief

### FIRST CAUSE OF ACTION

### Breach of Temporary HAMP Agreement

146.   Plaintiff incorporates in this cause of action all of the allegations in paragraphs 1 through 147 as though set forth in full herein.

147. Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class and the Subclass described above.

148. Defendant Aurora and the Plaintiffs and Class entered into a Temporary HAMP agreement as alleged above, a true and correct copy of the Plaintiff's agreement is attached hereto and fully incorporated herein as **Exhibit 3.**

149. Defendant Aurora agreed to permanently modify plaintiff and each members of the Class's loan if plaintiffs and the Class complied with the terms of the temporary modification.

150. Plaintiff and the Class complied with the terms of the temporary modification, except for those terms and conditions that were excused or waived.

151. Defendant unjustifiably and inexcusably breached the contract by failing to perform its obligations thereunder as described above.

152. As a result of defendant's breach, plaintiff's loan was not permanently modified causing injury to the plaintiff and Class.

153. Plaintiffs and the Class seek specific performance or if specific performance cannot be granted, reformation of the contract from temporary to permanent under the same monthly payment terms for a term of 30 years or if reformation of the contract cannot be granted, damages according to proof and reserve the right to seek equitable remedies to rescind the payments made to defendants under guise of performance of this contract and disgorgement of profits made on the Plaintiffs

and the Class loans above reasonable rental value of their homes from the time the loans originated.

## SECOND CAUSE OF ACTION

### Breach of Written Contracts – Third Party Beneficiary

154.   Plaintiffs repeat and re-allege every allegation in paragraphs 1 through 153 as though set forth in full herein.

155.   Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class and Subclass described above.

156.   Plaintiffs and the Class members are third party beneficiaries to the contract attached hereto and fully incorporated herein as **Exhibit 1** and to the Amended and Restated contract attached hereto and fully incorporated herein as **Exhibit 2**.

157.   Plaintiff and the Class are intended beneficiaries under the contracts.

158.   Defendants Aurora and Deutsche Bank, jointly and severally, unjustifiably and inexcusably breached the Contract by failing to perform their obligations thereunder as described above.

159.   Defendants' breach of the contract resulted in harm to plaintiff.

160.   Pursuant to California Civil Code §1559 and/or federal law, plaintiff may enforce the contract's provisions.

161.   Plaintiffs and the Class seek specific performance or if specific performance cannot be granted, reformation of the contract from temporary to

permanent under the same monthly payment terms for a term of 30 years or if reformation of the contract cannot be granted, damages according to proof and reserve the right to seek equitable remedies to rescind the payments made to defendants under guise of performance of this contract and disgorgement of profits made on the Plaintiffs and the Class loans above reasonable rental value of their homes from the time the loans originated.

## THIRD CAUSE OF ACTION

### Specific Performance

162.   Plaintiff incorporates in this cause of action all of the allegations in paragraphs 1 through 161 as though set forth in full herein except for the allegations made in the First, Second, Third, Fourth, Seventh and Eighth cause of action.

163.   Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class and Subclass described above.

164.   In the alternative to the First and Second causes of action plaintiff alleges the following:

165.   As described above the Plaintiffs and Class entered into written temporary HAMP agreements with the defendants. (**Exhibit 3**)

166.   In accord with this agreement, the Plaintiffs and the Class tendered payment to the defendants and defendant promised to reinstate and modify the plaintiffs and the Class' loans permanently at the end of the payment plan and conveyance of the

land in the form of releasing/extinguishing or otherwise disposing of the Defaults and Notice of Sale of Foreclosure on the land.

167.   Defendants accepted the tendered payments but refused to permanently modify the borrowers' loans under the HAMP program and convey the land back to the Plaintiffs and the Class in the form of releasing/extinguishing or otherwise disposing of the Notices of Default and Notices of Foreclosure Sale on the land.

168.   Wherefore plaintiffs and the Class hereby demand (1) that defendant be required specifically to perform said agreement; (2) damages in the sum of $1,000.00; and (3) that if specific performance is not granted, plaintiff be granted damages in a sum to be proven at trial and any further relief the court deems just and equitable.

## FOURTH CAUSE OF ACTION

### Unjust Enrichment

169.   Plaintiff incorporates in this cause of action all of the allegations in paragraphs 1 through 168 as though set forth in full herein.

170.   Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class and Subclass described above.

171.   California is a non-judicial foreclosure state wherein after a Notice of Default has been filed and served, the lender has no right to collect any more money from the borrower. Deficiency judgments are not allowed.

172.   Defendants were unjustly enriched as follows:

a. As a result of the above described scheme, Defendants extracted millions of dollars in payments from Plaintiffs and the Class that they would not have been entitled to collect after placing the plaintiffs and the Class in default had they not engaged in the scheme as described herein; and/or

b. As a result of the above described scheme, Defendants cashed in on their entire "loss" on the borrowers loan on default through a CDS or other similar security/insurance and any money received through any government economic Stabilization Act or similar program, any sale proceeds of the home through foreclosure, or any money from the borrowers after default was a windfall which they would not have been entitled to had they not engaged in the scheme as described herein; and/or

c. As a result of the above described scheme, Defendant Deutsche Bank was in essence the landlord from the time of initiating the home loan, with every intention to cash in on the CDS or similar security/insurance when the time became ripe to do so. However, the plaintiffs and Class paid more for their homes with the monthly mortgage payments than the property's reasonable rental value prior to default and more in form of a down payment than is allowed as a security deposit for rentals under California law than what defendant Deutsche Bank would have received by renting

the same property resulting in unjustly enriching the defendant in an amount to be determined at trial.

173.   Defendants are aware of its receipt of the above-described benefits.

174.   Defendants received the above-described benefits to the detriment of Plaintiff's and the Class.

175.   Defendants Deutsche Bank and Aurora continue to retain the above-described benefits to the detriment of Plaintiffs and the Class.

176.   As a result of Defendants' unjust enrichment, Plaintiffs and the Class have sustained damages in an amount to be determined at trial (which include legal and other fees in excess of the principal and interest due on their loans) and seek full disgorgement and restitution of Defendants' enrichments, benefits, and ill-gotten gains acquired as a result of the wrongful conduct alleged above.

## FIFTH CAUSE OF ACTION

### Unlawful and Unfair Acts and Practices

177.   Plaintiff incorporates in this cause of action all of the allegations in paragraphs 1 through 176 as though set forth in full herein.

178.   Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class and Sub-Class described above.

179.   California's Unfair Competition Law (UCL) defines unfair competition to include any "unlawful, unfair, or fraudulent" business act or practice. Cal Bus & Prof Code 17200 et seq.

> By its terms, the statute is broad in scope. "It governs „anti-competitive business practices□ as well as injuries to consumers, and has as a major purpose „the preservation of fair business competition.□ [Citations.]" (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180.) "By defining unfair competition to include any „*unlawful* . . . business act or practice□ [citation], the UCL permits violations of other laws to be treated as unfair competition that is independently actionable. [Citation.]" (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 949.) In addition, under the UCL, "„a practice may be deemed unfair even if not specifically proscribed by some other law.□ [Citation.]" (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1143.) The remedies available under the UCL are "cumulative . . . to the remedies or penalties available under all other laws of this state." (Bus. & Prof. Code, § 17205.) *Arce v Kaiser Foundations Health Plan, Inc.* (2010)

180.   Defendants have violated Cal Bus & Prof Code §17200 et seq with the following conduct:

   a. Defendants have a pattern and practice of applying all payments to the late charges and other fees and expenses first after the borrower is late, and application of payments avoided the programs guidelines to exclude late payments and other charges from the calculations for HAMP eligibility which as applied, constitutes an unlawful, unfair or fraudulent business act or practice in violation of UCL, and/or

b. Defendants have a pattern and practice of padding the loan with other charges and expenses and in some cases even insurance that was not needed after defaulting on the loans, and this pattern and practice of padding these loans constitutes an unlawful, unfair or fraudulent business act or practice in violation of UCL, and/or

c. Defendants have a pattern and practice of demanding all post default payments to be paid by Western Union or other similar cash type manner to those borrowers who loans were placed in temporary HAMP plans while simultaneously keeping them in foreclosure (in essence taking their money and keeping the ability to foreclose simultaneously), and this practice constitutes an unlawful, unfair or fraudulent business act or practice in violation of UCL, and/or

d. Defendants have a pattern and practice of refusing to provide permanent loan modifications to those borrowers who loans were placed in temporary HAMP plans but were covered by CDS or other securities/insurance, and this refusal to provide permanent loan modifications constitutes an unlawful, unfair or fraudulent business act or practice in violation of UCL, and/or

e. Defendants have a pattern and practice of refusing to place the homeowners in this Class in a temporary HAMP plan prior to forcing the homeowner's

into default, and this refusal to place them in a temporary HAMP plan prior to default constitutes an unlawful, unfair or fraudulent business act or practice in violation of UCL.

f.  Defendants' breach of contract is an unlawful and unfair business practice or act under the Unfair Competition Law of Business and Professions Code section 17200, et seq.

g.  Defendant Aurora's pattern and practice of sending a campaign of letters to the plaintiffs and the Subclass (excluding the members of the Class that are not part of the Subclass) representing that the special forbearance plan would allow the plaintiffs and the Subclass to suspend or reduce their mortgage payments for a short period of time until a long term solution was available, then sending a forbearance agreement that did not suspend or reduce their mortgage payments for a short period of time until a long term solution was available was an unlawful and unfair business practice or act under the Unfair Competition Law of Business and Professions Code section 17200, et seq. and/or

h.  The conduct of Aurora as set forth herein constitutes an unlawful, unfair or deceptive acts or practices, its practice of leading borrowers to believe that they will have an opportunity to enter into a permanent HAMP modification if they made all of the payments requests at the expiration of

the temporary HAMP Agreements and its practice of filing the Notice of Default and Notice of Sale before offering the temporary HAMP Agreements only to obtain additional moneys from borrowers that under California's foreclosure laws it would not be entitled to collect and to avoid the waiting period required to resume a foreclosure after offering the program to the borrower, and/or

i.    Defendant Aurora engaged in "fraudulent" business practices under the UCL because its temporary HAMP Agreements and post temporary HAMP Agreements were intended and likely to mislead the public into believing that if they made the additional payments that Aurora required they would have an opportunity to cure their loan defaults with a permanent HAMP modification or similar type of agreement prior to foreclosure.   A true opportunity to cure their defaults was "material" to Plaintiffs and the Class within the meaning of *In re Tobacco II Cases*, (2009) 46 Cal 4th 298, 325, and/or

j.    Aurora engaged in "unlawful" business practices under the UCL based on its violations of the Security First Rule, Cal Code Civ Pro 726 which states in pertinent part:

(a) There can be but one form of action for the recovery of any debt or the enforcement of any right secured by mortgage upon real property or an estate for years therein, which action shall be in accordance with the provisions of this chapter. n the action the court may, by its

judgment, direct the sale of the encumbered real property or estate for years therein (or so much of the real property or estate for years as may be necessary), and the application of the proceeds of the sale to the payment of the costs of court, the expenses of levy and sale, and the amount due plaintiff, including, where the mortgage provides for the payment of attorney's fees, the sum for attorney's fees as the court shall find reasonable, not exceeding the amount named in the mortgage.

(b) The decree for the foreclosure of a mortgage or deed of trust secured by real property or estate for years therein shall declare the amount of the indebtedness or right so secured and, unless judgment for any deficiency there may be between the sale price and the amount due with costs is waived by the judgment creditor or a deficiency judgment is prohibited by Section 580b, shall determine the personal liability of any defendant for the payment of the debt secured by the mortgage or deed of trust and shall name the defendants against whom a deficiency judgment may be ordered following the proceedings prescribed in this section....

k.  Aurora engaged in "unfair" business practices under the UCL because it violated the laws and underlying legislative policies concerning: (1) foreclosure prevention; (2) the unavailability of deficiency judgments after a lender exercised its election to sell under non-judicial foreclosure; and (3) the rights of contracting parties to enjoy the benefits of their agreements after having paid valuable consideration for such benefits.

181.  Aurora's acts and practices violate established public policy and the harm they cause to consumers in California greatly outweighs any benefits associated with those practices.

182.  As a proximate result of defendant Aurora's conduct, plaintiff was injured. Aurora's conduct as set forth herein resulted in loss of money or property to Plaintiffs

**Class Action Complaint**                    49
*Yau v. Deutsche Bank National Trust Company Americas*

and Class members, including (1) principal and interest that they were not obligated to pay after Aurora elected to exercise non-judicial foreclosure and to which Aurora had no ability to collect after foreclosure; and (2) legal and other fees that Plaintiffs and the Class members paid to Aurora under the temporary HAMP Agreements and post temporary HAMP Agreements.

183.   Plaintiffs and the Class seek the same type of relief being sought in the first five causes of action, and any other relief that the court deems appropriate.

## SIXTH CAUSE OF ACTION

## (Fraud/Concealment of Material Fact)

184.   Plaintiff incorporates by reference the allegations in paragraphs 1 through 183 as though fully set out herein.

185.   Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class and Subclass described above.

186.   As more fully described above defendants concealed the following material facts that they had a duty disclose:

1.   Defendants Deutsche Bank and Aurora concealed the material fact that Deutsche Bank National Trust Company Americas as trustee was the owner of the note and mortgage loan until after the plaintiffs and Class were thrown into default on their loans.

**Class Action Complaint**                                    50
*Yau v. Deutsche Bank National Trust Company Americas*

m. Defendant Deutsche Bank concealed the material fact that the plaintiffs and Class's loans were covered with CDS or other similar security/insurance after the defendant defaulted the plaintiffs and Class's loans.

n. Defendant Aurora concealed a material fact that the way the contract was written between Fannie Mae and Aurora, there was a substantial amount of loans aimed at receiving a more sustainable and affordable mortgage under HAMP that would not pass the NPV test because the lenders such as defendant Deutsche Bank had purchased credit default swaps or other types of investment security/insurance against these mortgages.

187.   In plain language, the very types of mortgages the federal HAMP program was designed to protect were the very types of mortgages that were not being protected by the terms of the agreement between Aurora and Fannie Mae. The lenders like defendant Deutsche Bank knew it. The servicers such like defendant Aurora knew or should have known it and the plaintiffs and the Class in this action didn't have a clue.

188.   Aurora was under a duty by the terms of the contract with Fannie Mae to disclose this material fact to Fannie Mae when it entered into this Agreement or when it learned of this material fact from defendant Deutsche Bank.  The defendants were under a duty to disclose the owner of the loan.

189.   The suppression of this fact was likely to mislead and did mislead Fannie Mae, the plaintiffs and the Class.

190.   The representations and failure to disclose information and suppression of the information herein alleged to have been made by defendant were made with the intent to induce plaintiffs and the Class to act in the manner herein alleged in reliance thereon.

191.   In reliance upon the representation that defendants were qualified to offer the HAMP program to plaintiffs and the Class and without knowing that their loans were asset-backed pass-through securities held by Deutsche Bank who bought credit default swaps or other types of investment security/insurance or what that really meant, the plaintiffs and the members of the Class continued to make payments on their mortgage after they were in default and entered into the temporary HAMP agreements as described above believing if they continued to make their payments they would be accepted into a permanent HAMP modification.

192.   Plaintiffs and the members of the Class, at the time these failures to disclose and suppressions of facts occurred, and at the time plaintiff took the actions herein alleged, was ignorant of the existence of the facts which defendant suppressed and failed to disclose.   If plaintiff had been aware of the existence of the facts not disclosed by defendant, plaintiff would not have paid these additional amounts to the defendants after default; may not have even signed the note or mortgage loan; and most likely would not have relied on defendant Aurora's representations which lulled them into default without looking beyond the servicer for an alternate solution.

193.   As a proximate result of Defendants' fraudulent conduct as herein alleged, plaintiffs and the Class were induced to disclose all of their private financial information and pay Aurora additional monies without any real consideration by reason of which plaintiffs and the Class have been damaged in the sum of their payments so made.

194.   Plaintiffs and the Class seek specific performance or if specific performance cannot be granted, reformation or if reformation cannot be granted, offset, equitable remedies to rescind the payments made to defendants under guise of performance of this contract and disgorgement of profits made on the Plaintiffs and the Class loans above reasonable rental value of their homes from the time the loans originated.

195.   The aforementioned conduct of defendant(s) was an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant(s) with the intention on the part of the defendant(s) of thereby depriving plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected plaintiff to a cruel and unjust hardship in conscious disregard of plaintiff's rights, so as to justify an award of exemplary and punitive damages.

## SEVENTH CAUSE OF ACTION

### Fraud and Deceit – (Fraudulent Inducement of Consent)

196.   Plaintiff incorporates in this cause of action all of the allegations in paragraphs 1 through 195 as though set forth in full herein.

197.  Plaintiffs bring this complaint on their own behalf and on behalf of each member of the Class and Subclass described above.

198.  Consent to the temporary modification under the HAMP program and extended special forbearance was not real or free in that it was obtained solely through fraud and misrepresentations as herein alleged.

199.  Plaintiffs thus seek to rescind the agreements under California Civil Code section 1689(b)(1).  Plaintiffs have retained no consideration provided by defendants Aurora or Deutsche Bank that can be tendered back to Aurora or Deutsche Bank prior to rescission.

200.  Aurora led plaintiffs and the Class to believe that it wanted to help Plaintiffs and the Class maintain ownership of their homes.  In particular, Aurora sent the letters and made the statements described herein.

201.  Through the temporary HAMP agreement and Special Forbearances, and the letters and phone calls described herein, Aurora led Plaintiffs and the Class to believe that their default on their homes would be cured and they would eventually be reinstated through a permanent HAMP modification as long as Plaintiffs and the Class continued to make payments under the program.

202.  Through the language of the temporary HAMP agreement, Aurora led Plaintiffs and the Class to believe that they would know whether they were approved for

a loan modification and would have a genuine opportunity to obtain a permanent HAMP modification.

203.   In truth and fact, Aurora would ensure that NOD and NOS were on file before plaintiffs and the Class were offered a temporary modification under the HAMP program so that Aurora could execute the Trustee's sale and foreclose after obtaining the payments knowing that these Plaintiffs and this Class would not be reinstated with a permanent modification.

204.   Aurora represented that at the expiration of the temporary HAMP modification, plaintiffs and the Class would have an opportunity to sign a permanent modification if they made their payments as requires.

205.   At the time that Aurora made these representations, Aurora know or should have known that they were not true.

206.   Aurora made these representations with the purpose of persuading Plaintiffs and the Class to enter into the temporary HAMP Agreements and post HAMP agreements such as the Special Forbearance agreements and to continue to make payments of thousands of dollars.

207.   Plaintiffs and the Class reasonably relied on these representations.

208.   Plaintiffs and the Class would not have entered into the temporary HAMP modification and post HAMP agreements and paid thousands of dollars to defendants Aurora and Deutsch Bank after default had they known that they would not have a

genuine opportunity to obtain a permanent modification under HAMP or cure their default.

209.   As a proximate result of defendant's conduct plaintiffs and the Class have been injured.

210.   Plaintiffs and the Class seek rescission of the Agreements and will suffer irreparable harm if the payments wrongfully collected are not returned.

## EIGHTH CAUSE OF ACTION

### Fraud and Deceit – (No Consideration)

211.   Plaintiff incorporates in this cause of action all of the allegations in paragraphs 1 through 210 as though set forth in full herein.

212.   Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class and Subclass described above.

213.   As consideration for the temporary HAMP Agreements, Plaintiffs and the Class made payments to Defendant totaling thousands of dollars.  These payments were made after Aurora had exercised its election to foreclose and had filed Notices of Default and Notices of Foreclosure Sale.  As such, Plaintiffs and the Class had no continuing obligation to make payments under their notes, and had no obligation to pay the legal and other fees that Aurora required them to pay under the agreements. Plaintiffs and the Class voluntarily chose to make these payments to Aurora because Aurora led them to believe that by doing so Plaintiffs and the Class would receive in

return an opportunity to cure the defaults on their loans through a permanent loan modification under HAMP prior to completion of a foreclosure sale.

214. Consideration from Aurora was the combination of postponement of foreclosure and an opportunity to cure. Plaintiffs and the Class would not have entered into the agreements and paid thousands of dollars to defendants Aurora and Deutsche Bank if the only consideration from Aurora and Deutsche Bank was a temporary delay in foreclosure.

215. Defendants' consideration was illusory because they had no intention to and did not provide the Plaintiffs with a permanent HAMP modification that it had promised.

216. Plaintiffs and the Class would not have entered into the temporary HAMP Agreements had they known that Defendant's consideration would fail in material part or be rendered void.

217. As a proximate result of the defendants conduct, the plaintiffs and the Class were injured.

218. Plaintiffs and the Class seek specific performance of the temporary HAMP agreement by converting it to a permanent modification on the same terms and if specific performance cannot be granted; rescission of all of the agreements as a result of these failures of consideration. Plaintiffs have no other adequate remedy at law and will

suffer irreparable harm if the agreements are not rescinded and if the fees paid (which included legal and other fees not required to be paid under their notes) are not returned.

## NINTH CAUSE OF ACTION

### Declaratory Relief/Injunction

### (As between plaintiff Gloria Yau and defendants Deutsche Bank and Aurora Only)

219.  Plaintiff incorporates in this cause of action all of the allegations in paragraphs 1 through 218 as though set forth in full herein.

220.  Plaintiff Gloria Yau always held title in the home described in the complaint and in the Notice of Default and Foreclosure Sale attached hereto as exhibits.

221.  Plaintiff Gloria Yau was not a signer on the Note and was not a co-borrower on the loan, in fact.

222.  Defendants contend that they have the right to non-judicially foreclose on plaintiff Gloria Yau's home, and conduct a trustee's sale relative to that property and evict her.

223.  Plaintiff contends that Defendants do not have a right to foreclose on her portion of the home.

224.  An actual controversy presently exists between Plaintiff Gloria Yau and Defendants as to the existence of the ability or right to foreclose on her home and evict her.  A judicial decision is necessary and appropriate at this time so that Plaintiff Gloria

Yau and Defendants may ascertain their respective rights relative to Plaintiffs and the Class's homes.

## TENTH CAUSE OF ACTION

### Declaratory Relief

225. Plaintiff incorporates in this cause of action all of the allegations in paragraphs 1 through 224 as though set forth in full herein.

226. Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class and Subclass described above.

227. There is a question as to the validity, the terms and meanings of the contracts as well as the right to terminate the contracts through rescission in this action.

228. Defendants contend that they have the right to foreclose on plaintiffs and the Class's homes, and conduct a trustee's sale relative to that property and evict them.

229. Plaintiffs and the Class contend that Defendants do not have a right to foreclose on their homes and conduct a trustee's sale relative to their property as Defendants have not complied with either their contractual obligations under the Agreements and/or they have failed to comply with the California laws as stated above.

230. An actual controversy presently exists between Plaintiffs and the Class and Defendants as to the existence of, validity, terms, meaning and "terminability" of the contracts at issue in this action and the ability or right to foreclose on Plaintiffs and the Class's homes and evict. A judicial decision is necessary and appropriate at this time so

that Plaintiffs, the Class and Defendants may ascertain their respective rights relative to Plaintiffs and the Class's homes.

## ELVENTH CAUSE OF ACTION

### Constructive Trust

231.   Plaintiff incorporates in this cause of action all of the allegations in paragraphs 1 through 230 as though set forth herein.

232.   Plaintiff is informed and believes and alleges thereon that the wrongful conduct alleged herein, and/or CDS or other securities/insurance that was purchased by the defendants on plaintiff and the Class's homes created a constructive trust.

233.   As a proximate result of the defendants' fraudulent misrepresentations and failure to disclose material facts and otherwise wrongful conduct as alleged in this Complaint, plaintiff and the Class has been harmed as alleged herein.

234.   The defendants are holding the proceeds from the credit default swaps (CDS) or other securities/insurance for the benefit of the plaintiffs and the Class.

235.   By reason of the fraudulent and otherwise wrongful manner in which the defendant, or any of them, obtained their alleged right, claim or interest in and to the property, defendants, and each of them, have no legal or equitable right, claim or interest therein, but instead, Defendants, and each of them, including their agents, RALI and Quality Loan Service, are involuntary trustees holding said property and profits

therefrom in constructive trust for the Plaintiffs and the Class with the duty to convey

the same to Plaintiff s and the Class forthwith.

## 11. PRAYER FOR RELIEF

**WHEREFORE, Plaintiffs pray for judgment** against defendant Aurora and

defendant Deutsche Bank, jointly and severally, as follows:

**A.** Certify this case as a class action and appoint the named Plaintiffs to be Class

representatives and their counsel to be Class counsel;

**B.** Enter a judgment ordering the Defendants to specifically perform or if specific

performance cannot be granted, reformation of the contract from temporary to

permanent under the same monthly payment terms for a term of 30 years (or

other terms that are deemed just) or if reformation of the contract cannot be

granted, damages according to proof and if damages cannot be granted, a

judgment in equity rescinding all contracts between the defendants and

plaintiffs and the Class, payments and disgorgement of profits made on the

Plaintiffs.

**C.** For a judicial determination and decree that the plaintiffs and each member of

the Class were eligible for the HAMP program and met all conditions under

their temporary HAMP modification agreements qualifying them for permanent

HAMP modification; and

1. Reformation of the temporary HAMP agreements into permanent HAMP agreements.

**D.** For a judicial determination and decree that neither Aurora nor Deutsche Bank has the authority to foreclose on the homes in this Action; and

    1. As to Gloria Yau only, to enjoin defendants from further representing that they have any such ownership interest therein; and

    2. As to the remaining plaintiffs and the Class, to enjoin the defendants from foreclosing on the home in this Action;

**E.** If no legal remedy can be rendered, then in equity, a judicial determination and decree that the agreements are not valid or *void ab initio*; and

    1. Rescission of the agreements;

**F.** Grant a permanent or final injunction enjoining defendants,  and their agents and employees, affiliates and subsidiaries, from continuing to offer said agreements without permanently modifying the loans under HAMP where the borrower qualified for the loan when the borrower initially applied for a HAMP modification and the borrower made the payments under the temporary plan as requested;

**G.** An injunction to force defendants to request immediate removal default status and all other derogatory/negative information from the Plaintiff and Class's credit reports and to refrain such derogatory reporting in the future;

**H.** Declaration whether the contracts are valid, the meaning of the terms and conditions, and whether the plaintiffs and Class may terminate and rescind those contracts in this action;

**I.** Declaration that defendants hold the property and profits therefrom as constructive trustees for the benefit of the plaintiffs and the Class;

**J.** Restitution to the Plaintiffs and the Class in amounts to be proven at trial;

**K.** Statutory damages and civil penalties;

**L.** Disgorgement of profits;

**M.** Costs of this action, including the fees and costs of experts;

**N.** Attorneys' fees;

**O.** Prejudgment interest at the statutory rate;

**P.** Post-judgment interest;

**Q.** Exemplary and punitive damages; and

**R.** Such further relief as this Court finds necessary and proper.

## 12. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial.

Dated: January 3, 2011          LAW OFFICES OF LENORE ALBERT

By: _Lenore L Albert_

LENORE ALBERT, ESQ.
Attorney for the Plaintiffs and the Class

**Class Action Complaint**                         63
*Yau v. Deutsche Bank National Trust Company Americas*

**EXHIBIT 1**

## COMMITMENT TO PURCHASE FINANCIAL INSTRUMENT
### and
## SERVICER PARTICIPATION AGREEMENT
### for the
## HOME AFFORDABLE MODIFICATION PROGRAM
### under the
## EMERGENCY ECONOMIC STABILIZATION ACT OF 2008

This Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment") is entered into as of the Effective Date, by and between Federal National Mortgage Association, a federally chartered corporation, as financial agent of the United States ("Fannie Mae"), and the undersigned party ("Servicer").  Capitalized terms used, but not defined contextually, shall have the meanings ascribed to them in Section 12 below.

### Recitals

WHEREAS, the U.S. Department of the Treasury (the "Treasury") has established a Home Affordable Modification Program (the "Program") pursuant to section 101 and 109 of the Emergency Economic Stabilization Act of 2008 (the "Act"), as section 109 of the Act has been amended by section 7002 of the American Recovery and Reinvestment Act of 2009;

WHEREAS, the Program includes loan modification and other foreclosure prevention services;

WHEREAS, Fannie Mae has been designated by the Treasury as a financial agent of the United States in connection with the implementation of the Program;

WHEREAS, Fannie Mae will, in its capacity as a financial agent of the United States, fulfill the roles of administrator, record keeper and paying agent for the Program, and in conjunction therewith must standardize certain mortgage modification and foreclosure prevention practices and procedures as they relate to the Program, consistent with the Act and in accordance with the directives of, and guidance provided by, the Treasury;

WHEREAS, Federal Home Loan Mortgage Corporation ("Freddie Mac") has been designated by the Treasury as a financial agent of the United States and will, in its capacity as a financial agent of the United States, fulfill a compliance role in connection with the Program; all references to Freddie Mac in the Agreement shall be in its capacity as compliance agent of the Program;

WHEREAS, all Fannie Mae and Freddie Mac approved servicers are being directed through their respective servicing guides and bulletins to implement the Program with respect to mortgage loans owned, securitized, or guaranteed by Fannie Mae or Freddie Mac (the "GSE Loans"); accordingly, this Agreement does not apply to the GSE Loans;

WHEREAS, all other servicers, as well as Fannie Mae and Freddie Mac approved servicers, that wish to participate in the Program with respect to loans that are not GSE Loans (collectively, "Participating Servicers") must agree to certain terms and conditions relating to the respective roles and responsibilities of Program participants and other financial agents of the government; and

WHEREAS, Servicer wishes to participate in the Program as a Participating Servicer on the terms and subject to the conditions set forth herein.

Accordingly, in consideration of the representations, warranties, and mutual agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Fannie Mae and Servicer agree as follows.

**Agreement**

## 1. Services

A.    Subject to Section 10.C., Servicer shall perform the loan modification and other foreclosure prevention services (collectively, the "Services") described in (i) the Financial Instrument attached hereto as Exhibit A (the "Financial Instrument"); (ii) the Program guidelines and procedures issued by the Treasury, including, without limitation, the net present value assessment requirements of the Program (the "Program Guidelines"); and (iii) any supplemental documentation, instructions, bulletins, letters, directives, or other communications, including, but not limited to, business continuity requirements, compliance requirements, performance requirements and related remedies, issued by the Treasury, Fannie Mae, or Freddie Mac in order to change, or further describe or clarify the scope of, the rights and duties of the Participating Servicers in connection with the Program (the "Supplemental Directives" and, together with the Program Guidelines, the "Program Documentation"). The Program Documentation will be available to all Participating Servicers at www.financialstability.gov. The Program Documentation, as the same may be modified or amended from time to time in accordance with Section 10 below, is hereby incorporated into the Commitment by this reference.

B.    Servicer's representations and warranties, and acknowledgement of and agreement to fulfill or satisfy certain duties and obligations, with respect to its participation in the Program and under the Agreement are set forth in the Financial Instrument. Servicer's certification as to its continuing compliance with, and the truth and accuracy of, the representations and warranties set forth in the Financial Instrument will be provided annually in the form attached hereto as Exhibit B (the "Annual Certification"), beginning on June 1, 2010 and again on June 1 of each year thereafter during the Term (as defined below).

C.    The recitals set forth above are hereby incorporated herein by this reference.

## 2. Authority and Agreement to Participate in Program

A.    Servicer shall perform the Services for all mortgage loans its services, whether it services such mortgage loans for its own account or for the account of another party, including any holders of mortgage-backed securities (each such other party, an "Investor"). Servicer shall use reasonable efforts to remove all prohibitions or impediments to its authority, and use reasonable efforts to obtain all third party consents and waivers that are required, by contract or law, in order to effectuate any modification of a mortgage loan under the Program.

B.    Notwithstanding subsection A., if (x) Servicer is unable to obtain all necessary consents and waivers for modifying a mortgage loan, or (y) the pooling and servicing agreement or other similar servicing contract governing Servicer's servicing of a mortgage loan prohibits Servicer from performing the Services for that mortgage loan, Servicer shall not be required to perform the Services with respect to that mortgage loan and shall not receive all or any portion of the Purchase Price (as defined below) otherwise payable with respect to such loan.

C.    Notwithstanding anything to the contrary contained herein, the Agreement does not apply to GSE Loans. Servicers are directed to the servicing guides and bulletins issued by Fannie Mae and Freddie Mac, respectively, concerning the Program as applied to GSE Loans.

D.    Servicer's performance of the Services and implementation of the Program shall be subject to review by Freddie Mac and its agents and designees as more fully set forth in the Agreement.

## 3. Set Up; Prerequisite to Payment

Servicer will provide to Fannie Mae: (a) the set up information required by the Program Documentation and any ancillary or administrative information requested by Fannie Mae in order to process Servicer's participation in the Program as a Participating Servicer on or before the Effective Date of the Commitment; and (b) the data elements for each mortgage eligible for the Program

as and when described in the Program Documentation and the Financial Instrument. Purchase Price payments will not be remitted pursuant to Section 4 with respect to any modified mortgage for which the required data elements have not been provided.

**4. Agreement to Purchase Financial Instrument; Payment of Purchase Price**

A. Fannie Mae, in its capacity as a financial agent of the United States, agrees to purchase, and Servicer agrees to sell to Fannie Mae, in such capacity, the Financial Instrument that is executed and delivered by Servicer to Fannie Mae in the form attached hereto as Exhibit A, in consideration for the payment by Fannie Mae, as agent, of the Purchase Price (defined below). The conditions precedent to the payment by Fannie Mae of the Purchase Price are: (a) the execution and delivery of the Commitment and the Financial Instrument by Servicer to Fannie Mae; (b) the execution and delivery by Fannie Mae of the Commitment to Servicer; (c) the delivery of copies of the fully executed Commitment and Financial Instrument to Treasury on the Effective Date; (d) the performance by Servicer of the Services described in the Agreement, in accordance with the terms and conditions thereof, to the reasonable satisfaction of Fannie Mae and Freddie Mac; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement.

B. Solely in its capacity as the financial agent of the United States, and subject to subsection C. below, Fannie Mae shall: (i) remit compensation payments to Servicer; (ii) remit incentive payments to Servicer for the account of Servicer and for the credit of borrowers under their respective mortgage loan obligations; and (iii) remit payments to Servicer for the account of Investors, in each case in accordance with the Program Documentation (all such payments, collectively, the "Purchase Price"); all payments remitted to Servicer for the credit of borrowers or for the account of Investors under the Program Documentation shall be applied by Servicer to the borrowers' respective mortgage loan obligations, or remitted by Servicer to Investors, as required by the Program Documentation. Fannie Mae shall have no liability to Servicer with respect to the payment of the Purchase Price, unless and until: (a) Servicer and all other interested parties have satisfied all pre-requisites set forth herein and in the Program Documentation relating to the Program payment structure, including, but not limited to, the delivery of all data elements required by Section 3 of this Commitment; and (b) the Treasury has provided funds to Fannie Mae for remittance to Servicer, together with written direction to remit the funds to Servicer in accordance with the Program Documentation.

C. The Purchase Price will be paid to Servicer by Fannie Mae as the financial agent of the United States as and when described herein and in the Program Documentation in consideration for the execution and delivery of the Financial Instrument by Servicer on or before the Effective Date of the Agreement, upon the satisfaction of the conditions precedent to payment described in subsections A. and B. above.

D. The value of the Agreement is limited to $798,000,000 (the "Program Participation Cap"). Accordingly, the aggregate Purchase Price payable to Servicer under the Agreement may not exceed the amount of the Program Participation Cap. For each loan modification that becomes effective, the aggregate remaining Purchase Price available to be paid to Servicer under the Agreement will be reduced by the maximum Purchase Price potentially payable with respect to that loan modification. In the event the Purchase Price actually paid with respect to that loan modification is less than the maximum Purchase Price potentially payable, the aggregate remaining Purchase Price available to be paid to Servicer under the Agreement will be increased by the difference between such amounts. Notwithstanding the foregoing, no agreements with borrowers intended to result in new loan modifications will be effected under the Agreement, and no payments will be made with respect to any new loan modifications from and after the date on which the aggregate Purchase Price paid or payable to Servicer under the Agreement equals the Program Participation Cap. Treasury may, from time to time in its sole discretion, adjust the amount of the Program Participation Cap. Servicer will be notified of all adjustments to the Program Participation Cap in writing by Fannie Mae.

E. Servicer shall maintain complete and accurate records of, and supporting documentation for, the borrower payment, including, but not limited to, PITIA (principal, interest, taxes, insurance (including homeowner's insurance and hazard and flood insurance) and homeowner's association and/or condo fees), and delinquency information and data provided to Fannie Mae regarding each agreement relating to a trial modification period and each loan modification agreement executed under the Program, which will be relied upon by Fannie Mae when calculating, as financial agent for the United States, the Purchase Price to be paid by the Treasury through Fannie Mae or any other financial agent. Servicer agrees to provide Fannie Mae and Freddie Mac with documentation and

other information with respect to any amounts paid by the Treasury as may be reasonably requested by such parties. In the event of a discrepancy or error in the amount of the Purchase Price paid hereunder, at Fannie Mae's election, (x) Servicer shall remit to Fannie Mae the amount of any overpayment within thirty (30) days of receiving a refund request from Fannie Mae, or (y) Fannie Mae may immediately offset the amount of the overpayment against other amounts due and payable to Servicer by Fannie Mae, as financial agent of the United States, upon written notice to Servicer. Servicer shall still be obligated to credit to the respective mortgage loan obligations of borrowers, and to the respective accounts of Investors, any portion of the Purchase Price to which they are entitled (if any) notwithstanding such offset unless otherwise directed by Fannie Mae.

F. At the election and upon the direction of the Treasury and with prior written notice to Servicer, Fannie Mae may deduct from any amount to be paid to Servicer any amount that Servicer, Investor, or borrower is obligated to reimburse or pay to the United States government, provided, however, that any amount withheld under this subsection F. will be withheld only from the amounts payable to, or for the account or credit of, the party which is liable for the obligation to the United States government.

G. In the event that the Agreement expires or is terminated pursuant to Section 5 or Section 6, and subject to Fannie Mae's rights under Section 6, Fannie Mae shall, solely in its capacity as the financial agent of the United States, continue to remit all amounts that are properly payable pursuant to subsection A. above to Servicer in accordance with the Program Documentation until paid in full, provided, however, that Purchase Price payments will be made only with respect to qualifying mortgage loan modifications that were submitted by Servicer and accepted by Fannie Mae for inclusion in the Program in accordance with the Program Documentation prior to the date of expiration or termination and that do not exceed the Program Participation Cap.

H. Notwithstanding anything to the contrary contained in subsection G. above, in the event that the Agreement is terminated pursuant to Section 6 B. in connection with an Event of Default by Servicer under Section 6 A., no compensation with respect to any loan will be paid to Servicer for the account of the Servicer subsequent to termination; subject to Fannie Mae's rights under Section 6, Fannie Mae's only continuing obligations as financial agent of the United States subsequent to termination will be to remit payments to Servicer (or, at Fannie Mae's discretion, an alternative provider) for the account of borrowers and Investors, as provided in the Agreement.

I. Notwithstanding anything to the contrary contained in subsection F. above, in the event that the Agreement is terminated pursuant to Section 6 C. in connection with an Event of Default by an Investor or a borrower under Section 6 A., no compensation with respect to any loan will be paid to Servicer for the credit or account of the defaulting party subsequent to termination; subject to Fannie Mae's rights under Section 6, Fannie Mae's only continuing obligations as financial agent of the United States subsequent to termination will be to remit payments to Servicer for the credit or account of non-defaulting parties as described in the Program Documentation.

J. Notwithstanding anything to the contrary contained herein, Fannie Mae, in its capacity as the financial agent of the United States, may reduce the amounts payable to Servicer under Section 4.B., or obtain repayment of prior payments made under Section 4.B., in connection with an Event of Default by Servicer or in connection with an evaluation of performance that includes any specific findings by Freddie Mac that Servicer's performance under any performance criteria established pursuant to the Program Documentation is materially insufficient; provided, however, Fannie Mae will seek to obtain repayment of prior payments made under Section 4.B. only with respect to loan modifications that are determined by Fannie Mae or Freddie Mac to have been impacted by, or that Fannie Mae or Freddie Mac believes may have been, or may be, impacted, by the Event of Default or findings giving rise to this remedy. These remedies are not exclusive; they are available in addition to, and not in lieu of, any other remedies available to Fannie Mae at law or in equity.

K. Notwithstanding anything to the contrary contained herein, Fannie Mae, in its capacity as the financial agent of the United States, may reduce the amounts payable to Servicer for the credit or account of an Investor or a borrower under Section 4.B., or obtain repayment of prior payments made for the credit or account of such parties under Section 4.B., in connection with an Event of Default by an Investor or a borrower. Servicer will reasonably cooperate with, and provide reasonable support and assistance to, Fannie Mae and Freddie Mac in connection with their respective roles and, in Fannie Mae's case, in connection with its efforts to obtain repayment of prior payments made to Investors and borrowers as provided in this subsection. These remedies are not

- 4 -

exclusive; they are available in addition to, and not in lieu of, any other remedies available to Fannie Mae at law or in equity.

**5. Term**

A.  Qualifying mortgage loans may be submitted by Servicer and accepted by Fannie Mae as described in the Financial Instrument and the Program Documentation from and after the Effective Date until December 31, 2012 (the "Initial Term"), subject to Program extensions by the Treasury or earlier termination of the Agreement by Fannie Mae pursuant to the provisions hereof or suspension or termination of the Program by the Treasury, provided, however, no new qualifying mortgage loans may be submitted by Servicer or accepted by Fannie Mae from and after the date on which the Program Participation Cap is reached.

B.  Servicer shall perform the Services described in the Program Documentation in accordance with the terms and conditions of the Agreement during the Initial Term and any extensions thereof (the Initial Term, together with all extensions thereof, if any, the "Term"); and during such additional period as may be necessary to: (i) comply with all data collection, retention and reporting requirements specified in the Program Documentation during and for the periods set forth therein; and (ii) complete all Services that were initiated by Servicer, including, but not limited to, mortgage modifications and the completion of all documentation relating thereto, during the Term.  Servicer agrees that it will work diligently to complete all Services as soon as reasonably possible after the end of the Term or earlier termination.

C.  The Agreement may be terminated by Fannie Mae or Servicer prior to the end of the Term pursuant to Section 6 below.

**6. Defaults and Early Termination**

A.  The following constitute events of default under the Agreement (each, an "Event of Default" and, collectively, "Events of Default"):

    (1) Servicer fails to perform or comply with any of its material obligations under the Agreement, including, but not limited to, circumstances in which Servicer fails to ensure that all eligibility criteria and other conditions precedent to modification specified in the Program Documentation are satisfied prior to effectuating modifications under the Program.

    (2) Servicer: (a) ceases to do business as a going concern; (b) makes a general assignment for the benefit of, or enters into any arrangement with creditors in lieu thereof; (c) admits in writing its inability to pay its debts as they become due; (d) files a voluntary petition under any bankruptcy or insolvency law or files a voluntary petition under the reorganization or arrangement provisions of the laws of the United States or any other jurisdiction; (e) authorizes, applies for or consents to the appointment of a trustee or liquidator of all or substantially all of its assets; (f) has any substantial part of its property subjected to a levy, seizure, assignment or sale for or by any creditor or governmental agency; or (g) enters into an agreement or resolution to take any of the foregoing actions.

    (3) Servicer, any employee or contractor of Servicer, or any employee or contractor of Servicers' contractors, or any Investor or borrower, commits a grossly negligent, willful or intentional, or reckless act (including, but not limited to, fraud) in connection with the Program or the Agreement.

    (4) Any representation, warranty, or covenant made by Servicer in the Agreement or any Annual Certification is or becomes materially false, misleading, incorrect, or incomplete.

    (5) An evaluation of performance that includes any specific findings by Freddie Mac, in its sole discretion, that Servicer's performance under any performance criteria established pursuant to the Program Documentation is materially insufficient, or any failure by Servicer to comply with any

- 5 -

directive issued by Fannie Mae or Freddie Mac with respect to documents or data requested, findings made, or remedies established, by Fannie Mae and/or Freddie Mac in conjunction with such performance criteria or other Program requirements.

B. Fannie Mae may take any, all, or none of the following actions upon an **Event of Default by Servicer** under the Agreement:

(1) Fannie Mae may: (i) withhold some or all of the Servicer's portion of the Purchase Price until, in Fannie Mae's determination, Servicer has cured the default; and (ii) choose to utilize alternative means of paying any portion of the Purchase Price for the credit or account of borrowers and Investors and delay paying such portion pending adoption of such alternative means.

(2) Fannie Mae may: (i) reduce the amounts payable to Servicer under Section 4.B; and/or (ii) require repayment of prior payments made to Servicer under Section 4.B, provided, however, Fannie Mae will seek to obtain repayment of prior payments made under Section 4.B. only with respect to loan modifications that are determined by Fannie Mae or Freddie Mac to have been impacted, or that Fannie Mae or Freddie Mac believes may have been, or may be, impacted, by the Event of Default giving rise to the remedy.

(3) Fannie Mae may require Servicer to submit to additional Program administrator oversight, including, but not limited to, additional compliance controls and quality control reviews.

(4) Fannie Mae may terminate the Agreement and cease its performance hereunder as to some or all of the mortgage loans subject to the Agreement.

(5) Fannie Mae may require Servicer to submit to information and reporting with respect to its financial condition and ability to continue to meet its obligations under the Agreement.

C. Fannie Mae may take any, all, or none of the following actions upon an **Event of Default involving an Investor or a borrower** in connection with the Program:

(1) Fannie Mae may withhold all or any portion of the Purchase Price payable to, or for the credit or account of, the defaulting party until, in Fannie Mae's determination, the default has been cured or otherwise remedied to Fannie Mae's satisfaction.

(2) Fannie Mae may: (i) reduce the amounts payable to Servicer for the credit, or account of, the defaulting party under Section 4.B; and/or (ii) require repayment of prior payments made to the defaulting party under Section 4.B. Servicer will reasonably cooperate with, and provide reasonable support and assistance to, Fannie Mae and Freddie Mae in connection with their respective roles and, in Fannie Mae's case, in connection with its efforts to obtain repayment of prior payments made to Investors and borrowers as provided in this subsection.

(3) Fannie Mae may require Servicer to submit to additional Program administrator oversight, including, but not limited to, additional compliance controls and quality control reviews.

(4) Fannie Mae may cease its performance hereunder as to some or all of the mortgage loans subject to the Agreement that relate to the defaulting Investor or borrower.

D. In addition to the termination rights set forth above, Fannie Mae may terminate the Agreement immediately upon written notice to Servicer:

- 6 -

      (1) at the direction of the Treasury;

      (2) in the event of a merger, acquisition, or other change of control of Servicer;

      (3) in the event that a receiver, liquidator, trustee, or other custodian is appointed for the Servicer; or

      (4) in the event that a material term of the Agreement is determined to be prohibited or unenforceable as referred to in Section 11.C.

E. The Agreement will terminate automatically:

      (1) in the event that the Financial Agency Agreement, dated February 18, 2009, by and between Fannie Mae and the Treasury is terminated; or

      (2) upon the expiration or termination of the Program.

F. The remedies available to Fannie Mae upon an Event of Default under this Section are cumulative and not exclusive; further, these remedies are in addition to, and not in lieu of, any other remedies available to Fannie Mae at law or in equity.

G. If the event of termination of the Agreement under any circumstances, Servicer and Fannie Mae agree to cooperate with one another on an ongoing basis to ensure an effective and orderly transition or resolution of the Services, including the provision of any information, reporting, records and data required by Fannie Mae and Freddie Mac.

H. If an Event of Default under Section 6.A.1., Section 6.A.4., or Section 6.A.5. occurs and Fannie Mae determines, in its sole discretion, that the Event of Default is curable and elects to exercise its right to terminate the Agreement, Fannie Mae will provide written notice of the Event of Default to Servicer and the Agreement will terminate automatically thirty (30) days after Servicer's receipt of such notice, if the Event of Default is not cured by Servicer to the reasonable satisfaction of Fannie Mae prior to the end of such thirty (30) day period. If Fannie Mae determines, in its sole discretion, that an Event of Default under Section 6.A.1., Section 6.A.4, or Section 6.A. 5. is not curable, or if an Event of Default under Section 6.A.2. or Section 6.A.3. occurs, and Fannie Mae elects to exercise its right to terminate the Agreement under Section 6.B.4., Fannie Mae will provide written notice of termination to the Servicer on or before the effective date of the termination.

## 7. Disputes

Fannie Mae and Servicer agree that it is in their mutual interest to resolve disputes by agreement. If a dispute arises under the Agreement, the parties will use all reasonable efforts to promptly resolve the dispute by mutual agreement. If a dispute cannot be resolved informally by mutual agreement at the lowest possible level, the dispute shall be referred up the respective chain of command of each party in an attempt to resolve the matter. This will be done in an expeditious manner. Servicer shall continue diligent performance of the Services pending resolution of any dispute. Fannie Mae and Servicer reserve the right to pursue other legal or equitable rights they may have concerning any dispute. However, the parties agree to take all reasonable steps to resolve disputes internally before commencing legal proceedings.

**8.  Transfer or Assignment**

A.  Servicer must provide written notice to Fannie Mae and Freddie Mac pursuant to Section 9 below of: (i) any transfers or assignments of mortgage loans subject to this Agreement; and (ii) any other transfers or assignments of Servicer's rights and obligations under this Agreement.  Such notice must include payment instructions for payments to be made to the transferee or assignee of the mortgage loans subject to the notice (if applicable), and evidence of the assumption by such transferee or assignee of the mortgage loans or other rights and obligations that are transferred, in the form of <u>Exhibit C</u> (the "<u>Assignment and Assumption Agreement</u>").  Servicer acknowledges that Fannie Mae will continue to remit payments to Servicer in accordance with Section 4.B. with respect to mortgage loans that have been assigned or transferred, and that Servicer will be liable for underpayments, overpayments and misdirected payments, unless and until such notice and an executed Assignment and Assumption Agreement are provided to Fannie Mae and Freddie Mac.  Any purported transfer or assignment of mortgage loans or other rights or obligations under the Agreement in violation of this Section is void.

B.  Servicer shall notify Fannie Mae as soon as legally possible of any proposed merger, acquisition, or other change of control of Servicer, and of any financial and operational circumstances which may impair Servicer's ability to perform its obligations under the Agreement.

**9.  Notices**

All legal notices under the Agreement shall be in writing and referred to each party's point of contact identified below at the address listed below, or to such other point of contact at such other address as may be designated in writing by such party. All such notices under the Agreement shall be considered received: (a) when personally delivered; (b) when delivered by commercial overnight courier with verification receipt; (c) when sent by confirmed facsimile; or (d) three (3) days after having been sent, postage prepaid, via certified mail, return receipt requested. Notices shall not be made or delivered in electronic form, except as provided in Section 12 B. below, provided, however, that the party giving the notice may send an e-mail to the party receiving the notice advising that party that a notice has been sent by means permitted under this Section.

To Servicer:



Aurora Loan Services, LLC
10350 Park Meadows Drive
Littleton, CO  80124
Office: (720) 945-4350
Facsimile:
email:

With a copy to:

Aurora Bank, FSB
15305 Dallas Parkway, Suite 300
Addison, TX  75001
Office:
Facsimile:
email:

- 8 -

To Fannie Mae:

> Fannie Mae
> 3900 Wisconsin Avenue, NW
> Washington, DC 20016
> Attention: General Counsel
> Facsimile: ▆▆▆▆▆▆
> email: ▆▆▆▆▆▆▆▆▆

To Treasury:

> Chief
> Office of Homeownership Preservation
> Office of Financial Stability
> Department of the Treasury
> 1500 Pennsylvania Avenue, NW
> Washington, DC 20220
> Facsimile: (202) 622-9219

To Freddie Mac:

> Freddie Mac
> 8100 Jones Branch Drive
> McLean, VA 22102
> Attention: Vice President, Making Home Affordable -- Compliance
> Facsimile: (703) 903-2544
> Email to: MHA_Compliance@freddiemac.com

## 10. Modifications

A. Subject to Sections 10.B. and 10.C., modifications to the Agreement shall be in writing and signed by Fannie Mae and Servicer.

B. Fannie Mae and the Treasury each reserve the right to unilaterally modify or supplement the terms and provisions of the Program Documentation that relate (as determined by Fannie Mae or the Treasury, in their reasonable discretion) to the compliance and performance requirements of the Program, and related remedies established by Freddie Mac, and/or to technical, administrative, or procedural matters or compliance and reporting requirements that may impact the administration of the Program.

C. Notwithstanding Sections 10.A. and 10.B., any modification to the Program Documentation that materially impact the borrower eligibility requirements, the amount of payments of the Purchase Price to be made to Participating Servicers, Investors and borrowers under the Program, or the rights, duties, or obligations of Participating Servicers, Investors or borrowers in connection with the Program (each, a "<u>Program Modification</u>" and, collectively, the "<u>Program Modifications</u>") shall be effective only on a prospective basis; Participating Servicers will be afforded the opportunity to opt-out of the Program when Program Modifications are published with respect to some or all of the mortgage loans sought to be modified under the Program on or after the effective date of the Program Modification, at Servicer's discretion. Opt-out procedures, including, but not limited to, the time and process for notification of election to opt-out and the window for such election, will be set forth in the Program Documentation describing the Program Modification, provided, however, that Servicer will be given at least thirty (30) days to elect to opt-out of a Program Modification. For the avoidance of doubt, during the period during which Servicer may elect to opt-out of a Program Modification

- 9 -

and after any such opt-out is elected by Servicer, Servicer will continue to perform the Services described in the Financial Instrument and the Program Documentation (as the Program Documentation existed immediately prior to the publication of the Program modification prompting the opt-out) with respect to qualifying mortgage loan modifications that were submitted by Servicer and accepted by Fannie Mae prior to the opt-out.

## 11. Miscellaneous

A. The Agreement shall be governed by and construed under Federal law and not the law of any state or locality, without reference to or application of the conflicts of law principles. Any and all disputes between the parties that cannot be settled by mutual agreement shall be resolved solely and exclusively in the United States Federal courts located within the District of Columbia. Both parties consent to the jurisdiction and venue of such courts and irrevocably waive any objections thereto.

B. The Agreement is not a Federal procurement contract and is therefore not subject to the provisions of the Federal Property and Administrative Services Act (41 U.S.C. §§ 251-260), the Federal Acquisition Regulations (48 CFR Chapter 1), or any other Federal procurement law.

C. Any provision of the Agreement that is determined to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of the Agreement, and no such prohibition or unenforceability in any jurisdiction shall invalidate such provision in any other jurisdiction.

D. Failure on the part of Fannie Mae to insist upon strict compliance with any of the terms hereof shall not be deemed a waiver, nor will any waiver hereunder at any time be deemed a waiver at any other time. No waiver will be valid unless in writing and signed by an authorized officer of Fannie Mae. No failure by Fannie Mae to exercise any right, remedy, or power hereunder will operate as a waiver thereof. The rights, remedies, and powers provided herein are cumulative and not exhaustive of any rights, remedies, and powers provided by law.

E. The Agreement shall inure to the benefit of and be binding upon the parties to the Agreement and their permitted successors-in-interest.

F. The Commitment and the Assignment and Assumption Agreement (if applicable) may be executed in two or more counterparts (and by different parties on separate counterparts), each of which shall be an original, but all of which together shall constitute one and the same instrument.

G. The Commitment, together with the Financial Instrument, the Annual Certifications, the Assignment and Assumption Agreement (if applicable) and the Program Documentation, constitutes the entire agreement of the parties with respect to the subject matter hereof. In the event of a conflict between any of the foregoing documents and the Program Documentation, the Program Documentation shall prevail. In the event of a conflict between the Program Guidelines and the Supplemental Directives, the Program Guidelines shall prevail.

H. Any provisions of the Agreement (including all documents incorporated by reference thereto) that contemplate their continuing effectiveness, including, but not limited to, Sections 4, 5 B., 6 F., 6 G., 9, 11 and 12 of the Commitment, and Sections 2, 3, 5, 7, 8, 9 and 10 of the Financial Instrument, and any other provisions (or portions thereof) in the Agreement that relate to, or may impact, the ability of Fannie Mae and Freddie Mac to fulfill their responsibilities as agents of the United States in connection with the Program, shall survive the expiration or termination of the Agreement.

## 12. Defined Terms; Incorporation by Reference

A. All references to the "Agreement" necessarily include, in all instances, the Commitment and all documents incorporated into the Commitment by reference, whether or not so noted contextually, and all amendments and modifications thereto. Specific references

- 10

throughout the Agreement to individual documents that are incorporated by reference into the Commitment are not inclusive of any other documents that are incorporated by reference, unless so noted contextually.

B.   The term "Effective Date" means the date on which Fannie Mae transmits a copy of the fully executed Commitment and Financial Instrument to Treasury and Servicer with a completed cover sheet, in the form attached hereto as Exhibit D (the "Cover Sheet"). The Commitment and Financial Instrument and accompanying Cover Sheet will be faxed, emailed, or made available through other electronic means to Treasury and Servicer in accordance with Section 9.

C.   The Program Documentation and Exhibit A -- Form of Financial Instrument, Exhibit B -- Form of Annual Certification, Exhibit C -- Form of Assignment and Assumption Agreement and Exhibit D -- Form of Cover Sheet (in each case, in form and, upon completion, in substance), including all amendments and modifications thereto, are incorporated into this Commitment by this reference and given the same force and effect as though fully set forth herein.

[SIGNATURE PAGE FOLLOWS; REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**In Witness Whereof,** Servicer and Fannie Mae by their duly authorized officials hereby execute and deliver this Commitment to Purchase Financial Instrument and Servicer Participation Agreement as of the Effective Date.

**SERVICER:** Aurora Loan Services, LLC a Delaware limited liability company

**FANNIE MAE,** solely as Financial Agent of the United States

By: _____

Name: _____THOMAS I. WIND_____

Title: _____CEO_____

Date: _____April 30, 2009_____

By: _____

Name: _____Kevin M. Brungardt_____

Title: _____V. President_____

Date: _____May 1, 2009_____

## EXHIBITS

Exhibit A    Form of Financial Instrument

Exhibit B    Form of Annual Certification

Exhibit C    Form of Assignment and Assumption Agreement

Exhibit D    Form of Cover Sheet

- 12

## EXHIBIT A

## FORM OF FINANCIAL INSTRUMENT

## FINANCIAL INSTRUMENT

This Financial Instrument is delivered as provided in Section 1 of the Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment"), entered into as of the Effective Date, by and between Federal National Mortgage Association ("Fannie Mae"), a federally chartered corporation, acting as financial agent of the United States, and the undersigned party ("Servicer"). This Financial Instrument is effective as of the Effective Date. All of the capitalized terms that are used but not defined herein shall have the meanings ascribed to them in the Commitment.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Servicer agrees as follows:

1.  Purchase Price Consideration; Services. This Financial Instrument is being purchased by Fannie Mae pursuant to Section 4 of the Commitment in consideration for the payment by Fannie Mae, in its capacity as a financial agent of the United States, of various payments detailed in the Program Documentation and referred to collectively in the Commitment as the "Purchase Price." The conditions precedent to the payment by Fannie Mae of the Purchase Price are: (a) the execution and delivery of this Financial Instrument and the Commitment by Servicer to Fannie Mae; (b) the execution and delivery by Fannie Mae of the Commitment to Servicer; (c) the delivery of copies of the fully executed Commitment and Financial Instrument to Treasury on the Effective Date; (d) the performance by Servicer of the Services described in the Agreement; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement. Servicer shall perform all Services in consideration for the Purchase Price in accordance with the terms and conditions of the Agreement, to the reasonable satisfaction of Fannie Mae and Freddie Mac.

2.  Authority and Agreement to Participate in Program. Subject to the limitations set forth in Section 2 of the Agreement, Servicer shall use reasonable efforts to remove all prohibitions or impediments to its authority and to obtain all third party consents and waivers that are required, by contract or law, in order to effectuate any loan modification under the Program.

3.  Audits, Reporting and Data Retention.

    (a) Freddie Mac, the Federal Housing Finance Agency and other parties designated by the Treasury or applicable law shall have the right during normal business hours to conduct unannounced, informal onsite visits and to conduct formal onsite and offsite physical, personnel and information technology testing, security reviews, and audits of Servicer and to examine all books, records and data related to the Services provided and Purchase Price received in connection with the Program on thirty (30) days' prior written notice.

    (b) Servicer will collect, record, retain and provide to Treasury, Fannie Mae and Freddie Mac all data, information and documentation relating to the Program and borrowers, loans and loan modifications implemented, or potentially eligible for modification, under the Program and any trials conducted in connection with the Program, as required by the Program Documentation. All such data, information and documentation must be provided to the Treasury, Fannie Mae and Freddie Mac as, when and in the manner specified in the Program Documentation. In addition, Servicer shall provide copies of executed contracts and tapes of loan pools related to the Program for review upon request.

    (c) Servicer shall promptly take corrective and remedial actions associated with reporting and reviews as directed by Fannie Mae or Freddie Mac and provide to Fannie Mae and Freddie Mac such evidence of the effective implementation of corrective and remedial actions as Fannie Mae and Freddie Mac shall reasonably require. Freddie Mac may conduct additional reviews based on its findings and the corrective actions taken by Servicer.

- 1 -

(d) In addition to any other obligation to retain financial and accounting records that may be imposed by Federal or state law, Servicer shall retain all information described in Section 3(b), and all data, books, reports, documents, audit logs and records, including electronic records, related to the performance of Services in connection with the Program. In addition, Servicer shall maintain a copy of all computer systems and application software necessary to review and analyze these electronic records. Unless otherwise directed by Fannie Mae or Freddie Mac, Servicer shall retain these records for at least 7 years from the date the data or record was created, or for such longer period as may be required pursuant to applicable law. Fannie Mae or Freddie Mac may also notify Servicer from time to time of any additional record retention requirements resulting from litigation and regulatory investigations in which the Treasury or any agents of the United States may have an interest, and Servicer agrees to comply with these litigation and regulatory investigations requirements.

4. <u>Internal Control Program</u>.

(a) Servicer shall develop, enforce and review on a quarterly basis for effectiveness an internal control program designed to: (i) ensure effective delivery of Services in connection with the Program and compliance with the Program Documentation; (ii) effectively monitor and detect loan modification fraud; and (iii) effectively monitor compliance with applicable consumer protection and fair lending laws. The internal control program must include documentation of the control objectives for Program activities, the associated control techniques, and mechanisms for testing and validating the controls.

(b) Servicer shall provide Freddie Mac with access to all internal control reviews and reports that relate to Services under the Program performed by Servicer and its independent auditing firm to enable Freddie Mac to fulfill its duties as a compliance agent of the United States; a copy of the reviews and reports will be provided to Fannie Mae for record keeping and other administrative purposes.

5. <u>Representations, Warranties and Covenants</u>. Servicer makes the following representations, warranties and covenants to Fannie Mae, Freddie Mac and the Treasury, the truth and accuracy of which are continuing obligations of Servicer. In the event that any of the representations, warranties, or covenants made herein cease to be true and correct, Servicer agrees to notify Fannie Mae and Freddie Mac immediately.

(a) Servicer is established under the laws of the United States or any state, territory, or possession of the United States or the District of Columbia, and has significant operations in the United States. Servicer has full corporate power and authority to enter into, execute, and deliver the Agreement and to perform its obligations hereunder and has all licenses necessary to carry on its business as now being conducted and as contemplated by the Agreement.

(b) Servicer is in compliance with, and covenants that all Services will be performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC § 1601 et seq., the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights. Subject to the following sentence, Servicer has obtained or made, or will obtain or make, all governmental approvals or registrations required under law and has obtained or will obtain all consents necessary to authorize the performance of its obligations under the Program and the Agreement. The performance of Services under the Agreement will not conflict with, or be prohibited in any way by, any other agreement or statutory restriction by which Servicer is bound,

- 2 -

provided, however, that Fannie Mae acknowledges and agrees that this representation and warranty is qualified solely by and to the extent of any contractual limitations established under applicable servicing contracts to which Servicer is subject. Servicer is not aware of any other legal or financial impediments to performing its obligations under the Program or the Agreement and shall promptly notify Fannie Mae of any financial and/or operational impediments which may impair its ability to perform its obligations under the Program or the Agreement. Servicer is not delinquent on any Federal tax obligation or any other debt owed to the United States or collected by the United States for the benefit of others, excluding any debt or obligation that is being contested in good faith.

(c) Servicer covenants that: (i) it will perform its obligations in accordance with the Agreement and will promptly provide such performance reporting as Fannie Mae may reasonably require; (ii) all mortgage modifications and all trial period modifications will be offered to borrowers, fully documented and serviced in accordance with the Program Documentation; and (iii) all data, collection information and other information reported by Servicer to Fannie Mae and Freddie Mac under the Agreement, including, but not limited to, information that is relied upon by Fannie Mae or Freddie Mac in calculating the Purchase Price or in performing any compliance review will be true, complete and accurate in all material respects, and consistent with all relevant servicing records, as and when provided.

(d) Servicer covenants that it will: (i) perform the Services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed operation, and no less than that which the Servicer exercises for itself under similar circumstances; and (ii) use qualified individuals with suitable training, education, experience and skills to perform the Services. Servicer acknowledges that Program participation may require changes to, or the augmentation of, its systems, staffing and procedures, and covenants and agrees to take all actions necessary to ensure it has the capacity to implement the Program in accordance with the Agreement.

(e) Servicer covenants that it will comply with all regulations on conflicts of interest that are applicable to Servicer in connection with the conduct of its business and all conflicts of interest and non-disclosure obligations and restrictions and related mitigation procedures set forth in the Program Documentation (if any).

(f) Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie Mac in connection with the Program or pursuant to the Agreement may constitute a violation of: (a) Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (b) the civil False Claims Act (31 U.S.C. §§ 3729-3733). Servicer covenants to disclose to Fannie Mae and Freddie Mac any credible evidence, in connection with the Services, that a management official, employee, or contractor of Servicer has committed, or may have committed, a violation of the referenced statutes.

(g) Servicer covenants to disclose to Fannie Mae and Freddie Mac any other facts or information that the Treasury, Fannie Mae or Freddie Mac should reasonably expect to know about Servicer and its contractors to help protect the reputational interests of the Treasury, Fannie Mae and Freddie Mac in managing and monitoring the Program.

(h) Servicer covenants that it will timely inform Fannie Mae and Freddie Mac of any anticipated Event of Default.

(i) Servicer acknowledges that Fannie Mae or Freddie Mac may be required to assist the Treasury with responses to the Privacy Act of 1974 (the "Privacy Act"), 5 USC § 552a, inquiries from borrowers and Freedom of Information Act, 5 USC § 552, inquiries from other parties, as well as formal inquiries from Congressional committees and members, the Government Accounting Office, Inspectors General and other government entities, as well as media and consumer advocacy group inquiries about the Program and its effectiveness. Servicer covenants that it will respond promptly and accurately to all search requests made by Fannie Mae or Freddie Mac, comply with any related procedures which Fannie Mae or Freddie Mac may establish, and provide related training to employees and contractors. In connection with Privacy Act inquiries, Servicer covenants that it will provide updated and corrected information as appropriate about borrowers' records to ensure that any system of record maintained by Fannie Mae on behalf of the Treasury is accurate and complete.

(j) Servicer acknowledges that Fannie Mae is required to develop and implement customer service call centers to respond to borrowers' and other parties' inquiries regarding the Program, which may require additional support from Servicer. Servicer covenants that it will provide such additional customer service call support as Fannie Mae reasonably determines is necessary to support the Program.

(k) Servicer acknowledges that Fannie Mae and/or Freddie Mac are required to develop and implement practices to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws. Servicer covenants that it will fully and promptly cooperate with Fannie Mae's inquiries about loan modification fraud and legal compliance and comply with any anti-fraud and legal compliance procedures which Fannie Mae and/or Freddie Mac may require. Servicer covenants that it will develop and implement an internal control program to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws, among other things, as provided in Section 4 of this Financial Instrument and acknowledges that the internal control program will be monitored, as provided in such Section.

(l) Servicer shall sign and deliver an Annual Certification to Fannie Mae and Freddie Mac beginning on June 1, 2010 and again on June 1 of each year thereafter during the Term, in the form attached as Exhibit B to the Agreement.

6. Use of Contractors. Servicer is responsible for the supervision and management of any contractor that assists in the performance of Services in connection with the Program. Servicer shall remove and replace any contractor that fails to perform. Servicer shall ensure that all of its contractors comply with the terms and provisions of the Agreement. Servicer shall be responsible for the acts or omissions of its contractors as if the acts or omissions were by the Servicer.

7. Data Rights.

(a) For purposes of this Section, the following definitions apply:

(i) "Data" means any recorded information, regardless of form or the media on which it may be recorded, regarding any of the Services provided in connection with the Program.

(ii) "Limited Rights" means non-exclusive rights to, without limitation, use, copy, maintain, modify, enhance, disclose, reproduce, prepare derivative works, and distribute, in any manner, for any purpose related to the administration, activities, review, or audit of, or public reporting regarding, the Program and to permit others to do so in connection therewith.

- 4 -

(iii)   "NPI" means nonpublic personal information, as defined under the GLB.

(iv)   "GLB" means the Gramm-Leach-Bliley Act, 15 U.S.C. 6801-6809.

(b) Subject to Section 7(e) below, Treasury, Fannie Mae and Freddie Mac shall have Limited Rights, with respect to all Data produced, developed, or obtained by Servicer or a contractor of Servicer in connection with the Program, provided, however, that NPI will not be transferred by Fannie Mae in violation of the GLB and, provided, further, that Servicer acknowledges and agrees that any use of NPI by, the distribution of NPI to, or the transfer of NPI among, Federal, state and local government organizations and agencies does not constitute a violation of the GLB for purposes of the Agreement. If requested, such Data shall be made available to the Treasury, Fannie Mae, or Freddie Mac upon request, or as and when directed by the Program Documentation, in industry standard useable format.

(c) Servicer expressly consents to the publication of its name as a participant in the Program, and the use and publication of Servicer's Data, subject to applicable state and federal laws regarding confidentiality, in any form and on any media utilized by Treasury, Fannie Mae or Freddie Mac, including, but not limited to, on any website or webpage hosted by Treasury, Fannie Mae, or Freddie Mac, in connection with the Program, provided that no Data placed in the public domain will: (i) contain the name, social security number, or street address of any borrower or other information that would allow the borrower to be identified; or, (ii) if presented in a form that links the Servicer with the Data, include information other than program performance and participation related statistics such as the number of modifications, performance of modifications, characteristics of the modified loans, or program compensation or fees, with any information about any borrower limited to creditworthiness characteristics such as debt, income, and credit score. In any Data provided to an enforcement or supervisory agency with jurisdiction over the Servicer, these limitations on borrower information do not apply.

8.   **Publicity and Disclosure.**

(a) Servicer shall not make use of any Treasury name, symbol, emblem, program name, or product name, in any advertising, signage, promotional material, press release, Web page, publication, or media interview, without the prior written consent of the Treasury.

(b) Servicer shall not publish, or cause to have published, or make public use of Fannie Mae's name, logos, trademarks, or any information about its relationship with Fannie Mae without the prior written permission of Fannie Mae, which permission may be withdrawn at any time in Fannie Mae's sole discretion.

(c) Servicer shall not publish, or cause to have published, or make public use of Freddie Mac's name (i.e., "Freddie Mac" or "Federal Home Loan Mortgage Corporation"), logos, trademarks, or any information about its relationship with Freddie Mac without the prior written permission of Freddie Mac, which permission may be withdrawn at any time in Freddie Mac's sole discretion.

9.   **Limitation of Liability.** IN NO EVENT SHALL FANNIE MAE, THE TREASURY, OR FREDDIE MAC, OR THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR AFFILIATES BE LIABLE TO SERVICER WITH RESPECT TO THE PROGRAM OR THE AGREEMENT, OR FOR ANY

ACT OR OMISSION OCCURRING IN CONNECTION WITH THE FOREGOING, FOR ANY DAMAGES OF ANY KIND, INCLUDING, BUT NOT LIMITED TO DIRECT DAMAGES, INDIRECT DAMAGES, LOST PROFITS, LOSS OF BUSINESS, OR OTHER INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES OF ANY NATURE OR UNDER ANY LEGAL THEORY WHATSOEVER, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF WHETHER OR NOT THE DAMAGES WERE REASONABLY FORESEEABLE; PROVIDED, HOWEVER, THAT THIS PROVISION SHALL NOT LIMIT FANNIE MAE'S OBLIGATION TO REMIT PURCHASE PRICE PAYMENTS TO SERVICER IN ITS CAPACITY AS FINANCIAL AGENT OF THE UNITED STATES IN ACCORDANCE WITH THE AGREEMENT.

10.    Indemnification.  Servicer shall indemnify, hold harmless, and pay for the defense of Fannie Mae, the Treasury and Freddie Mac, and their respective officers, directors, employees, agents and affiliates against all claims, liabilities, costs, damages, judgments, suits, actions, losses and expenses, including reasonable attorneys' fees and costs of suit, arising out of or resulting from: (a) Servicer's breach of Section 5 (Representations, Warranties and Covenants) of this Financial Instrument; (b) Servicer's negligence, willful misconduct or failure to perform its obligations under the Agreement; or (c) any injuries to persons (including death) or damages to property caused by the negligent or willful acts or omissions of Servicer or its contractors. Servicer shall not settle any suit or claim regarding any of the foregoing without Fannie Mae's prior written consent if such settlement would be adverse to Fannie Mae's interest, or the interests of the Treasury or Freddie Mac. Servicer agrees to pay or reimburse all costs that may be incurred by Fannie Mae and Freddie Mac in enforcing this indemnity, including attorneys' fees.

IN WITNESS WHEREOF, Servicer hereby executes this Financial Instrument on the date set forth below.

Aurora Loan Services, LLC a Delaware limited liability company

_____                    _____
Thomas L. Wind                                                         Date   April 30, 2009
Chief Executive Officer

- 6 -

**EXHIBIT B**

**FORM OF ANNUAL CERTIFICATION**

## ANNUAL CERTIFICATION

This Annual Certification is delivered as provided in Section 1.B. of the Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment"), effective as of [INSERT], by and between Federal National Mortgage Association ("Fannie Mae"), a federally chartered corporation, acting as financial agent of the United States, and the undersigned party ("Servicer"). All terms used, but not defined herein, shall have the meanings ascribed to them in the Commitment.

Servicer hereby certifies, as of [INSERT DATE ON WHICH CERTIFICATION IS GIVEN], that:

1.     Servicer is established under the laws of the United States or any state, territory, or possession of the United States or the District of Columbia, and has significant operations in the United States. Servicer had full corporate power and authority to enter into, execute, and deliver the Agreement and to perform its obligations hereunder and has all licenses necessary to carry on its business as now being conducted and as contemplated by the Agreement.

2.     Servicer is in compliance with, and certifies that all Services have been performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq., the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights. Subject to the following sentence, Servicer has obtained or made all governmental approvals or registrations required under law and has obtained all consents necessary to authorize the performance of its obligations under the Program and the Agreement. The performance of Services under the Agreement has not conflicted with, or been prohibited in any way by, any other agreement or statutory restriction by which Servicer is bound, except to the extent of any contractual limitations under applicable servicing contracts to which Servicer is subject. Servicer is not aware of any other legal or financial impediments to performing its obligations under the Program or the Agreement and has promptly notified Fannie Mae of any financial and/or operational impediments which may impair its ability to perform its obligations under the Program or the Agreement. Servicer is not delinquent on any Federal tax obligation or any other debt owed to the United States or collected by the United States for the benefit of others, excluding any debts or obligations that are being contested in good faith.

3.     (i) Servicer has performed its obligations in accordance with the Agreement and has promptly provided such performance reporting as Fannie Mae and Freddie Mac have reasonably required; (ii) all mortgage modifications and all trial period modifications have been offered by Servicer to borrowers, fully documented and serviced by Servicer in accordance with the Program Documentation; and (iii) all data, collection information and other information reported by Servicer to Fannie Mae and Freddie Mac under the Agreement, including, but not limited to, information that was relied upon by Fannie Mae and Freddie Mac in calculating the Purchase Price and in performing any compliance review, was true, complete and accurate in all material respects, and consistent with all relevant servicing records, as and when provided.

4.     Servicer has: (i) performed the Services required under the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed operation, and no less than that which the Servicer exercises for itself under similar circumstances; and (ii) used qualified individuals with suitable training, education, experience and skills to perform the Services. Servicer acknowledges that Program participation required changes to, or the augmentation of, its systems, staffing and procedures; Servicer took all actions necessary to ensure that it had the capacity to implement the Program in accordance with the Agreement.

5.     Servicer has complied with all regulations on conflicts of interest that are applicable to Servicer in connection with the conduct of its business and all conflicts of interest and non-disclosure obligations and restrictions and related mitigation procedures set forth in the Program Documentation (if any).

6.     Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie Mac in connection with the Program or pursuant to the Agreement may constitute a violation of: (a) Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (b) the civil False Claims Act (31 U.S.C. §§ 3729-3733). Servicer has disclosed to Fannie Mae and Freddie Mac any credible evidence, in connection with the Services, that a management official, employee, or contractor of Servicer has committed, or may have committed, a violation of the referenced statutes.

7.     Servicer has disclosed to Fannie Mae and Freddie Mac any other facts or information that the Treasury, Fannie Mae or Freddie Mac should reasonably expect to know about Servicer and its contractors to help protect the reputational interests of the Treasury, Fannie Mae and Freddie Mac in managing and monitoring the Program.

8.     Servicer acknowledges that Fannie Mae and Freddie Mac may be required to assist the Treasury with responses to the Privacy Act of 1974 (the "Privacy Act"), 5 USC § 552a, inquiries from borrowers and Freedom of Information Act, 5 USC § 552, inquiries from other parties, as well as formal inquiries from Congressional committees and members, the Government Accounting Office, Inspectors General and other government entities, as well as media and consumer advocacy group inquiries about the Program and its effectiveness. Servicer has responded promptly and accurately to all search requests made by Fannie Mae and Freddie Mac, complied with any related procedures which Fannie Mae and Freddie Mac have established, and provided related training to employees and contractors. In connection with Privacy Act inquiries, Servicer has provided updated and corrected information as appropriate about borrowers' records to ensure that any system of record maintained by Fannie Mae on behalf of the Treasury is accurate and complete.

9.     Servicer acknowledges that Fannie Mae is required to develop and implement customer service call centers to respond to borrowers' and other parties' inquiries regarding the Program, which may require additional support from Servicer. Servicer has provided such additional customer service call support as Fannie Mae has reasonably requested to support the Program.

10.     Servicer acknowledges that Fannie Mae and/or Freddie Mac are required to develop and implement practices to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws. Servicer has fully and promptly cooperated with Fannie Mae's inquiries about loan modification fraud and legal compliance and has complied with any anti-fraud and legal compliance procedures which Fannie Mae and/or Freddie Mac have required. Servicer has developed and implemented an internal control program to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws, among other things, as provided in Section 4 of the Financial Instrument.

In the event that any of the certifications made herein are discovered not to be true and correct, Servicer agrees to notify Fannie Mae and Freddie Mac immediately.

[INSERT FULL LEGAL NAME OF SERVICER]:

_____          _____
[Name of Authorized Official]                       Date
[Title of Authorized Official]

## EXHIBIT C

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Assignment and Assumption Agreement") is entered into as of [INSERT DATE] by and between [INSERT FULL LEGAL NAME OF ASSIGNOR] ("Assignor") and [INSERT FULL LEGAL NAME OF ASSIGNEE] ("Assignee"). All terms used, but not defined, herein shall have the meanings ascribed to them in the Underlying Agreement (defined below).

WHEREAS, Assignor and Federal National Mortgage Association, a federally chartered corporation, as financial agent of the United States ("Fannie Mae"), are parties to a Commitment to Purchase Financial Instrument and Servicer Participation Agreement, a complete copy of which (including all exhibits, amendments and modifications thereto) is attached hereto and incorporated herein by this reference (the "Underlying Agreement");

WHEREAS, Assignor has agreed to assign to Assignee: (i) all of its rights and obligations under the Underlying Agreement with respect to the mortgage loans identified on the schedule attached hereto as Schedule 1 ("Schedule 1") and/or (ii) certain other rights and obligations under the Underlying Agreement that are identified on Schedule 1; and

WHEREAS, Assignee has agreed to assume the mortgage loans and other rights and obligations under the Underlying Agreement identified on Schedule 1.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Assignment. Assignor hereby assigns to Assignee all of Assignor's rights and obligations under the Underlying Agreement with respect to the mortgage loans identified on Schedule 1 and such other rights and obligations under the Underlying Agreement that are identified on Schedule 1.

2. Assumption. Assignee hereby accepts the foregoing assignment and assumes all of the rights and obligations of Assignor under the Underlying Agreement with respect to the mortgage loans identified on Schedule 1 and such other rights and obligations under the Underlying Agreement that are identified on Schedule 1.

3. Effective Date. The date on which the assignment and assumption of rights and obligations under the Underlying Agreement is effective is [INSERT EFFECTIVE DATE OF ASSIGNMENT/ASSUMPTION].

4. Successors. All future transfers and assignments of the mortgage loans, rights and obligations transferred and assigned hereby are subject to the transfer and assignment provisions of the Underlying Agreement. This Assignment and Assumption Agreement shall inure to the benefit of, and be binding upon, the permitted successors and assigns of the parties hereto.

5. Counterparts. This Assignment and Assumption Agreement may be executed in counterparts, each of which shall be an original, but all of which together constitute one and the same instrument.

IN WITNESS WHEREOF, Assignor and Assignee, by their duly authorized officials, hereby execute and deliver this Assignment and Assumption Agreement, together with Schedule 1, effective as of the date set forth in Section 3 above.

ASSIGNOR: [INSERT FULL LEGAL NAME OF ASSIGNOR]     ASSIGNEE: [INSERT FULL LEGAL NAME OF ASSIGNEE]

By:_____     By:_____
Name:_____     Name:_____
Title:_____     Title:_____
Date:_____     Date:_____

## SCHEDULE 1

### To

### ASSIGNMENT AND ASSUMPTION AGREEMENT

**EXHIBIT D**

**FORM OF COVER SHEET**

<u>Cover Sheet for Transmission of</u>

<u>Commitment to Purchase Financial Instrument and Servicer Participation Agreement</u>

<u>To:</u> [INSERT FULL LEGAL NAME OF SERVICER] ("<u>Servicer</u>"), [INSERT SERVICER CONTACT]

<u>From:</u> Federal National Mortgage Association, a federally chartered corporation, as financial agent of the United States ("<u>Fannie Mae</u>")

<u>Copy To:</u> The U.S. Department of the Treasury, [INSERT TREASURY CONTACT]

<u>Date:</u> [INSERT DATE OF TRANSMISSION]

<u>Method of Transmission:</u>  [Facsimile to [INSERT FAX NUMBER OF SERVICER]] [[Email with PDF file attached to [INSERT SERVICER EMAIL ADDRESS][Specify other method of electronic delivery]]

<u>NOTICE</u>

This transmission constitutes notice to Servicer that the Commitment to Purchase Financial Instrument and Servicer Participation Agreement, by and between Fannie Mae and Servicer (the "<u>Commitment</u>") and the Financial Instrument attached thereto have been fully executed and are effective as of the date of this transmission. The date of this transmission shall be the "<u>Effective Date</u>" of the Commitment and the Financial Instrument.

Copies of the fully executed Commitment and Financial Instrument are attached to this transmission for your records.

- 1 -

**EXHIBIT 2**

**AMENDED AND RESTATED**

**COMMITMENT TO PURCHASE FINANCIAL INSTRUMENT**
**and**
**SERVICER PARTICIPATION AGREEMENT**

This Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment") is entered into as of the Effective Date, by and between Federal National Mortgage Association, a federally chartered corporation, as financial agent of the United States ("Fannie Mae"), and the undersigned party ("Servicer"). Capitalized terms used, but not defined contextually, shall have the meanings ascribed to them in Section 12 below.

**Recitals**

WHEREAS, the U.S. Department of the Treasury (the "Treasury") has established a Home Affordable Modification Program (the "HAMP") pursuant to section 101 and 109 of the Emergency Economic Stabilization Act of 2008 (the "Act"), as section 109 of the Act has been amended by section 7002 of the American Recovery and Reinvestment Act of 2009;

WHEREAS, Fannie Mae, as financial agent of the United States, and Servicer entered into a Commitment to Purchase Financial Instrument and Servicer Participation Agreement for the Home Affordable Modification Program under the Emergency Economic Stabilization Act (the "Prior Agreement") in connection with the implementation of HAMP, the primary purpose of which was the modification of first lien mortgage loan obligations and the provision of loan modification and foreclosure prevention services relating thereto (the "HAMP Services");

WHEREAS, the Treasury has established a variety of new programs (together with the HAMP, the "Programs") under the Act to further stabilize the housing market by facilitating second lien mortgage loan modifications and extinguishments, providing home price decline protection incentives, encouraging foreclosure alternatives, such as short sales and deeds in lieu of foreclosure, and making other foreclosure prevention services available to the marketplace (collectively, together with the HAMP Services, the "Services");

WHEREAS, the Programs may include Services relating to FHA, VA and USDA loans;

WHEREAS, Fannie Mae has been designated by the Treasury as a financial agent of the United States in connection with the implementation of the Programs; all references to Fannie Mae in the Agreement shall be in its capacity as financial agent of the United States;

WHEREAS, Fannie Mae will fulfill the roles of administrator and record keeper for the Programs, and in conjunction therewith must standardize certain mortgage modification and foreclosure prevention practices and procedures as they relate to the Programs, consistent with the Act and in accordance with the directives of, and guidance provided by, the Treasury;

WHEREAS, Federal Home Loan Mortgage Corporation ("Freddie Mac") has been designated by the Treasury as a financial agent of the United States and will fulfill a compliance role in connection with the Programs; all references to Freddie Mac in the Agreement shall be in its capacity as compliance agent of the Programs;

WHEREAS, Fannie Mae and Servicer desire to amend and restate the Prior Agreement in its entirety as set forth herein;

WHEREAS, all Fannie Mae and Freddie Mac approved servicers are being directed through their respective servicing guides and bulletins to implement the Programs with respect to mortgage loans owned, securitized, or guaranteed by Fannie Mae or Freddie Mac (the "GSE Loans"); accordingly, this Agreement does not apply to the GSE Loans;

WHEREAS, all other servicers, as well as Fannie Mae and Freddie Mac approved servicers, that wish to participate in the Programs with respect to loans that are not GSE Loans (collectively, "Participating Servicers") must agree to certain terms and conditions relating to the respective roles and responsibilities of participants and other financial agents of the government; and

WHEREAS, Servicer wishes to participate in the Programs as a Participating Servicer on the terms and subject to the conditions set forth herein.

Accordingly, in consideration of the representations, warranties, and mutual agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Fannie Mae and Servicer agree to amend and restate the Prior Agreement in its entirety, as follows.

Agreement

## 1. Services

A.      Contemporaneously with the execution and delivery of this Commitment and the Financial Instrument, Servicer will execute and deliver to Fannie Mae one or more schedules describing the Services to be performed by Servicer pursuant to this Agreement, effective as of the Effective Date of the Agreement (each, a "Service Schedule" or an "Initial Service Schedule" and, collectively, the "Initial Service Schedules"). After the Effective Date of the Agreement, Servicer may opt-in to any additional initiatives offered by Treasury in connection with the Programs by executing and delivering to Fannie Mae one or more additional Service Schedules describing the Services relating to such initiatives (each, a "Service Schedule" or an "Additional Service Schedule" and, collectively, the "Additional Service Schedules") (the Initial Service Schedules and the Additional Service Schedules, collectively, the "Service Schedules"). All Service Schedules that are executed and delivered to Fannie Mae by Servicer from time to time will be numbered sequentially (e.g. Service Schedule A-1; Service Schedule A-2; Service Schedule A-3; et seq.) and are referenced herein, collectively, as Exhibit A; Exhibit A is hereby incorporated into the Commitment by this reference.

B.      Subject to Section 10.C., Servicer shall perform the Services described in (i) the Financial Instrument attached hereto as Exhibit B (the "Financial Instrument"); (ii) the Service Schedules attached hereto, collectively, as Exhibit A; (iii) the guidelines and procedures issued by the Treasury with respect to the Programs outlined in the Service Schedules (the "Program Guidelines"); and (iv) any supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications, including, but not limited to, business continuity requirements, compliance requirements, performance requirements and related remedies, issued by the Treasury, Fannie Mae, or Freddie Mac in order to change, or further describe or clarify the scope of, the rights and duties of the Participating Servicers in connection with the Programs outlined in the Service Schedules (the "Supplemental Directives" and, together with the Program Guidelines, the "Program Documentation"). The Program Documentation will be available to all Participating Servicers at www.HMPadmin.com; for the avoidance of doubt, the term "Program Documentation" includes all of the Program Guidelines and Supplemental Directives issued by Treasury and made available to Participating Servicers at www.HMPadmin.com prior to the Effective Date of the Agreement. The Program Documentation, as the same may be modified or amended from time to time in accordance with Section 10 below, is hereby incorporated into the Commitment by this reference.

C.      Servicer's representations and warranties, and acknowledgement of and agreement to fulfill or satisfy certain duties and obligations, with respect to its participation in the Programs and under the Agreement are set forth in the Financial Instrument. Servicer's certification as to its continuing compliance with, and the truth and accuracy of, the representations and warranties set forth in the Financial Instrument will be provided annually in the form attached hereto as Exhibit C (the "Certification"), beginning on June 1, 2010 and again on June 1 of each year thereafter during the Term (as defined below) and upon the execution and delivery by Servicer of any Additional Service Schedule during the Term.

D.      The recitals set forth above are hereby incorporated herein by this reference.

2

**2. Authority and Agreement to Participate in Programs**

A.      Servicer shall perform the Services for all mortgage loans it services, whether it services such mortgage loans for its own account or for the account of another party, including any holders of mortgage-backed securities (each such other party, an "Investor").

B.      Fannie Mae acknowledges that Servicer may service mortgage loans for its own account or for the account of one or more Investors and may be subject to restrictions set forth in pooling and servicing agreements or other servicing contracts governing Servicer's servicing of a mortgage loan; Servicer shall use reasonable efforts to remove all prohibitions or impediments to its authority, and use reasonable efforts to obtain all third party consents, waivers and delegations that are required, by contract or law, in order to perform the Services.

C.      Notwithstanding subsection B., if (x) Servicer is unable to obtain all necessary consents, waivers and delegations for performing any Services under the Programs, or (y) the pooling and servicing agreement or other servicing contract governing Servicer's servicing of a mortgage loan prohibits Servicer from performing such Services for that mortgage loan, Servicer shall not be required to perform such Services with respect to that mortgage loan and shall not receive all or any portion of the Purchase Price (defined below) otherwise payable for such Services with respect to such loan.

D.      Notwithstanding anything to the contrary contained herein, the Agreement does not apply to GSE Loans. Servicers are directed to the servicing guides and bulletins issued by Fannie Mae and Freddie Mac, respectively, concerning the Programs as applied to GSE Loans.

E.      Servicer's performance of the Services and implementation of the Programs shall be subject to review by Freddie Mac and its agents and designees as more fully set forth in the Agreement.

**3. Set Up; Prerequisite to Payment**

Servicer will provide to Fannie Mae: (a) the set up information required by the Program Documentation and any ancillary or administrative information requested by Fannie Mae in order to process Servicer's participation in the Programs as a Participating Servicer on or before the Effective Date of the Agreement as to the Initial Service Schedules that are executed and delivered contemporaneously herewith, and on or before the effective date of the Additional Service Schedules (if any) executed and delivered after the Effective Date of the Agreement; and (b) the data elements for each mortgage obligation, property, or borrower eligible for the Programs as and when described in the Program Documentation and the Financial Instrument. Purchase Price payments will not be remitted pursuant to Section 4 with respect to Services for which the required data elements have not been provided.

**4. Agreement to Purchase Financial Instrument; Payment of Purchase Price**

A.      Fannie Mae, in its capacity as a financial agent of the United States, agrees to purchase, and Servicer agrees to sell to Fannie Mae, in such capacity, the Financial Instrument that is executed and delivered by Servicer to Fannie Mae in the form attached hereto as Exhibit B, in consideration for the payment by Fannie Mae, as agent, of the Purchase Price.

B.      The conditions precedent to the payment by Fannie Mae of the Purchase Price with respect to the Services described on the Initial Service Schedules are: (a) the execution and delivery of the Commitment, the Initial Service Schedules, and the Financial Instrument by Servicer to Fannie Mae; (b) the execution and delivery of the Commitment and the Initial Service Schedules by Fannie Mae to Servicer; (c) the delivery of copies of the fully executed Commitment, Initial Service Schedules and Financial Instrument to Treasury on the Effective Date of the Agreement; (d) the performance by Servicer of the Services described in the Agreement, in accordance with the terms and conditions thereof, to the reasonable satisfaction of Fannie Mae and Freddie Mac; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement.

3

C.      The conditions precedent to the payment by Fannie Mae of the Purchase Price with respect to the Services described on the Additional Service Schedules (if any) are: (a) the execution and delivery of the Additional Service Schedules and the Certification by Servicer to Fannie Mae; (b) the execution and delivery of the Additional Service Schedules by Fannie Mae to Servicer; (c) the delivery of copies of the fully executed Additional Service Schedules to Treasury; (d) the performance by Servicer of the Services described in the Agreement, in accordance with the terms and conditions thereof, to the reasonable satisfaction of Fannie Mae and Freddie Mac; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement.

D.      Solely in its capacity as the financial agent of the United States, and subject to subsection E. below, Fannie Mae shall remit all payments described in the Program Documentation to Servicer for the account or credit of Servicer, Investors and borrowers, in each case in accordance with the Program Documentation (all such payments, collectively, the "Purchase Price"); all payments remitted to Servicer for the credit or account of third parties under the Program Documentation shall be applied by Servicer as required by the Program Documentation. Fannie Mae shall have no liability to Servicer with respect to the payment of the Purchase Price, unless and until: (a) Servicer and all other interested parties have satisfied all pre-requisites set forth herein and in the Program Documentation relating to the applicable Program payment structure, including, but not limited to, the delivery of all data elements required by Section 3 of this Commitment; and (b) the Treasury has provided funds to Fannie Mae for remittance to Servicer, together with written direction to remit the funds to Servicer in accordance with the Program Documentation.

E.      The Purchase Price will be paid to Servicer by Fannie Mae as the financial agent of the United States as and when described herein and in the Program Documentation in consideration for the execution and delivery of the Financial Instrument by Servicer on or before the Effective Date of the Agreement, upon the satisfaction of the conditions precedent to payment described in this Section 4.

F.      The value of the Agreement is limited to **$401,700,000.00** (the "Program Participation Cap"). Accordingly, the aggregate Purchase Price payable to Servicer under the Agreement with respect to all Services described on all of the Service Schedules that are executed and delivered in connection with the Agreement may not exceed the amount of the Program Participation Cap. For each Service to be performed by Servicer, the aggregate remaining Purchase Price available to be paid to Servicer under the Agreement will be reduced by the maximum Purchase Price potentially payable with respect to that Service. In the event the Purchase Price actually paid with respect to that Service is less than the maximum Purchase Price potentially payable, the aggregate remaining Purchase Price available to be paid to Servicer under the Agreement will be increased by the difference between such amounts. Notwithstanding the foregoing, no agreements with any party that may result in a new payment obligation under the Programs will be effected under the Agreement, and no payments will be made with respect to any new Services, from and after the date on which the aggregate Purchase Price paid or payable to Servicer under the Agreement equals the Program Participation Cap. Treasury may, from time to time in its sole discretion, adjust the amount of the Program Participation Cap.   Servicer will be notified of all adjustments to the Program Participation Cap in writing by Fannie Mae.

G.      Servicer shall maintain complete and accurate records of, and supporting documentation for, all Services provided in connection with the Programs including, but not limited to, data relating to borrower payments (e.g., principal, interest, taxes, homeowner's insurance, hazard insurance, flood insurance and homeowner's association and/or condo fees), delinquencies and the terms of each agreement executed under the Programs (e.g., trial modification agreements, loan modification agreements and extinguishment agreements), which will be relied upon by Fannie Mae when calculating, as financial agent for the United States, the Purchase Price to be paid by the Treasury through Fannie Mae or any other financial agent. Servicer agrees to provide Fannie Mae and Freddie Mac with documentation (including copies of executed borrower agreements) and other information with respect to any amounts paid by the Treasury as may be reasonably requested by such parties. In the event of a discrepancy or error in the amount of the Purchase Price paid hereunder, at Fannie Mae's election, (x) Servicer shall remit to Fannie Mae the amount of any overpayment within thirty (30) days of receiving a refund request from Fannie Mae, or (y) Fannie Mae may immediately offset the amount of the overpayment against other amounts due and payable to Servicer by Fannie Mae, as financial agent of the United States, upon written notice to Servicer. Servicer shall still be obligated to credit

4

to the respective accounts of Investors and borrowers any portion of the Purchase Price to which they are entitled (if any) notwithstanding such offset unless otherwise directed by Fannie Mae.

H. At the election and upon the direction of the Treasury and with prior written notice to Servicer, Fannie Mae may deduct from any amount to be paid to Servicer any amount that Servicer, Investor, or borrower is obligated to reimburse or pay to the United States government, provided, however, that any amount withheld under this subsection H. will be withheld only from the amounts payable to, or for the account or credit of, the party which is liable for the obligation to the United States government.

## 5. Term

A. New Services may be undertaken by Servicer as described in the Financial Instrument and the Program Documentation from and after the Effective Date until December 31, 2012 (the "Initial Term"), subject to one or more extensions of the Initial Term by the Treasury, or earlier termination of the Agreement by Fannie Mae pursuant to the provisions hereof, or earlier suspension or termination of one or more of the Programs by the Treasury, provided, however, no new Services may be undertaken by Servicer, and Servicer will have no further obligation to perform any Services under this Agreement, from and after the date on which the Program Participation Cap is reached.

B. Servicer shall perform the Services described in the Program Documentation in accordance with the terms and conditions of the Agreement during the Initial Term and any extensions thereof (the Initial Term, together with all extensions thereof, if any, the "Term"), and during such additional period as may be necessary to: (i) comply with all data collection, retention and reporting requirements specified in the Program Documentation during and for the periods set forth therein; and (ii) complete all Services that were initiated by Servicer, including, but not limited to, the completion of all documentation relating thereto, during the Term. Servicer agrees that it will work diligently to complete all Services as soon as reasonably possible after the end of the Term or earlier termination.

C. Notwithstanding Sections 5.A. and 5.B., if the Servicer has elected to participate in the Second Lien Modification Program by executing and delivering to Fannie Mae a Service Schedule relating thereto, the Servicer in its discretion, may elect to opt out of the Second Lien Modification Program on an annual basis by providing notice to Fannie Mae in accordance with Section 9 hereof within 30 days following the anniversary of the Effective Date of the Service Schedule for the Second Lien Modification Program. Following the Servicer's election to opt out of the Second Lien Modification Program, the Servicer will not be required to perform any Services for any new mortgage loans under the Second Lien Modification Program; however, the Servicer must continue to perform any Services for any mortgage loan for which it had already begun performing Services prior to electing to opt out of the Second Lien Modification Program.

D. The Agreement, or any of the Programs implemented under the Agreement, may be terminated by Fannie Mae or Servicer prior to the end of the Term pursuant to Section 6 below.

## 6. Defaults, Acts of Bad Faith and Early Termination; Remedies for and Effects of Defaults, Acts of Bad Faith and Early Termination; Opportunity to Cure

A. The following constitute events of default by Servicer under the Agreement (each, an "Event of Default" and, collectively, "Events of Default"):

> (1) Servicer fails to perform or comply with any of its material obligations under the Agreement, including, but not limited to, circumstances in which Servicer fails to ensure that all eligibility criteria and other conditions precedent specified in applicable Program Documentation are satisfied prior to effectuating any Services in connection with any of the Programs.

(2) Servicer: (a) ceases to do business as a going concern; (b) makes a general assignment for the benefit of, or enters into any arrangement with creditors in lieu thereof; (c) admits in writing its inability to pay its debts as they become due; (d) files a voluntary petition under any bankruptcy or insolvency law or files a voluntary petition under the reorganization or arrangement provisions of the laws of the United States or any other jurisdiction; (e) authorizes, applies for or consents to the appointment of a trustee or liquidator of all or substantially all of its assets; (f) has any substantial part of its property subjected to a levy, seizure, assignment or sale for or by any creditor or governmental agency; or (g) enters into an agreement or resolution to take any of the foregoing actions.

(3) Servicer, any employee or contractor of Servicer, or any employee or contractor of Servicers' contractors, commits a grossly negligent, willful or intentional, or reckless act (including, but not limited to, misrepresentation or fraud) in connection with any of the Programs or the Agreement.

(4) Any representation, warranty, or covenant made by Servicer in the Agreement or any Certification is or becomes materially false, misleading, incorrect, or incomplete.

(5) An evaluation of performance that includes any specific findings by Freddie Mac, in its sole discretion, that Servicer's performance under any performance criteria established pursuant to applicable Program Documentation is materially insufficient, or any failure by Servicer to comply with any directive issued by Fannie Mae or Freddie Mac with respect to documents or data requested, findings made, or remedies established, by Fannie Mae and/or Freddie Mac in conjunction with such performance criteria or other Program requirements.

B. Fannie Mae may take any, all, or none of the following actions upon an <u>Event of Default by Servicer</u> under the Agreement:

(1) Fannie Mae may: (i) withhold some or all of the Servicer's portion of the Purchase Price until, in Fannie Mae's determination, Servicer has cured the default; and (ii) choose to utilize alternative means of paying any portion of the Purchase Price for the credit or account of borrowers and Investors and delay paying such portion pending adoption of such alternative means.

(2) Fannie Mae may: (i) reduce the amounts payable to Servicer under Section 4; and/or (ii) obtain repayment of prior payments made to Servicer under Section 4, provided, however, Fannie Mae will seek to obtain repayment of prior payments made under Section 4 only with respect to Services that are determined by Fannie Mae or Freddie Mac to have been impacted by, or that Fannie Mae or Freddie Mac believes may have been, or may be, impacted by, the Event of Default giving rise to the remedy.

(3) Fannie Mae may require Servicer to submit to additional Program administrator oversight, including, but not limited to, additional compliance controls and quality control reviews.

(4) Fannie Mae may terminate the Agreement and cease its performance hereunder, or cease its performance hereunder as to any Program in which Servicer is a participant.

(5) Fannie Mae may require Servicer to submit to information and reporting with respect to its financial condition and ability to continue to meet its obligations under the Agreement.

C. The following constitute acts of bad faith of Investors and borrowers in connection with the Programs (each, an "<u>Act of Bad Faith</u>" and, collectively, "<u>Acts of Bad Faith</u>"): an Investor or borrower commits a grossly negligent, willful or intentional, or reckless act (including, but not limited to, misrepresentation or fraud) in connection with any of the Programs

(including, but not limited to, in connection with such Investor's or borrower's response to Program questionnaires, the execution or delivery to Servicer, Fannie Mae, or Treasury of any of the agreements relating to such Investor's or borrower's participation in any of the Programs and the production of supporting documentation therefore and in connection with any audit or review by Freddie Mac for Investor or borrower compliance with the Programs). For brevity, any such Investor or borrower is referred to in this subsection as a "defaulting party" or as a "defaulting" Investor or borrower and the Act of Bad Faith by such Investor or borrower as a "default."

D. Fannie Mae may take any, all, or none of the following actions if an Act of Bad Faith involving an Investor or a borrower occurs, or is reasonably believed by Fannie Mae to have occurred, in connection with any of the Programs:

(1) Fannie Mae may withhold all or any portion of the Purchase Price payable to, or for the credit or account of, the defaulting party until, in Fannie Mae's determination, the default has been cured or otherwise remedied to Fannie Mae's satisfaction.

(2) Fannie Mae may: (i) reduce the amounts payable to Servicer for the credit, or account of, the defaulting party under Section 4; and/or (ii) obtain repayment of prior payments made to or for the credit or account of the defaulting party under Section 4. Servicer will reasonably cooperate with, and provide reasonable support and assistance to, Fannie Mae and Freddie Mac in connection with their respective roles and, in Fannie Mae's case, in connection with its efforts to obtain repayment of prior payments made to Investors and borrowers as provided in this subsection.

(3) Fannie Mae may require Servicer to submit to additional Program administrator oversight, including, but not limited to, additional compliance controls and quality control reviews.

(4) Fannie Mae may cease its performance hereunder as to some or all of the Services subject to the Agreement that relate to the defaulting Investor or borrower.

(5) Fannie Mae may terminate the Agreement and cease its performance hereunder if Acts of Bad Faith occur on a recurring basis, are widespread among the Investor or borrower bases served by Servicer, or occur in combination or in connection with one or more Events of Default by Servicer.

E. In addition to the termination rights set forth above, Fannie Mae may terminate the Agreement or any Program implemented under the Agreement immediately upon written notice to Servicer:

(1) at the direction of the Treasury;

(2) in the event of a merger, acquisition, or other change of control of Servicer;

(3) in the event that a receiver, liquidator, trustee, or other custodian is appointed for the Servicer; or

(4) in the event that a material term of the Agreement is determined to be prohibited or unenforceable as referred to in Section 11.C.

F. The Agreement will terminate automatically:

(1) in the event that the Financial Agency Agreement, dated February 18, 2009, by and between Fannie Mae and the Treasury is terminated; or

(2) upon the expiration or termination of all of the Programs implemented under the Agreement.

G.  The effects of the expiration or termination of the Agreement are as follows:

(1) In the event that the Agreement expires at the end of the Initial Term or any extension thereof pursuant to Section 5, or in the event that the Agreement expires or is terminated pursuant to Section 6.E. or 6.F., Fannie Mae shall, solely in its capacity as the financial agent of the United States, continue to remit all amounts that are properly payable pursuant to Section 4 to Servicer in accordance with the Program Documentation until paid in full, provided, however, that Purchase Price payments will be made only with respect to Services that were performed in accordance with the applicable Program Documentation prior to the date of expiration or termination and that do not exceed the Program Participation Cap.

(2)  In the event that the Agreement is terminated in connection with an Event of Default by Servicer, no compensation with respect to any Service will be paid to Servicer for the account of the Servicer subsequent to termination; Fannie Mae's only continuing obligations as financial agent of the United States subsequent to termination will be to remit all payments that are properly payable pursuant to Section 4 to Servicer (or, at Fannie Mae's discretion, an alternative provider) for the account of borrowers and Investors in accordance with the Program Documentation until paid in full.

(3)  In the event that the Agreement is terminated in connection with an Act of Bad Faith by an Investor or a borrower, no compensation with respect to any Services will be paid to Servicer for the credit or account of the defaulting Investor or borrower subsequent to termination; Fannie Mae's only continuing obligation as financial agent of the United States subsequent to termination will be to remit all payments that are properly payable pursuant to Section 4 to Servicer for the credit or account of non-defaulting parties as described in the applicable Program Documentation until paid in full.  For the avoidance of doubt, if the Act of Bad Faith resulting in the termination of the Agreement occurs in connection with an Event of Default of Servicer, no compensation with respect to any Service will be paid to Servicer for the account of the Servicer subsequent to termination.

H.  Fannie Mae, in its capacity as the financial agent of the United States, may reduce the amounts payable to Servicer under Section 4, or obtain repayment of prior payments made under Section 4, in connection with: (a) an evaluation of Servicer's performance that includes any specific findings by Freddie Mac that Servicer's performance under any performance criteria established pursuant to the Program Documentation is materially insufficient, or (b) any failure by Servicer to comply materially with any directive issued by Fannie Mae or Freddie Mac with respect to documents or data requested, findings made, or remedies established, by Fannie Mae and/or Freddie Mac in conjunction with such performance criteria or other Program requirements; provided, however, Fannie Mae will seek to obtain repayment of prior payments made under Section 4 only with respect to Services that are determined by Fannie Mae or Freddie Mac to have been impacted by, or that Fannie Mae or Freddie Mac believes may have been, or may be, impacted by, the findings giving rise to this remedy. Fannie Mae may initially avail itself of this remedy in lieu of a specific declaration of an Event of Default, provided, however, that doing so shall not preclude Fannie Mae from later declaring an Event of Default or exercising any other rights or remedies otherwise available to it under this Section 6, or at law or in equity, in connection with the event giving rise to this remedy, or any future events giving rise to this remedy.

I.  The remedies available to Fannie Mae upon an Event of Default and an Act of Bad Faith under this Section are cumulative and not exclusive; further, these remedies are in addition to, and not in lieu of, any other remedies available to Fannie Mae at law or in equity.

J. In the event of the expiration or termination of the Agreement or any Program implemented under the Agreement under any circumstances, Servicer and Fannie Mae agree to cooperate with one another on an ongoing basis to ensure an effective and orderly transition or resolution of the Services, including the provision of any information, reporting, records and data required by Fannie Mae and Freddie Mac.

K. If an Event of Default under Section 6.A.1., Section 6.A.4., or Section 6.A.5. occurs and Fannie Mae determines, in its sole discretion, that the Event of Default is curable and elects to exercise its right to terminate the Agreement, Fannie Mae will provide written notice of the Event of Default to Servicer and the Agreement will terminate automatically thirty (30) days after Servicer's receipt of such notice, if the Event of Default is not cured by Servicer to the reasonable satisfaction of Fannie Mae prior to the end of such thirty (30) day period. If Fannie Mae determines, in its sole discretion, that an Event of Default under Section 6.A.1., Section 6.A.4., or Section 6.A.5. is not curable, or if an Event of Default under Section 6.A.2. or Section 6.A.3. occurs, and Fannie Mae elects to exercise its right to terminate the Agreement under Section 6.B.4., Fannie Mae will provide written notice of termination to the Servicer on or before the effective date of the termination.

## 7. Disputes

Fannie Mae and Servicer agree that it is in their mutual interest to resolve disputes by agreement. If a dispute arises under the Agreement, the parties will use all reasonable efforts to promptly resolve the dispute by mutual agreement. If a dispute cannot be resolved informally by mutual agreement at the lowest possible level, the dispute shall be referred up the respective chain of command of each party in an attempt to resolve the matter. This will be done in an expeditious manner. Servicer shall continue diligent performance of the Services pending resolution of any dispute. Fannie Mae and Servicer reserve the right to pursue other legal or equitable rights they may have concerning any dispute. However, the parties agree to take all reasonable steps to resolve disputes internally before commencing legal proceedings.

## 8. Transfer or Assignment; Mergers, Acquisitions and Changes of Control; Effects of Assignment

A. Mortgage loans and servicing rights are freely transferable under this Agreement, subject to: (i) the contractual requirements regarding notice and the execution and delivery of the Assignment and Assumption Agreement, in the form of Exhibit D, set forth in Sections 8 and 9 hereof, and (ii) any restrictions under applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements. Servicer must provide written notice to Fannie Mae and Freddie Mac pursuant to Section 9 below of: (i) any transfers or assignments of mortgage loans, or servicing rights relating to mortgage loans, that are 60 or more days delinquent and otherwise eligible for consideration or process under one or more of the Programs at the time of transfer or assignment, or for which the Servicer is performing Services at the time of transfer or assignment (collectively, "Eligible Loans"); and (ii) any other transfers or assignments of Servicer's rights and obligations relating to Eligible Loans under this Agreement, including, but not limited to, transfers or assignments of any rights or obligations relating to Eligible Loans under this Agreement that occur in connection with the merger, acquisition, or other change of control of Servicer. Such notice must include payment instructions for payments to be made to the transferee or assignee of the Eligible Loans, servicing rights or other rights and obligations subject to the notice (if applicable), and, subject to Section 8.B. below, evidence of the assumption by such transferee or assignee of the Eligible Loans, servicing rights or other rights and obligations that are transferred, in the form of Exhibit D (the "Assignment and Assumption Agreement"). Servicer acknowledges that Fannie Mae will continue to remit payments to Servicer in accordance with Section 4 for Services relating to mortgage loans, servicing rights or other rights and obligations that have been assigned or transferred, and that Servicer will be liable for underpayments, overpayments and misdirected payments, unless and until such notice and an executed Assignment and Assumption Agreement are provided to Fannie Mae and Freddie Mac.

B. Servicer shall notify Fannie Mae as soon as legally possible of any proposed merger, acquisition, or other change of control of Servicer, and of any financial and operational circumstances which may impair Servicer's ability to perform its obligations under the Agreement, in accordance with Sections 8 and 9, provided, however, that Servicer need not execute and deliver an Assignment and Assumption Agreement in the form of Exhibit D in the event that the assignment and assumption occur by operation of law in connection with a merger, acquisition, or other change of control of Servicer and are effective as to all of Servicer's rights and obligations under this Agreement with respect to all of the mortgage loans it services.

C. The effects of transfers and assignments under this Agreement are as follows:

9

(1)     If the Servicer transfers or assigns all or any portion of its portfolio of mortgage loans or servicing rights to a third party pursuant to an Assignment and Assumption Agreement, only the Eligible Loans must be identified on a schedule to the Assignment and Assumption Agreement.  The transferee or assignee of Servicer's mortgage loans and servicing rights must assume Servicer's obligations under this Agreement only with respect to Eligible Loans, subject to the Service Schedules and the Program Documentation applicable to the Programs in which Servicer agreed to participate prior to the transfer or assignment. Any mortgage loans or servicing rights that (I) are not Eligible Loans at the time of the transfer or assignment, (II) are a part of the transferee's or assignee's existing portfolio prior to the transfer or assignment, or (III) become a part of the transferee's or assignee's portfolio subsequent to such transfer or assignment will become subject to the Programs only if the transferee or assignee has itself executed a Commitment to Purchase Financial Instrument and Servicer Participation Agreement separate and apart from the transfer or assignment involving Servicer and, then, only in accordance therewith.

(2)     If the Servicer transfers or assigns its portfolio of mortgage loans and servicing rights to a third party in connection with a merger, acquisition, or other change of control and the transfer or assignment is effective by operation of law, the transferee or assignee of such mortgage loans and servicing rights must provide servicing with respect to all such mortgage loans and servicing rights (regardless of status at the time of transfer or assignment with respect to Program eligibility) in accordance with this Agreement, subject to the Service Schedules and the Program Documentation applicable to the Programs in which Servicer agreed to participate prior to the transfer or assignment. Any mortgage loans or servicing rights that (I) are a part of the transferee's or assignee's existing portfolio prior to the transfer or assignment, or (II) become a part of the transferee's or assignee's portfolio subsequent to such transfer or assignment will become subject to the Programs only if the transferee or assignee has itself executed a Commitment to Purchase Financial Instrument and Servicer Participation Agreement separate and apart from the transfer or assignment involving Servicer and, then, only in accordance therewith.

(3)     Servicer may not transfer or assign any mortgage loans or servicing rights to any third party in a manner that is intended to circumvent, or has the effect of circumventing, Servicer's obligations under this Agreement.

## 9. Notices

All legal notices under the Agreement shall be in writing and referred to each party's point of contact identified below at the address listed below, or to such other point of contact at such other address as may be designated in writing by such party. All such notices under the Agreement shall be considered received: (a) when personally delivered; (b) when delivered by commercial overnight courier with verification receipt; (c) when sent by confirmed facsimile; or (d) three (3) days after having been sent, postage prepaid, via certified mail, return receipt requested. Notices shall not be made or delivered in electronic form, except as provided in Section 12.B. below, provided, however, that the party giving the notice may send an e-mail to the party receiving the notice advising that party that a notice has been sent by means permitted under this Section.


To Servicer:

Aurora Loan Services LLC
██████████████
10350 Park Meadows Drive
Littleton, CO 80124
██████████████████████████████

To Fannie Mae:

Fannie Mae
3900 Wisconsin Ave, NW
Washington, DC 20016

To Treasury:

Department of Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220

To Freddie Mac:

Freddie Mac
8100 Jones Branch Drive
McLean, VA 22102
Attn: Vice President, Making Home Affordable – Compliance
Facsimile: (703) 903-2544
Email: MHA_Compliance@freddiemac.com

**10. Modifications**

A. Subject to Sections 10.B. and 10.C., modifications to the Agreement shall be in writing and signed by Fannie Mae and Servicer.

B. Fannie Mae and the Treasury each reserve the right to unilaterally modify or supplement the terms and provisions of the Program Documentation that relate (as determined by Fannie Mae or the Treasury, in their reasonable discretion) to the compliance and performance requirements of the Programs, and related remedies established by Freddie Mac, and/or to technical, administrative, or procedural matters or compliance and reporting requirements that may impact the administration of the Programs.

C. Notwithstanding Sections 10.A. and 10.B., any modification to the Program Documentation that materially impacts the borrower eligibility requirements, the amount of payments of the Purchase Price to be made to Participating Servicers, Investors or borrowers in connection with any of the Programs in which Servicer participates, or the rights, duties, or obligations of Participating Servicers, Investors or borrowers in connection with any of the Programs in which Servicer participates (each, a "Program Modification" and, collectively, the "Program Modifications") shall be effective only on a prospective basis; Participating Servicers will be afforded the opportunity to opt-out of a modified Program when Program Modifications are published with respect to the Services to be performed by Servicer in connection with the modified Program on or after the effective date of the Program Modification, at Servicer's discretion. Opt-out procedures, including, but not limited to, the time

11

and process for notification of election to opt-out and the window for such election, will be set forth in the Program Documentation describing the Program Modification, provided, however, that Servicer will be given at least thirty (30) days to elect to opt-out of a Program Modification. For the avoidance of doubt, during the period during which Servicer may elect to opt-out of a Program Modification and after any such opt-out is elected by Servicer, Servicer will continue to perform the Services described in the Financial Instrument and the Program Documentation (as the Program Documentation existed immediately prior to the publication of the Program Modification prompting the opt-out) with respect to any Services that Servicer had already begun to perform prior to the opt-out.

**11. Miscellaneous**

A. The Agreement shall be governed by and construed under Federal law and not the law of any state or locality, without reference to or application of the conflicts of law principles. Any and all disputes between the parties that cannot be settled by mutual agreement shall be resolved solely and exclusively in the United States Federal courts located within the District of Columbia. Both parties consent to the jurisdiction and venue of such courts and irrevocably waive any objections thereto.

B. The Agreement is not a Federal procurement contract and is therefore not subject to the provisions of the Federal Property and Administrative Services Act (41 U.S.C. §§ 251-260), the Federal Acquisition Regulations (48 CFR Chapter 1), or any other Federal procurement law.

C. Any provision of the Agreement that is determined to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of the Agreement, and no such prohibition or unenforceability in any jurisdiction shall invalidate such provision in any other jurisdiction.

D. Failure on the part of Fannie Mae to insist upon strict compliance with any of the terms hereof shall not be deemed a waiver, nor will any waiver hereunder at any time be deemed a waiver at any other time. No waiver will be valid unless in writing and signed by an authorized officer of Fannie Mae. No failure by Fannie Mae to exercise any right, remedy, or power hereunder will operate as a waiver thereof. The rights, remedies, and powers provided herein are cumulative and not exhaustive of any rights, remedies, and powers provided by law.

E. The Agreement shall inure to the benefit of and be binding upon the parties to the Agreement and their permitted successors-in-interest.

F. The Commitment, the Service Schedule(s) and the Assignment and Assumption Agreement (if applicable) may be executed in two or more counterparts (and by different parties on separate counterparts), each of which shall be an original, but all of which together shall constitute one and the same instrument.

G. The Commitment, together with the Service Schedule(s), the Financial Instrument, the Certifications, the Assignment and Assumption Agreement (if applicable) and the Program Documentation, constitutes the entire agreement of the parties with respect to the subject matter hereof. In the event of a conflict between any of the foregoing documents and the Program Documentation, the Program Documentation shall prevail. In the event of a conflict between the Program Guidelines and the Supplemental Directives, the Program Guidelines shall prevail.

H. Any provisions of the Agreement (including all documents incorporated by reference thereto) that contemplate their continuing effectiveness, including, but not limited to, Sections 4, 5.B., 6, 8, 9, 11 and 12 of the Commitment, and Sections 2, 3, 5, 7, 8, 9 and 10 of the Financial Instrument, and any other provisions (or portions thereof) in the Agreement that relate to, or may impact, the ability of Fannie Mae and Freddie Mac to fulfill their responsibilities as agents of the United States in connection with the Programs, shall survive the expiration or termination of the Agreement.

**12. Defined Terms; Incorporation by Reference; Effect of Amendment and Restatement**

A. All references to the "Agreement" necessarily include, in all instances, the Commitment and all documents incorporated into the Commitment by reference, whether or not so noted contextually, and all amendments and modifications thereto. Specific references throughout the Agreement to individual documents that are incorporated by reference into the Commitment are not inclusive of any other documents that are incorporated by reference, unless so noted contextually.

B. The term "Effective Date" means the date on which Fannie Mae transmits a copy of the fully executed Commitment, Initial Service Schedule(s) and Financial Instrument to Treasury and Servicer with a completed cover sheet, in the form attached hereto as Exhibit E (the "Cover Sheet"); the Agreement shall be effective on the Effective Date. Any Additional Service Schedules that are executed and delivered to Fannie Mae after the Effective Date of the Agreement shall be also be accompanied by a completed Cover Sheet and shall be effective on the effective date or dates set forth therein. All executed documents and accompanying Cover Sheets will be faxed, emailed, or made available through other electronic means to Treasury and Servicer in accordance with Section 9.

C. The Program Documentation and Exhibit A – Service Schedule(s) (Service Schedule A-1, et seq.), Exhibit B – Form of Financial Instrument, Exhibit C – Form of Certification, Exhibit D – Form of Assignment and Assumption Agreement and Exhibit E – Form of Cover Sheet (in each case, in form and, upon completion, in substance), including all amendments and modifications thereto, are incorporated into this Commitment by this reference and given the same force and effect as though fully set forth herein.

D. The Prior Agreement is amended and restated in its entirety, and all of the terms and conditions of the Prior Agreement are superseded by the terms and conditions of this Agreement, effective as of the Effective Date of this Agreement.

[SIGNATURE PAGE FOLLOWS; REMAINDER OF PAGE
INTENTIONALLY LEFT BLANK]

13

**In Witness Whereof,** Servicer and Fannie Mae by their duly authorized officials hereby execute and deliver this Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement as of the Effective Date.

**SERVICER:** Aurora Loan Services LLC

By: _M._____

Name: ___D. Aydelotte____

Title: ___SVP_____

Date: ___8/24/2010_____

**FANNIE MAE,** solely as Financial Agent of the United States

By: _Donald R Palumbo____

Name: _DONALD R PALUMBO__

Title: _VICE PRESIDENT, CREDIT_

Date: _9/1/2010_____

**EXHIBITS**

Exhibit A    Service Schedule(s)

Exhibit B    Form of Financial Instrument

Exhibit C    Form of Certification

Exhibit D    Form of Assignment and Assumption Agreement

Exhibit E    Form of Cover Sheet

## EXHIBIT A

## SERVICE SCHEDULE(S)

The attached Service Schedules together comprise Exhibit A to that certain Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment"), entered into as of the Effective Date, by and between Federal National Mortgage Association ("Fannie Mae"), a federally chartered corporation, acting as financial agent of the United States, and the undersigned party ("Servicer").

Each of the Service Schedules attached hereto is effective as of the Effective Date, or on such other date or dates as may be specified therein. All of the capitalized terms that are used but not defined in the Service Schedules shall have the meanings ascribed to them in the Commitment.

Exhibit A is deemed to be amended to include all Additional Service Schedules (if any) that are executed and delivered by the parties after the Effective Date in accordance with the Agreement, without any further action on the part of the parties hereto.

## SERVICE SCHEDULE A-1

This Service Schedule is appended to that certain Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment"), entered into as of the Effective Date, by and between Federal National Mortgage Association ("Fannie Mae"), a federally chartered corporation, acting as financial agent of the United States, and the undersigned party ("Servicer"), and, together with all other Services Schedules appended thereto (if any), constitutes Exhibit A to the Commitment.

All of the capitalized terms that are used but not defined below shall have the meanings ascribed to them in the Commitment or in applicable Program Documentation.

1. **Program Name:**

Servicer hereby elects to participate in the following Program:

**Home Affordable Modification Program (HAMP)**

2. **Description of Program Services:**

All services required to be performed by a participating servicer as set forth in the Program Documentation for the Home Affordable Modification Program under the Emergency Economic Stabilization Act of 2008, as amended, including, but not limited to, obligations relating to the modification of first lien mortgage loans and the provision of loan modification and foreclosure prevention services relating thereto.

3. **Effective date of Service Schedule:**

**This Service Schedule is effective as of 5/1/2009.**

**In Witness Whereof,** Servicer and Fannie Mae by their duly authorized officials hereby execute and deliver this Service Schedule as of the effective date of the Service Schedule set forth above.

**SERVICER:** Aurora Loan Services LLC

**FANNIE MAE,** solely as Financial Agent of the United States

By: _____
Name: _____D. Aydelotte_____
Title: _____SVP_____
Date: ____8/24/2010_____

By: _____
Name: ___DONALD R PALUMBO___
Title: __VICE PRESIDENT, CREDIT__
Date: ___9/1/2010_____

A-16

## SERVICE SCHEDULE A-3

This Service Schedule is appended to that certain Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment"), entered into as of the Effective Date, by and between Federal National Mortgage Association ("Fannie Mae"), a federally chartered corporation, acting as financial agent of the United States, and the undersigned party ("Servicer"), and, together with all other Services Schedules appended thereto (if any), constitutes Exhibit A to the Commitment.

All of the capitalized terms that are used but not defined below shall have the meanings ascribed to them in the Commitment or in applicable Program Documentation.

### 1. Program Name:

Servicer hereby elects to participate in the following Program(s):

**Treasury Federal Housing Administration – Home Affordable Modification Program (Treasury FHA-HAMP)**

### 2. Description of Program Services:

All services required to be performed by a participating servicer relating to Treasury FHA-HAMP, as set forth in guidance issued by the Federal Housing Administration from time to time; including Mortgagee Letter 2009-23, 2009-35, 2009-39, 2010-04 and 2010-10, and in the Program Documentation for including Treasury FHA-HAMP in the Home Affordable Modification Program under the Emergency Economic Stabilization Act of 2008, as amended, including, but not limited to, obligations relating to the modification of first lien mortgage loans insured by the Federal Housing Administration and the provision of loan modification and foreclosure prevention services relating thereto.

### 3. Effective date of Service Schedule:

**This Service Schedule is executed and delivered contemporaneously with the Commitment; accordingly, the effective date of this Service Schedule is the Effective Date of the Agreement.**

**In Witness Whereof**, Servicer and Fannie Mae by their duly authorized officials hereby execute and deliver this Service Schedule as of the effective date of the Service Schedule set forth above.

**SERVICER**: Aurora Loan Services LLC

**FANNIE MAE**, solely as Financial Agent of the United States

By: _M. Sw_
Name: _J. Aadelotte_
Title: _SVP_
Date: _8/24/2010_

By: _Donald R Palumbo_
Name: _Donald R Palumbo_
Title: _Vice President Credit_
Date: _9/1/2010_

## EXHIBIT B

## FORM OF FINANCIAL INSTRUMENT

## FINANCIAL INSTRUMENT

This Financial Instrument is delivered as provided in Section 1 of the Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment"), entered into as of the Effective Date, by and between Federal National Mortgage Association ("Fannie Mae"), a federally chartered corporation, acting as financial agent of the United States, and the undersigned party ("Servicer"). This Financial Instrument is effective as of the Effective Date. All of the capitalized terms that are used but not defined herein shall have the meanings ascribed to them in the Commitment.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Servicer agrees as follows:

1.   Purchase Price Consideration; Services. This Financial Instrument is being purchased by Fannie Mae pursuant to Section 4 of the Commitment in consideration for the payment by Fannie Mae, in its capacity as a financial agent of the United States, of various payments detailed in the Program Documentation and referred to collectively in the Commitment as the "Purchase Price."

   (a) The conditions precedent to the payment by Fannie Mae of the Purchase Price with respect to the Services described on the Initial Service Schedules are: (i) the execution and delivery of this Financial Instrument, the Commitment and the Initial Service Schedules by Servicer to Fannie Mae; (ii) the execution and delivery of the Commitment and the Initial Service Schedules by Fannie Mae to Servicer; (iii) the delivery of copies of the fully executed Commitment, Initial Service Schedules and Financial Instrument to Treasury on the Effective Date of the Agreement; (iv) the performance by Servicer of the Services described in the Agreement; and (v) the satisfaction by Servicer of such other obligations as are set forth in the Agreement. Servicer shall perform all Services in consideration for the Purchase Price in accordance with the terms and conditions of the Agreement, to the reasonable satisfaction of Fannie Mae and Freddie Mac.

   (b) The conditions precedent to the payment by Fannie Mae of the Purchase Price with respect to the Services described on the Additional Service Schedules (if any) are: (i) the execution and delivery of the Additional Service Schedules and the Certification by Servicer to Fannie Mae; (ii) the execution and delivery of the Additional Service Schedules by Fannie Mae to Servicer; (iii) the delivery of copies of the fully executed Additional Service Schedules to Treasury; (iv) the performance by Servicer of the Services described in the Agreement, in accordance with the terms and conditions thereof, to the reasonable satisfaction of Fannie Mae and Freddie Mac; and (v) the satisfaction by Servicer of such other obligations as are set forth in the Agreement.

2.   Authority and Agreement to Participate in Program. Subject to the limitations set forth in Section 2 of the Agreement, Servicer shall use reasonable efforts to remove all prohibitions or impediments to its authority and to obtain all third party consents, waivers and delegations that are required, by contract or law, in order to perform the Services.

3.   Audits, Reporting and Data Retention.

   (a) Freddie Mac, the Federal Housing Finance Agency and other parties designated by the Treasury or applicable law shall have the right during normal business hours to conduct unannounced, informal onsite visits and to conduct formal onsite and offsite physical, personnel and information technology testing, security reviews, and audits of Servicer and to examine all books, records and data related to the Services provided and Purchase Price received in connection with each of the Programs in which Servicer participates on thirty (30) days' prior written notice.

B-1

(b) Servicer will collect, record, retain and provide to Treasury, Fannie Mae and Freddie Mac all data, information and documentation relating to the Programs in which Servicer participates as required by applicable Program Documentation. All such data, information and documentation must be provided to the Treasury, Fannie Mae and Freddie Mac as, when and in the manner specified in applicable Program Documentation. In addition, Servicer shall provide copies of executed contracts and tapes of loan pools related to the Programs for review upon request.

(c) Servicer shall promptly take corrective and remedial actions associated with reporting and reviews as directed by Fannie Mae or Freddie Mac and provide to Fannie Mae and Freddie Mac such evidence of the effective implementation of corrective and remedial actions as Fannie Mae and Freddie Mac shall reasonably require. Freddie Mac may conduct additional reviews based on its findings and the corrective actions taken by Servicer.

(d) In addition to any other obligation to retain financial and accounting records that may be imposed by Federal or state law, Servicer shall retain all information described in Section 3(b), and all data, books, reports, documents, audit logs and records, including electronic records, related to the performance of Services in connection with the Programs. In addition, Servicer shall maintain a copy of all computer systems and application software necessary to review and analyze these electronic records. Unless otherwise directed by Fannie Mae or Freddie Mac, Servicer shall retain these records for at least 7 years from the date the data or record was created, or for such longer period as may be required pursuant to applicable law. Fannie Mae or Freddie Mac may also notify Servicer from time to time of any additional record retention requirements resulting from litigation and regulatory investigations in which the Treasury or any agents of the United States may have an interest, and Servicer agrees to comply with these litigation and regulatory investigations requirements.

4.   Internal Control Program.

(a) Servicer shall develop, enforce and review on a quarterly basis for effectiveness an internal control program designed to: (i) ensure effective delivery of Services in connection with the Programs in which Servicer participates and compliance with applicable Program Documentation; (ii) effectively monitor and detect loan modification fraud; and (iii) effectively monitor compliance with applicable consumer protection and fair lending laws. The internal control program must include documentation of the control objectives for Program activities, the associated control techniques, and mechanisms for testing and validating the controls.

(b) Servicer shall provide Freddie Mac with access to all internal control reviews and reports that relate to Services under the Programs performed by Servicer and its independent auditing firm to enable Freddie Mac to fulfill its duties as a compliance agent of the United States; a copy of the reviews and reports will be provided to Fannie Mae for record keeping and other administrative purposes.

5.   Representations, Warranties and Covenants. Servicer makes the following representations, warranties and covenants to Fannie Mae, Freddie Mac and the Treasury, the truth and accuracy of which are continuing obligations of Servicer. In the event that any of the representations, warranties, or covenants made herein cease to be true and correct, Servicer agrees to notify Fannie Mae and Freddie Mac immediately.

(a) Servicer is established under the laws of the United States or any state, territory, or possession of the United States or the District of Columbia, and has significant operations in the United States. Servicer has full corporate power and authority to enter into, execute, and deliver the Agreement

(b) Servicer is in compliance with, and covenants that all Services will be performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq., the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights. Subject to the following sentence, Servicer has obtained or made, or will obtain or make, all governmental approvals or registrations required under law and has obtained or will obtain all consents necessary to authorize the performance of its obligations under the Programs in which Servicer participates and the Agreement. The performance of Services under the Agreement will not conflict with, or be prohibited in any way by, any other agreement or statutory restriction by which Servicer is bound, provided, however, that Fannie Mae acknowledges and agrees that this representation and warranty is qualified solely by and to the extent of any contractual limitations established under applicable pooling and servicing agreements and other servicing contracts to which Servicer is subject. Servicer is not aware of any other legal or financial impediments to performing its obligations under the Programs in which Servicer participates or the Agreement and shall promptly notify Fannie Mae of any financial and/or operational impediments which may impair its ability to perform its obligations under such Programs or the Agreement. Servicer is not delinquent on any Federal tax obligation or any other debt owed to the United States or collected by the United States for the benefit of others, excluding any debt or obligation that is being contested in good faith.

(c) Servicer covenants that: (i) it will perform its obligations in accordance with the Agreement and will promptly provide such performance reporting as Fannie Mae may reasonably require; (ii) all Services will be offered to borrowers, fully documented and serviced , or otherwise performed, in accordance with the applicable Program Documentation; and (iii) all data, collection information and other information reported by Servicer to Fannie Mae and Freddie Mac under the Agreement, including, but not limited to, information that is relied upon by Fannie Mae or Freddie Mac in calculating the Purchase Price or in performing any compliance review will be true, complete and accurate in all material respects, and consistent with all relevant business records, as and when provided.

(d) Servicer covenants that it will: (i) perform the Services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed operation, and no less than that which the Servicer exercises for itself under similar circumstances; and (ii) use qualified individuals with suitable training, education, experience and skills to perform the Services. Servicer acknowledges that Program participation may require changes to, or the augmentation of, its systems, staffing and procedures, and covenants and agrees to take all actions necessary to ensure it has the capacity to implement the Programs in which it participates in accordance with the Agreement.

(e) Servicer covenants that it will comply with all regulations on conflicts of interest that are applicable to Servicer in connection with the conduct of its business and all conflicts of interest and non-disclosure obligations and restrictions and related mitigation procedures set forth in the Program Documentation (if any), as they relate to the Programs in which Servicer participates.

(f) Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie Mac in connection with any of the Programs or pursuant to the Agreement may constitute a violation of: (a) Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (b) the civil False Claims Act (31 U.S.C. §§ 3729-3733). Servicer covenants to disclose to Fannie Mae and Freddie Mac any credible evidence, in connection with the Services, that a management official, employee, or contractor of Servicer has committed, or may have committed, a violation of the referenced statutes.

(g) Servicer covenants to disclose to Fannie Mae and Freddie Mac any other facts or information that the Treasury, Fannie Mae or Freddie Mac should reasonably expect to know about Servicer and its contractors to help protect the reputational interests of the Treasury, Fannie Mae and Freddie Mac in managing and monitoring the Programs in which Servicer participates.

(h) Servicer covenants that it will timely inform Fannie Mae and Freddie Mac of any anticipated Event of Default and of any Act of Bad Faith of which it becomes aware.

(i) Servicer acknowledges that Fannie Mae or Freddie Mac may be required to assist the Treasury with responses to the Privacy Act of 1974 (the "Privacy Act"), 5 USC § 552a, inquiries from borrowers and Freedom of Information Act, 5 USC § 552, inquiries from other parties, as well as formal inquiries from Congressional committees and members, the Government Accounting Office, Inspectors General and other government entities, as well as media and consumer advocacy group inquiries about the Programs and their effectiveness. Servicer covenants that it will respond promptly and accurately to all search requests made by Fannie Mae or Freddie Mac, comply with any related procedures which Fannie Mae or Freddie Mac may establish, and provide related training to employees and contractors. In connection with Privacy Act inquiries, Servicer covenants that it will provide updated and corrected information as appropriate about borrowers' records to ensure that any system of record maintained by Fannie Mae on behalf of the Treasury is accurate and complete.

(j) Servicer acknowledges that Fannie Mae is required to develop and implement customer service call centers to respond to borrowers' and other parties' inquiries regarding the Programs, which may require additional support from Servicer.  Servicer covenants that it will provide such additional customer service call support as Fannie Mae reasonably determines is necessary to support the Programs in which Servicer participates.

(k) Servicer acknowledges that Fannie Mae and/or Freddie Mac are required to develop and implement practices to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws. Servicer covenants that it will fully and promptly cooperate with Fannie Mae's inquiries about loan modification fraud and legal compliance and comply with any anti-fraud and legal compliance procedures which Fannie Mae and/or Freddie Mac may require. Servicer covenants that it will develop and implement an internal control program to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws, among other things, as provided in Section 4 of this Financial Instrument and acknowledges that the internal control program will be monitored, as provided in such Section.

(l) Servicer shall sign and deliver a Certification to Fannie Mae and Freddie Mac beginning on June 1, 2010 and again on June 1 of each year thereafter during the Term, and upon the execution and

Exhibit C to the Agreement.

(m) Solely if Servicer has elected to participate in the Second Lien Modification Program by executing and delivering to Fannie Mae a Service Schedule relating thereto, Servicer represents, warrants and covenants that each mortgage loan it modifies under the Second Lien Modification Program is, or will be at the time of modification, a lien that is second in priority relative to the first lien that was modified under the Programs.

6.   Use of Contractors.  Servicer is responsible for the supervision and management of any contractor that assists in the performance of Services in connection with the Programs in which Servicer participates.  Servicer shall remove and replace any contractor that fails to perform.  Servicer shall ensure that all of its contractors comply with the terms and provisions of the Agreement.  Servicer shall be responsible for the acts or omissions of its contractors as if the acts or omissions were by the Servicer.

7.   Data Rights.

(a) For purposes of this Section, the following definitions apply:

(i)   "Data" means any recorded information, regardless of form or the media on which it may be recorded, regarding any of the Services provided in connection with the Programs.

(ii)  "Limited Rights" means non-exclusive rights to, without limitation, use, copy, maintain, modify, enhance, disclose, reproduce, prepare derivative works, and distribute, in any manner, for any purpose related to the administration, activities, review, or audit of, or public reporting regarding, the Programs and to permit others to do so in connection therewith.

(iii) "NPI" means nonpublic personal information, as defined under the GLB.

(iv)  "GLB" means the Gramm-Leach-Bliley Act, 15 U.S.C. 6801-6809.

(b) Subject to Section 7(c) below, Treasury, Fannie Mae and Freddie Mac shall have Limited Rights, with respect to all Data produced, developed, or obtained by Servicer or a contractor of Servicer in connection with the Programs, provided, however, that NPI will not be transferred by Fannie Mae in violation of the GLB and, provided, further, that Servicer acknowledges and agrees that any use of NPI by, the distribution of NPI to, or the transfer of NPI among, Federal, state and local government organizations and agencies does not constitute a violation of the GLB for purposes of the Agreement.  If requested, such Data shall be made available to the Treasury, Fannie Mae, or Freddie Mac upon request, or as and when directed by the Program Documentation relating to the Programs in which Servicer participates, in industry standard useable format.

(c) Servicer expressly consents to the publication of its name as a participant in the Programs listed on the Service Schedules, and the use and publication of Servicer's Data, subject to applicable state and federal laws regarding confidentiality, in any form and on any media utilized by Treasury, Fannie Mae or Freddie Mac, including, but not limited to, on any website or webpage hosted by Treasury, Fannie Mae, or Freddie Mac, in connection with such Programs, provided that no Data placed in the public domain: (i) will contain the name, social security number, or street address of any borrower or other information that would allow the borrower to be

B-5

8.       Publicity and Disclosure.

(a) Servicer shall not make use of any Treasury name, symbol, emblem, program name, or product name, in any advertising, signage, promotional material, press release, Web page, publication, or media interview, without the prior written consent of the Treasury.

(b) Servicer shall not publish, or cause to have published, or make public use of Fannie Mae's name, logos, trademarks, or any information about its relationship with Fannie Mae without the prior written permission of Fannie Mae, which permission may be withdrawn at any time in Fannie Mae's sole discretion.

(c) Servicer shall not publish, or cause to have published, or make public use of Freddie Mac's name (i.e., "Freddie Mac" or "Federal Home Loan Mortgage Corporation"), logos, trademarks, or any information about its relationship with Freddie Mac without the prior written permission of Freddie Mac, which permission may be withdrawn at any time in Freddie Mac's sole discretion.

9.       Limitation of Liability.  IN NO EVENT SHALL FANNIE MAE, THE TREASURY, OR FREDDIE MAC, OR THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR AFFILIATES BE LIABLE TO SERVICER WITH RESPECT TO ANY OF THE PROGRAMS OR THE AGREEMENT, OR FOR ANY ACT OR OMISSION OCCURRING IN CONNECTION WITH THE FOREGOING, FOR ANY DAMAGES OF ANY KIND, INCLUDING, BUT NOT LIMITED TO DIRECT DAMAGES, INDIRECT DAMAGES, LOST PROFITS, LOSS OF BUSINESS, OR OTHER INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES OF ANY NATURE OR UNDER ANY LEGAL THEORY WHATSOEVER, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF WHETHER OR NOT THE DAMAGES WERE REASONABLY FORESEEABLE; PROVIDED, HOWEVER, THAT THIS PROVISION SHALL NOT LIMIT FANNIE MAE'S OBLIGATION TO REMIT PURCHASE PRICE PAYMENTS TO SERVICER IN ITS CAPACITY AS FINANCIAL AGENT OF THE UNITED STATES IN ACCORDANCE WITH THE AGREEMENT.

10.      Indemnification.  Servicer shall indemnify, hold harmless, and pay for the defense of Fannie Mae, the Treasury and Freddie Mac, and their respective officers, directors, employees, agents and affiliates against all claims, liabilities, costs, damages, judgments, suits, actions, losses and expenses, including reasonable attorneys' fees and costs of suit, arising out of or resulting from: (a) Servicer's breach of Section 5 (Representations, Warranties and Covenants) of this Financial Instrument; (b) Servicer's negligence, willful misconduct or failure to perform its obligations under the Agreement; or (c) any injuries to persons (including death) or damages to property caused by the negligent or willful acts or omissions of Servicer or its contractors. Servicer shall not settle any suit or claim regarding any of the foregoing without Fannie Mae's prior written consent if such settlement would be adverse to Fannie Mae's interest, or the interests of the Treasury or Freddie Mac. Servicer agrees to pay or reimburse all costs that may be incurred by Fannie Mae and Freddie Mac in enforcing this indemnity, including attorneys' fees.

B-6

IN WITNESS WHEREOF, Servicer hereby executes this Financial Instrument on the date set forth below.

Aurora Loan Services LLC:

_____ _SVP_____          _____8/24/10_____
[Name of Authorized Official]                Date
[Title of Authorized Official]

D. Aydelotte

B-7

## EXHIBIT C

## FORM OF CERTIFICATION

## CERTIFICATION

This Certification is delivered as provided in Section 1.C. of the Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment"), effective as of [INSERT], by and between Federal National Mortgage Association ("Fannie Mae"), a federally chartered corporation, acting as financial agent of the United States, and the undersigned party ("Servicer"). All terms used, but not defined herein, shall have the meanings ascribed to them in the Commitment.

Servicer hereby certifies, as of [INSERT DATE ON WHICH CERTIFICATION IS GIVEN], that:

1.      Servicer is established under the laws of the United States or any state, territory, or possession of the United States or the District of Columbia, and has significant operations in the United States. Servicer had full corporate power and authority to enter into, execute, and deliver the Agreement and to perform its obligations hereunder and has all licenses necessary to carry on its business as now being conducted and as contemplated by the Agreement.

2.      Servicer is in compliance with, and certifies that all Services have been performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq., the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights. Subject to the following sentence, Servicer has obtained or made all governmental approvals or registrations required under law and has obtained all consents necessary to authorize the performance of its obligations under the Programs in which Servicer participated and the Agreement. The performance of Services under the Agreement has not conflicted with, or been prohibited in any way by, any other agreement or statutory restriction by which Servicer is bound, except to the extent of any contractual limitations under applicable pooling and servicing agreements and other servicing contracts to which Servicer is subject. Servicer is not aware of any other legal or financial impediments to performing its obligations under the Programs or the Agreement and has promptly notified Fannie Mae of any financial and/or operational impediments which may impair its ability to perform its obligations under the Programs or the Agreement. Servicer is not delinquent on any Federal tax obligation or any other debt owed to the United States or collected by the United States for the benefit of others, excluding any debts or obligations that are being contested in good faith.

3.      (i) Servicer has performed its obligations in accordance with the Agreement and has promptly provided such performance reporting as Fannie Mae and Freddie Mac have reasonably required; (ii) all Services have been offered by Servicer to borrowers, fully documented and serviced by Servicer in accordance with the applicable Program Documentation; and (iii) all data, collection information and other information reported by Servicer to Fannie Mae and Freddie Mac under the Agreement, including, but not limited to, information that was relied upon by Fannie Mae and Freddie Mac in calculating the Purchase Price and in performing any compliance review, was true, complete and accurate in all material respects, and consistent with all relevant business records, as and when provided.

4.      Servicer has: (i) performed the Services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed operation, and no less than that which the Servicer exercises for itself under similar circumstances; and (ii) used qualified individuals with suitable training, education, experience and skills to perform the Services. Servicer acknowledges that Program participation required changes to, or the augmentation of, its systems, staffing and procedures; Servicer took all actions necessary to ensure that it had the capacity to implement the Programs in which it participated in accordance with the Agreement.

5.      Servicer has complied with all regulations on conflicts of interest that are applicable to Servicer in connection with the conduct of its business and all conflicts of interest and non-disclosure obligations and restrictions and related mitigation procedures set forth in the Program Documentation (if any), as they related to the Programs in which Servicer participated.

6.      Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie Mac in connection with the Programs or pursuant to the Agreement may constitute a violation of: (a) Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (b) the civil False Claims Act (31 U.S.C. §§ 3729-3733). Servicer has disclosed to Fannie Mae and Freddie Mac any credible evidence, in connection with the Services, that a management official, employee, or contractor of Servicer has committed, or may have committed, a violation of the referenced statutes.

7.  Servicer has disclosed to Fannie Mae and Freddie Mac any other facts or information that the Treasury, Fannie Mae or Freddie Mac should reasonably expect to know about Servicer and its contractors to help protect the reputational interests of the Treasury, Fannie Mae and Freddie Mac in managing and monitoring the Programs.

8.  Servicer acknowledges that Fannie Mae and Freddie Mac may be required to assist the Treasury with responses to the Privacy Act of 1974 (the "Privacy Act"), 5 USC § 552a, inquiries from borrowers and Freedom of Information Act, 5 USC § 552, inquiries from other parties, as well as formal inquiries from Congressional committees and members, the Government Accounting Office, Inspectors General and other government entities, as well as media and consumer advocacy group inquiries about the Programs and their effectiveness. Servicer has responded promptly and accurately to all search requests made by Fannie Mae and Freddie Mac, complied with any related procedures which Fannie Mae and Freddie Mac have established, and provided related training to employees and contractors. In connection with Privacy Act inquiries, Servicer has provided updated and corrected information as appropriate about borrowers' records to ensure that any system of record maintained by Fannie Mae on behalf of the Treasury is accurate and complete.

9.  Servicer acknowledges that Fannie Mae is required to develop and implement customer service call centers to respond to borrowers' and other parties' inquiries regarding the Programs in which Servicer participates, which may require additional support from Servicer. Servicer has provided such additional customer service call support as Fannie Mae has reasonably requested to support such Programs.

10.  Servicer acknowledges that Fannie Mae and/or Freddie Mac are required to develop and implement practices to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws. Servicer has fully and promptly cooperated with Fannie Mae's inquiries about loan modification fraud and legal compliance and has complied with any anti-fraud and legal compliance procedures which Fannie Mae and/or Freddie Mac have required. Servicer has developed and implemented an internal control program to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws, among other things, as provided in Section 4 of the Financial Instrument.

11.  Solely if Servicer has elected to participate in the Second Lien Modification Program by executing and delivering to Fannie Mae a Service Schedule relating thereto, Servicer acknowledges that each mortgage loan it modified under the Second Lien Modification Program was, at the time of modification, second in priority relative to the first lien that was modified under the Programs.

In the event that any of the certifications made herein are discovered not to be true and correct, Servicer agrees to notify Fannie Mae and Freddie Mac immediately.

[INSERT FULL LEGAL NAME OF SERVICER]:

_____          _____
[Name of Authorized Official]                          Date
[Title of Authorized Official]

C-2

## EXHIBIT D

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Assignment and Assumption Agreement") is entered into as of [INSERT DATE] by and between [INSERT FULL LEGAL NAME OF ASSIGNOR] ("Assignor") and [INSERT FULL LEGAL NAME OF ASSIGNEE] ("Assignee"). All terms used, but not defined, herein shall have the meanings ascribed to them in the Underlying Agreement (defined below).

WHEREAS, Assignor and Federal National Mortgage Association, a federally chartered corporation, as financial agent of the United States ("Fannie Mae"), are parties to an Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement, a complete copy of which (including all exhibits, amendments and modifications thereto) is attached hereto and incorporated herein by this reference (the "Underlying Agreement");

WHEREAS, Assignor has agreed to assign to Assignee all of its rights and obligations under the Underlying Agreement with respect to the Eligible Loans that are identified on the schedule attached hereto as Schedule 1 (collectively, the "Assigned Rights and Obligations"); and

WHEREAS, Assignee has agreed to assume the Assigned Rights and Obligations.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Assignment. Assignor hereby assigns to Assignee all of Assignor's rights and obligations under the Underlying Agreement with respect to the Assigned Rights and Obligations.

2. Assumption. Assignee hereby accepts the foregoing assignment and assumes all of the rights and obligations of Assignor under the Underlying Agreement with respect to the Assigned Rights and Obligations.

3. Effective Date. The date on which the assignment and assumption of rights and obligations under the Underlying Agreement is effective is [INSERT EFFECTIVE DATE OF ASSIGNMENT/ASSUMPTION].

4. Successors. All future transfers and assignments of the Assigned Rights and Obligations transferred and assigned hereby are subject to the transfer and assignment provisions of the Underlying Agreement. This Assignment and Assumption Agreement shall inure to the benefit of, and be binding upon, the permitted successors and assigns of the parties hereto.

5. Counterparts. This Assignment and Assumption Agreement may be executed in counterparts, each of which shall be an original, but all of which together constitute one and the same instrument.

IN WITNESS WHEREOF, Assignor and Assignee, by their duly authorized officials, hereby execute and deliver this Assignment and Assumption Agreement, together with Schedule 1, effective as of the date set forth in Section 3 above.

**ASSIGNOR:** [INSERT FULL LEGAL NAME OF ASSIGNOR]

**ASSIGNEE:** [INSERT FULL LEGAL NAME OF ASSIGNEE]

By:_____

By:_____

Name:_____

Name:_____

Title:_____

Title:_____

Date:_____

Date:_____

D-2

**SCHEDULE 1**

**To**

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

**EXHIBIT E**

**FORM OF COVER SHEET**

**Cover Sheet for Transmission of Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement and Related Documents**

**To:** [INSERT FULL LEGAL NAME OF SERVICER] ("Servicer"), [INSERT SERVICER CONTACT]

**From:** Federal National Mortgage Association, a federally chartered corporation, as financial agent of the United States ("Fannie Mae")

**Copy To:** The U.S. Department of the Treasury, [INSERT TREASURY CONTACT]

**Date:** [INSERT DATE OF TRANSMISSION]

**Method of Transmission:** [Facsimile to [INSERT FAX NUMBER OF SERVICER]] [[Email with PDF file attached to [INSERT SERVICER EMAIL ADDRESS][Specify other method of electronic delivery]]

**NOTICE**

[IF THIS TRANSMISSION OCCURS UPON EXECUTION OF COMMITMENT:]This transmission constitutes notice to Servicer that the Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement, by and between Fannie Mae and Servicer (the "Commitment") and the Service Schedule(s) and Financial Instrument attached thereto have been fully executed and are effective as of the date of this transmission. The date of this transmission shall be the "Effective Date" of the Commitment, the Service Schedule(s) and the Financial Instrument.

[IF THIS TRANSMISSION OCCURS IN CONNECTION WITH DELIVERY OF ADDITIONAL SERVICE SCHEDULES:] This transmission constitutes notice to Servicer that Additional Service Schedule(s) and a Certification have been delivered by Servicer to Fannie Mae, pursuant to Section 4 of the Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement, by and between Fannie Mae and Servicer (the "Commitment"). The Additional Service Schedule(s) and the Certification attached hereto have been fully executed and are effective as of the date set forth in the Additional Service Schedule(s).

Copies of the fully executed Additional Service Schedule(s) and the Certification are attached to this transmission for your records.

E-1

**EXHIBIT 3**

2010-08-05  12:42        ELITE        1494541856 >>        14 1983 13376                        P 4/6

Sep 24 09 01:00p        Eddie Yau                        7806300300

4-764-31862-0000037-001-8-000-000-000-000

Investor Loan No. 0019644997

## HOME AFFORDABLE MODIFICATION TRIAL PERIOD PLAN
### (Step One of Two-Step Documentation Process)

Trial Period Plan Effective Date: September 11, 2009
Borrower("I"):  Eddie K Yau
Lender ("Lender"): Aurora Loan Services
Date of first lien Security Instrument ("Mortgage") and Note ("Note"): 07-06-07
Loan Number: 00219███████
Property Address ("Property"): ███████████████  VISTA CA 92084

If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects then the Lender will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Plan and not defined have the meaning given to them in the Loan Documents.

If I have not already done so, I am providing confirmation of the reasons I cannot afford my mortgage payment and documents to permit verification of all of my income (except that I understand that I am not required to disclose any child support or alimony unless I wish to have such income considered) to determine whether I qualify for the offer described in this Plan (the "Offer"). I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify for the Offer or will send me written notice that I do not qualify for the Offer. This Plan will not take effect unless and until both I and the Lender sign it and Lender provides me with a copy of this Plan with the Lender's signature.

1. My Representations. I certify, represent to Lender and agree:
   A. I am unable to afford my mortgage payments for the reasons indicated in my Hardship Affidavit and as a result, (i) I am either in default or believe I will be in default under the Loan Documents in the near future, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;
   B. I live in the Property as my principal residence, and the Property has not been condemned;
   C. There has been no change in the ownership of the Property since I signed the Loan Documents;
   D. I am providing or already have provided documentation for all income that I receive (and I understand that I am not required to disclose any child support or alimony that I receive, unless I wish to have such income considered to qualify for the Offer);
   E. Under penalty of perjury, all documents and information I have provided to Lender pursuant to this Plan, including the documents and information regarding my eligibility for the program, are true and correct; and
   F. If Lender requires me to obtain credit counseling, I will do so.

2. The Trial Period Plan. On or before each of the following due date I will pay the Lender the amount set forth below ("Trial Period Payment"), which includes payment for Escrow Items, including real estate taxes, insurance premiums and other fees, if any, of U.S. $1,943.70.

| Payment | Due Date | Amount |
|---------|----------|--------|
| 1 | 10/01/09 | 1,943.70 |
| 2 | 11/01/09 | 1,943.70 |
| 3 | 12/01/09 | 1,943.70 |

The Trial Period Payment is an estimate of the payment that will be required under the modified loan terms, which will be finalized in accordance with Section 3 below. During the period (the "Trial Period") commencing on the Trial Period Effective Date and ending on the earlier of: (i) the first day of the month following the month in which the last Trial Period Payment is due (the "Modification Effective Date") or (ii) termination of this Plan, I understand and acknowledge that:

Continued on reverse side

A.  TIME IS OF THE ESSENCE under this Plan;

B.  Except as set forth in Section 2.C. below, the Lender will suspend any scheduled foreclosure sale, provided I continue to meet the obligations under this Plan, but any pending foreclosure action will not be dismissed and may be immediately resumed from the point at which it was suspended if this Plan terminates, and no new notice of default, notice of intent to accelerate, notice of acceleration, or similar notice will be necessary to continue the foreclosure action, all rights to such notices being hereby waived to the extent permitted by applicable law;

C.  If my property is located in Georgia, Hawaii, Missouri, or Virginia and a foreclosure sale is currently scheduled, the foreclosure sale will not be suspended and the lender may foreclose if I have not made each and every Trial Period Payment that is due before the scheduled foreclosure sale.  If a foreclosure sale occurs pursuant to this Section 2.C., this agreement shall be deemed terminated;

D.  The Lender will hold the payments received during the Trial Period in a non-interest bearing account until they total an amount that is enough to pay my oldest delinquent monthly payment on my loan in full.  If there is any remaining money after such payment is applied, such remaining funds will be held by the Lender and not posted to my account until they total an amount that is enough to pay the next oldest delinquent monthly payment in full;

E.  When the Lender accepts and posts a payment during the Trial Period it will be without prejudice to, and will not be deemed a waiver of, the acceleration of the loan or foreclosure action and related activities and shall not constitute a cure of my default under the Loan Documents unless such payments are sufficient to completely cure my entire default under the Loan Documents;

F.  If prior to the Modification Effective Date, (i) the Lender does not provide me a fully executed copy of this Plan and the Modification Agreement; (ii) I have not made the Trial Period payments required under Section 2 of this Plan; or (iii) the Lender determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Plan will terminate.  In this event, the Lender will have all of the rights and remedies provided by the Loan Documents, and any payment I make under this Plan shall be applied to amounts I owe under the Loan Documents and shall not be refunded to me; and

G.  I understand that the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of a Modification Agreement, and (iii) the Modification Effective Date has passed.  I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Plan.  If under the Lender's procedures a title endorsement or subordination agreements are required to ensure that the modified mortgage loan retains its first lien position and is fully enforceable, I understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents or to execute the Modification Agreement if the Lender has not received an acceptable title endorsement and/or subordination agreements from other lien holders, as Lender determines necessary.

3.  The Modification.  I understand that once Lender is able to determine the final amounts of unpaid interest and any other delinquent amounts (except late charges) to be added to my loan balance and after deducting from my loan balance any remaining money held at the end of the Trial Period under Section 2.D. above, the Lender will determine the new payment amount.  If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Lender will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date.  If the Loan Documents provide that the note and mortgage may be assumed by a transferee of an interest in the property, the Modification Agreement will provide that, as of the Modification Effective Date, a buyer or transferee of the Property will not be permitted, under any circumstances, to assume the loan.  Upon execution of a Modification Agreement by the Lender and me, this Plan shall terminate and the Loan Documents, as modified by the Modification Agreement, shall govern the terms between the Lender and me for the remaining term of the loan.

# Aurora · Loan Services

4-704-31962-0000037-001-9-000-000-000-000

00 746

4. Additional Agreements.  I agree to the following:

A.   That all persons who signed the Loan Documents or their authorized representative(s) have signed this Plan, unless a borrower or co-borrower is deceased or the Lender has waived this requirement in writing.

B.   To comply, except to the extent that they are modified by this Plan, with all covenants, agreements, and requirements of Loan Documents, including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my loan.

C.   That this Plan constitutes notice that the Lender's waiver as to payment of Escrow Items, if any, has been revoked, and I have been advised of the amount needed to fully fund my Escrow Account.  If the Loan Documents do not currently have Escrow Account provisions, such Escrow Account provisions, including such provisions as determined necessary to conform the Loan Documents to industry standards, shall be added in the Modification Agreement.

D.   That all terms and provisions of the Loan Documents remain in full force and effect; nothing in this Plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents.  The Lender and I will be bound by, and will comply with, all of the terms and provisions of the Loan Documents.

E.   If any provision in the Note, as amended, allowed for the assessment of a penalty for full or partial prepayment of the Note, such provision is null and void.


In Witness Whereof, the Lender and I have executed this Plan.

1-23-09
Date

_____
Borrower

_____
Co-Borrower

_____
Co-Borrower

_____
Co-Borrower

_____
Co-Borrower

_____
Co-Borrower

_____
Lender

By: _____        Date: _____

4-704-31962-0000037-001-11-000-000-000-000

## Borrower/Co-Borrower Acknowledgement

00 768

1. Under penalty of perjury, I/we certify that all of the information in this affidavit is truthful and the event(s) identified above has/have contributed to my/our need to modify the terms of my/our mortgage loan.

2. I/we understand and acknowledge the Servicer may investigate the accuracy of my/our statements, may require me/us to provide supporting documentation, and that knowingly submitting false information may violate Federal law.

3. I/we understand the Servicer will pull a current credit report on all borrowers obligated on the Note.

4. I/we understand that if I/we have intentionally defaulted on my/our existing mortgage, engaged in fraud or misrepresented any fact(s) in connection with this Hardship Affidavit, or if I/we do not provide all of the required documentation, the servicer may cancel the Agreement and will continue all collection activities which may include referring your account for foreclosure.

5. I/we certify that my/our property is owner-occupied and I/we have not received a condemnation notice.

6. I/we certify that I/we am/are willing to commit to credit counseling if it is determined that my/our financial hardship is related to excessive debt.

7. I/we certify that I/we am/are willing to provide all requested documents and to respond to all Servicer communications in a timely manner. I/we understand that time is of the essence.

8. I/we understand that the Servicer will use this information to evaluate my/our eligibility for a loan modification or other loan workout option, but the Servicer is not obligated to offer me/us assistance based solely on the representations in this affidavit.

9. I/we authorize and consent to Servicer disclosing to the U.S. Department of Treasury or other government agency, Fannie Mae and/or Freddie Mac any information provided by me/us or retained by Servicer in connection with the Home Affordable Modification Program.

| | | |
|---|---|---|
| 9/23/09 | _____ | _____ |
| Date | Borrower | Co-Borrower |
| | _____ | _____ |
| | Co-Borrower | Co-Borrower |
| | _____ | _____ |
| | Co-Borrower | Co-Borrower |

E-mail Address: _____ _____

Cell Phone: ███████████ ███████████

Home Phone: ███████████ ███████████

Work Phone: (___)____-_____ (___)____-_____

Social Security Number ███████ ███████ ___-___-_____

Explanation: _____

_____

_____

_____

_____

_____

_____

_____

_____

**EXHIBIT 4**

# Home Affordable Modification Program Guidelines
## March 4, 2009

*Trial loan modifications consistent with these Guidelines may be offered to homeowners beginning on this date, March 4, 2009, and may be considered for acceptance into the Home Affordable Modification Program upon completion of the trial period and other conditions. These Guidelines, however, do not constitute a contract offer binding on the Department of the Treasury.*

## Program Elements Described in the Guidelines

| | |
|---|---|
| **Monthly Payment Reduction Cost Share:** | Treasury will partner with financial institutions to reduce homeowners' monthly mortgage payments. The lender will have to first reduce payments on mortgages to no greater than 38% Front-End Debt-to-Income (DTI) ratio. Treasury will match further reductions in monthly payments dollar-for-dollar with the lender/investor, down to a 31% Front-End DTI ratio for the borrower. |
| **Servicer Incentive Payments and Pay for Success Fees:** | Servicers will receive an up-front Servicer Incentive Payment of $1,000 for each eligible modification meeting guidelines established under this initiative. Servicers will also receive Pay for Success payments –as long as the borrower stays in the program – of up to $1,000 each year for up to three years.<br><br>Similar incentives will be paid for Hope for Homeowner refinances. |
| **Borrower Pay-for-Performance Success Payments:** | Borrowers are eligible to receive a Pay-for-Performance Success Payment that goes straight towards reducing the principal balance on the mortgage loan as long as the borrower is current on his or her monthly payments. Borrowers can receive up to $1,000 of Pay-for-Performance Success Payments each year for up to five years. |
| **Current Borrower One-Time Bonus Incentive:** | One-time bonus incentive payments of $1,500 to lender/investors and $500 to servicers will be provided for modifications made while a borrower is still current on mortgage payments. The servicer will be required to maintain records and documentation evidencing that the Trial Period payment arrangements were agreed to while the borrower was less than 30 days delinquent. The servicer must comply with any express pooling and servicing contractual restrictions for modifying current loans. |

| Program Payment Conditions | No payments under the program to the lender/investor, servicer, or borrower will be made unless and until the servicer has entered into the program agreements with Treasury's financial agent. Servicers must enter into the program agreements with Treasury's financial agent no later than December 31, 2009. |
|---|---|

## Eligibility Requirements

| Pooling and Servicing Agreements: | The program guidelines reflect usual and customary industry standards for mortgage loan modifications contained in typical servicing agreements, including pooling and servicing agreements (PSAs) governing private label securitizations. Participating servicers are required to consider all eligible loans under the program guidelines unless prohibited by the rules of the applicable PSA and/or other investor servicing agreements. Participating servicers are required to use reasonable efforts to remove any prohibitions and obtain waivers or approvals from all necessary parties. |
|---|---|
| Origination Date of Loan Subject to Modification: | The mortgage to be modified must have been originated on or before January 1, 2009. |
| Program Expiration: | New borrowers will be accepted until December 31, 2012. Program payments will be made for up to five years after the date of entry into a Home Affordable Modification. Monitoring will continue through the life of the program. |
| Qualification Terms: | <ul><li>The home must be an owner occupied, single family 1-4 unit property (including condominium, cooperative, and manufactured home affixed to a foundation and treated as real property under state law).</li><li>The home must be a primary residence (verified with tax return, credit report, and other documentation such as a utility bill).</li><li>The home may not be investor-owned.</li><li>The home may not be vacant or condemned.</li><li>Borrowers in bankruptcy are not automatically eliminated from consideration for a modification.</li><li>Borrowers in active litigation regarding the mortgage loan can qualify for a modification without waiving their legal rights.</li><li>First lien loans must have an unpaid principal balance (prior to capitalization of arrearages) equal to or less than:<ul><li>1 Unit: $729,750</li><li>2 Units: $934,200</li></ul></li></ul> |

| | o  3 Units: $1,129,250<br>o  4 Units: $1,403,400 |
|---|---|
| **In Foreclosure Process:** | Any foreclosure action will be temporarily suspended during the trial period, or while borrowers are considered for alternative foreclosure prevention options.  In the event that the Home Affordable Modification or alternative foreclosure prevention options fail, the foreclosure action may be resumed. |
| **Current LTV:** | There is no minimum or maximum LTV ratio for eligibility purposes. |
| **Loan Type Exclusions:** | Loans can only be modified under the Home Affordable Modification program once. |
| **Subordinate Financing:** | Subordinate liens are not included in the Front-End DTI calculation, but they are included in the Back-End DTI calculation. |
| **Solicitation to Borrowers/ Incoming Inquiries:** | Servicers should follow any existing express contractual restrictions with respect to solicitation of borrowers for modifications. |

## Underwriting Analysis

| **Front-End DTI Target:** | Front-End DTI is the ratio of PITIA to Monthly Gross Income.  PITIA is defined as principal, interest, taxes, insurance (including homeowners insurance and hazard and flood insurance) and homeowners association and/or condominium fees.  Mortgage insurance premiums are excluded from the PITIA calculation.<br><br>The Front-End DTI Target is 31%.  The Standard Waterfall step that results in a Front-End DTI closest to 31%, without going below 31%, will satisfy the Front-End DTI Target.  There is no restriction on reducing Front-End DTI below 31%, but any portion of the reduction below 31% will not be covered by the Payment Reduction Cost Share. |
|---|---|
| **Property Value:** | The servicer may use, at its discretion, either one of the government sponsored enterprises (GSEs) automated valuation model (AVM) – provided that the AVM renders a reliable confidence score – or a broker price opinion (BPO). |

| | |
|---|---|
| | As an alternative, the servicer may rely on the AVM it uses internally provided that (i) the servicer is subject to supervision by a Federal regulatory agency, (ii) the servicer's primary Federal regulatory agency has reviewed the model and/or its validation and (iii) the AVM renders a reliable confidence score.<br><br>If the GSE or servicer AVM is unable to render a value with a reliable confidence score, the servicer must obtain an assessment of the property value utilizing a property valuation method acceptable to the servicer's Federal regulatory agency, *e.g.* in accordance with the Interagency Appraisal and Evaluation Guidelines (as though such guidelines apply to loan modifications), or a BPO.<br><br>In all cases, the property valuation may not be more than 60 days old. |
| **Income and Asset Validation:** | The borrower's income will be verified by requiring a signed Form 4506-T (Request for Transcript of Tax Return) and obtaining the most recent tax return on file for each borrower on the note.  For wage earners, the two most recent pay stubs for each wage earner on the note will also be required.  For self-employed borrowers or for non-wage income, the borrower's income will be verified by obtaining other third party documents that provide reasonably reliable evidence of income.<br><br>Borrowers must also represent and warrant that they do not have sufficient liquid assets to make their monthly mortgage payments. |
| **Monthly Gross Income:** | The borrower's Monthly Gross Income is the amount before any payroll deductions includes wages and salaries, overtime pay, commissions, fees, tips, bonuses, housing allowances, other compensation for personal services, Social Security payment, including Social Security received by adults on behalf of minors or by minors intended for their own support, annuities, insurance polices, retirement funds, pensions, disability or death benefits, unemployment benefits, rental income and other income.<br><br>Monthly net income can be used for preliminary screening and qualification.  If used, the servicer will need to multiply net income by 1.25 to get to an estimate of Monthly Gross Income. |
| **Back-End DTI:** | The Back-End DTI is the ratio of the borrower's total monthly debt payments (such as Front-End PITIA, any mortgage insurance premiums, payments on all installment debts, monthly payments on all junior liens, alimony, car lease payments, aggregate negative net rental income from |

4

| | |
|---|---|
| | all investment properties owned, and monthly mortgage payments for second homes) to the borrower's Monthly Gross Income. The servicer must validate monthly installment, revolving debt and secondary mortgage debt by pulling a credit report for each borrower or a joint report for a married couple. The servicer must also consider information obtained from the borrower orally or in writing concerning incremental monthly obligations.<br><br>Borrowers who otherwise qualify for a modification under this program, but who would have a post-modification Back-End DTI greater than or equal to 55%, will be provided with a letter stating that they are required to work with a HUD-approved counselor and the modification will not take effect until they provide a signed statement indicating that they will obtain counseling. |
| **Reasonably Foreseeable / Imminent Default:** | Every potentially eligible borrower who calls or writes in to their servicer in reference to a modification must be screened for hardship. This screen must ascertain whether the borrower has had a change in circumstances that causes financial hardship, or is facing a recent or imminent increase in the payment that is likely to create a financial hardship (payment shock). If the borrower reports a material change in circumstances, the servicer must ask about current income and assets, and current expenses as well as the specific circumstances relating to the claimed financial hardship. Each of these elements shall be verified through documentation.<br><br>If the servicer determines that a non-defaulted borrower facing a financial hardship is in Imminent Default and will be unable to make his or her mortgage payment in the immediate future, the servicer must apply the NPV Test. |
| **Required Modifications and Optional Modifications:** | A standard NPV Test will be required on each loan that is in Imminent Default or is at least 60 days delinquent under the MBA delinquency calculation. This NPV Test will compare the net present value (NPV) of cash flows expected from a modification to the net present value of cash flows expected in the absence of modification. If the NPV of the modification scenario is greater, the NPV result is deemed positive.<br><br>The NPV Test applies to the Standard Waterfall only and does not require consideration of principal forgiveness. However, the servicer may choose to forgive principal if the servicer determines that principal forgiveness improves the likelihood of loan performance and the value of modification. Required parameters for the NPV Test will be published separately. |

|  | If the NPV Test generates a positive result when applying the Standard Waterfall, the servicer is required to offer a Home Affordable Modification to the borrower.  If the NPV Test generates a negative result, modification is optional, unless prohibited under contract.  The monthly payment reduction incentive is available for any Home Affordable Modification, whether or not NPV positive, that meets the eligibility requirements and is performed according to the waterfall described below.<br><br>If the NPV Test result is negative and a Home Affordable Modification is not pursued, the lender/investor must seek other foreclosure prevention alternatives, including alternative modification programs, deed-in-lieu and short sale programs. |
|---|---|

## Loan Modification and Standard Waterfall

| Overview: | Servicers will follow the Standard Waterfall described below to reduce monthly payments to the 31% Front-End DTI Target defined above.  The initiative will reimburse lenders/investors for one half of the cost of reducing monthly payments from a level consistent with a 38% Front-End DTI Ratio (or less, if the unmodified DTI is less than 38%) down to a level consistent with a 31% Front-End DTI Ratio.  This Payment Reduction Cost Share can last for up to five years. |
|---|---|
| Hope for Homeowners: | Servicers will be required to consider a borrower for refinancing into the Hope for Homeowners program when feasible.  Servicer incentive payments will be paid for Hope for Homeowner refinances.<br><br>If the underwriting process for a Hope for Homeowners refinance would delay eligible borrowers from receiving a modification offer, servicers will use the Standard Waterfall to begin the Home Affordability Modification and work to complete the Hope for Homeowners refinance during the Trial Modification Period.<br><br>Consideration for a Hope for Homeowners refinance should not delay eligible borrowers from receiving a modification offer and beginning the Trial Modification Period. |
| Standard Waterfall Process: | Step 1a: Request Monthly Gross Income as specified above.<br><br>Step 1b: Validate total first lien debt and monthly payments (PITIA).  For |

6

purposes of making a provisional modification offer during the trial modification period, the borrower's unverified income and debt payments can be used. Provisional information and modification terms will be verified in a timely manner.

Step 2: Capitalize arrearage. Servicers may capitalize accrued interest, past due real estate taxes and insurance premiums, delinquency charges paid to third parties in the ordinary course of servicing and not retained by the servicer, any required escrow advances already paid by the servicer and any required escrow advances by the servicer that are currently due and will be paid by the servicer during the Trial Period. Late fees are not capitalized.

Step 3: Target a Front-End DTI of 31%. The lender/investor shall follow steps 4, 5, and 6 to reduce the borrower's payment to the level corresponding to the Front-End DTI Target.

Step 4: Reduce the interest rate to reach the Front-End DTI Target (subject to a floor of 2%). The note rate should be reduced in increments of 0.125 %, and should bring the monthly payment as close as possible to the Front-End DTI Target without going below 31%. If the resulting modified interest rate is at or above the Interest Rate Cap, this modified interest rate will be the new note rate for the remaining loan term. If the resulting modified interest rate is below the Interest Rate Cap, this modified interest rate will be in effect for the first five years, followed by annual increases of 1% (100 basis points) per year or such lesser amount as may be needed until the interest rate reaches the Interest Rate Cap, at which time it will be fixed for the remaining loan term.

Step 5: If the Front-End DTI Target has not been reached, extend the term of the loan up to 40 years. If term extension is not permitted extend amortization. The 40-year term begins at the start of the modification (after the borrower successfully completes the Trial Period). Note that the servicer should only extend to a term that is necessary to reach the Front-End DTI Target; there is no requirement to extend to a 40-year term.

Step 6: If the Front-End DTI Target has not been reached, forbear principal. If there is a principal forbearance amount, a balloon payment of that forbearance amount is due on the maturity date, upon sale of the property, or upon payoff of the interest bearing balance. If the modification does not pass the NPV Test and the servicer chooses to modify the loan, the modified balance must be no lower than the current property value.

| Principal Reduction Option: | There is no requirement to use principal reduction under the Home Affordable Modification program; however, servicers may forgive principal to achieve the Front-End DTI Target.

Principal forgiveness can be used on a standalone basis or before any step in the Standard Waterfall process. If principal forgiveness is used, subsequent steps in the Standard Waterfall may not be skipped. If principal is forgiven and the rate is not reduced, the rate will be frozen at its existing level and treated as a modified rate for the purposes of the Interest Rate Cap.

In the event of principal forgiveness, the Payment Reduction Cost Share continues to be based on the change in the borrower's monthly payment from 38% to 31% Front-End DTI ratio and is limited to five years. |
|---|---|

## Modification Terms

| Interest Rate Floor: | The Interest Rate Floor for modified loans is 2%. |
|---|---|
| Interest Rate Cap: | The modified interest rate must remain in place for five years, after which time the interest rate will be gradually increased 1% (100 basis points) per year or such lesser amount as may be needed until it reaches the Interest Rate Cap.

The Interest Rate Cap for the modified loan is the lesser of (i) the fully indexed and fully amortizing original contractual rate or (ii) the Freddie Mac Primary Mortgage Market Survey rate for 30-year fixed rate conforming mortgage loans, rounded to the nearest 0.125%, as of the date that the modification document is prepared.

If the modified rate exceeds the Freddie Mac Primary Mortgage Market Survey rate in effect on the date the modification document is prepared, the modified rate will be the new note rate for the remaining loan term. |

| Principal Forbearance: | No interest will accrue on the forbearance amount.<br><br>If the option to forebear principal is selected, the servicer shall forbear on collecting the deferred portion of the Capitalized Balance until the earliest of (i) the maturity of the modified loan, (ii) a sale of the property, or (iii) a pay-off or refinancing of the loan. |
|---|---|
| Redefaulting Loans: | A loan will be considered to have redefaulted when the borrower reaches a 90-day delinquency status under the MBA delinquency calculation. Redefaulting Loans will be terminated from the program, and no further payments of any kind will be made to the lender/investor, servicer, or borrower.  Redefaulting Loans should be considered for other loss mitigation programs prior to being referred to foreclosure. |

**Approval Conditions**

| Trial Period Required: | Successful completion of the trial modification period and entry into program agreements between the servicer and Treasury's financial agent are prerequisites for any payments to the lender/investor, servicer, or borrower.<br><br>Modification is effective the first calendar month following the successful completion of the Trial Period.  Successful completion means that the borrower is current (under the MBA delinquency calculation) at the end of the Trial Period.<br><br>Borrowers in foreclosure restart states will be considered to have failed the Trial Period if they are not current at the time the foreclosure sale is scheduled.<br><br>No payments under the program to the lender/investor, servicer, or borrower will be made during the Trial Period.  No payments under the program to the lender/investor, servicer, or borrower will be made if the Trial Period is not completed successfully.   No payments under the program to the lender/investor, servicer, or borrower will be made unless and until the servicer has entered into the program agreements with Treasury's financial agent. |
|---|---|
| Length of Trial Period: | The Trial Period will last 90 days (three payments at modified terms) or longer if necessary to comply with investor contractual obligations.  The |

| | borrower must be current at the end of the Trial Period to obtain a Home Affordable Modification. |
|---|---|
| **Escrows:** | Servicers are required to escrow for modified borrowers' real estate taxes and mortgage-related insurance payments immediately if they have the capability of processing these payments or are already using a third-party vendor for this purpose. Servicers who do not have this capacity must implement an escrow process within six months of the program agreement. |
| **Counseling Requirements:** | For borrowers with a Back-End DTI of 55% or higher, the servicer must inform the borrower of the availability and advantages of counseling and provide a list of local HUD-approved counselors. The servicer must provide the borrower with a letter stating that counseling is a requirement of the modification terms. This letter may be required by counselors in order to begin counseling. The modification will not take effect until the borrower represents in writing that he or she will obtain counseling. |
| **Assumable:** | If the modified loan was assumable prior to modification, a Home Affordable Modification cancels this feature. |

**Fees/Charges**

| | |
|---|---|
| **Modification Fees and Charges to Borrower:** | There are no modification fees or charges borne by the borrower. |
| **Modification Fees and Charges Reimbursable by Investor:** | Modification fees and charges to the servicer will be reimbursable by the investor. These include notary fees, property valuation and other required fees. Servicer reimbursement by the investor will take place within the normal process between the servicer and the investor. |
| **Unpaid Late Fees Waived:** | Unpaid late fees will be waived for the borrower. These include late fees prior to the start of the Trial Period and accrued during the period. |
| **Credit Report:** | The servicer will cover the cost of the credit report. |

**Compensation**

| | |
|---|---|
| **Servicer Compensation:** | Compensation is provided to the servicer that performs the loss mitigation or modification activities. Upon modification following successful completion of the Trial Period, and contingent on signing the program servicer agreement, the servicer will receive an incentive fee of $1,000 for each eligible modification meeting Home Affordable Modification guidelines.<br><br>Servicers will also receive Pay for Success fees – payable 12 months from the effective date of the Trial Period as long as the borrower continues in the program – of up to $1,000 each year for three years. Servicers will no longer receive Pay for Success incentive payments for Redefaulting Loans or for loans that have paid off subject to certain *de minimis* constraints (discussed below).<br><br>For loans modified while still current under the MBA delinquency calculation, the servicer will receive a Current Borrower One-Time Incentive of $500 following successful completion of the Trial Period.<br><br>Lenders that service their own loans are eligible for these incentives. Throughout this document the term "servicer" means the party that is responsible for performing the modification activities.<br><br>Similar incentives will be paid for Hope for Homeowner refinances. |
| **Borrower Cash Contribution:** | The investor may not require the borrower to contribute cash. |
| **Lender/Investor Compensation:** | Lenders/investors will be compensated only in the event that the Front-End DTI Target or a lower Front-End DTI is achieved. Lenders/investors will follow the Standard Waterfall specified above to reach a monthly payment that satisfies the Front-End DTI Target. As described above, Treasury will provide compensation based on one half of the dollar difference between the monthly payment for a 31% Front-End DTI Ratio and the lesser of (i) the monthly payment for a 38% Front-End DTI Ratio or (ii) the borrower's current monthly payment. This compensation will be provided for up to five years or until the loan is paid off.<br><br>Upon a modification becoming effective following successful completion of the Trial Period by a borrower who was current prior to the start of the Trial Period, lenders/investors will be paid a $1,500 Current Borrower One-Time Incentive, subject to certain *de minimis* constraints (discussed below). |

| | |
|---|---|
| | No monthly lender/investor payments will be made during the Trial Period. Monthly lender/investor payments will begin after the Trial Period is successfully completed, the servicer signs a service agreement with Treasury, and formal modification begins. No monthly lender/investor payments will be made if the Trial Period is not completed successfully. |
| **Borrower Compensation:** | Borrowers will be eligible to accrue up to $1,000 each year in Pay-for-Performance Success Payments for up to five years, a total of up to $5,000 over five years, subject to certain *de minimis* constraints (discussed below). Accruals are based on on-time payment performance. The first annual principal balance reduction will be effective 12 months after entering the Trial Period as long as the borrower is not terminated from the program. In any given month, the borrower's mortgage payment must be made on time, accounting for standard servicer grace periods, in order to accrue the monthly Pay for Performance Success Payment. The borrower will receive information on a monthly basis regarding the accrual of these payments.

The payment will be directed to the servicer, who will reduce the principal balance by the payment amount (but not by more than $1,000 per year) for five years if the borrower continues in the program. Payments are to be applied directly and entirely to reduce the principal balance, and any applicable prepayment penalties on partial principal prepayment made by the government must be waived. The equivalent of three months of Pay-for-Performance Success Payments will be made upon successful completion of the Trial Period, contingent upon the servicer signing a service agreement with the Treasury.

Borrowers who are terminated from the program lose their right to outstanding accruals. |
| ***De Minimis* Constraint:** | To qualify for servicer Pay for Success payments and borrower Pay for Performance Success Payments, the modification must reduce the monthly payment by a minimum of 6 %. The monthly payment is the PITIA payment, as used in defining DTI, with the loan fully indexed and fully amortized.

When paid, servicer annual Pay for Success payments and borrower Pay for Performance Success Payments will be the lesser of (i) $1,000 or (ii) half the reduction in the borrower's annualized monthly payment.

The *de minimis* constraint does not apply to the up-front Servicer |

| | Incentive Payment, the Payment Reduction Cost Share, or the Home Price Depreciation Reserve Payment. |
|---|---|

## Consumer Protection

| Disclosure | When promoting or describing loan modifications, servicers should provide borrowers with information designed to help them understand the modification terms that are being offered and the modification process. Servicers also must provide borrowers with clear and understandable written information about the material terms, costs, and risks of the modified mortgage loan in a timely manner to enable borrowers to make informed decisions. |
|---|---|
| Fair Lending | Servicers' modifications under this program must comply with the Equal Credit Opportunity Act and the Fair Housing Act, which prohibit discrimination on a prohibited basis in connection with mortgage transactions.  Loan modification programs are subject to the fair lending laws, and servicers and lenders should ensure that they do not treat a borrower less favorably than other borrowers on grounds such as race, religion, national origin, sex, marital or familial status, age, handicap, or receipt of public assistance income in connection with any loan modification.  These laws also prohibit redlining. |
| Consumer Inquiries and Complaints | Servicers should have procedures and systems in place to be able to respond to inquiries and complaints relating to loan modifications. Servicers should ensure that such inquiries and complaints are provided fair consideration, and timely and appropriate responses and resolution. |

## Monitoring

| Documentation: | Servicers will be required to maintain records of key data points for verification/compliance reviews.  These documents may include, but are not limited to, borrower eligibility and qualification, underwriting criteria, and incentive payments. These documents also include a hardship affidavit, which every borrower is required to execute.<br><br>Borrowers will be required to provide declarations under penalty of perjury attesting to the truth of the information that they have provided to the servicer to allow the servicer to determine the borrower's eligibility for entry into the Home Affordable Modification Program. |
|---|---|

13

| | |
|---|---|
| | Detailed guidance on data requirements will be released separately. |
| **Anti-Fraud Measures:** | Measures to prevent and detect fraud, such as documentation and audit requirements, will be described in the servicer guidelines and the program guidelines in the financial agency agreements with Fannie Mae and Freddie Mac.  Additional fraud protection measures will be announced by Treasury.<br><br>Participating servicers and lenders/investors are not required to modify the loan if there is reasonable evidence indicating the borrower submitted false or misleading information or otherwise engaged in fraud in connection with the modification.  Servicers should employ reasonable policies and/or procedures to identify fraud in the modification process. |
| **Data Collection:** | Servicers will be required to collect and transmit borrower and property data in order to ensure compliance with the program as well as to measure its effectiveness.  Data elements may include data needed to perform underwriting analysis, loan modification and waterfall analysis, and modification terms.  In addition, borrower profiles and property level information may be included.  Detailed guidance on data requirements will be released separately. |
| **Accounting and Legal:** | The provisions of the Program should not be construed to override, void or in any way modify  the responsibility of the management of lenders and servicers for preparing financial statements and regulatory reports in accordance with all applicable generally accepted accounting principles, including standards such as Statement of Financial Accounting Standards (SFAS) No. 15, *Accounting by Debtors and Creditors for Troubled Debt Restructurings,* SFAS No. 114, *Accounting by Creditors for Impairment of a Loan,* SFAS No. 133, *Accounting for Derivative Instruments and Hedging* Activities, SFAS No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities,* and AICPA Statement of Position 03-3, *Accounting for Certain Loans or Debt Securities Acquired in a Transfer,* and their related amendments and interpretations. |

## Other Program Features

| | |
|---|---|
| **Home Price Depreciation Payments:** | To encourage lenders/investors to modify more mortgages, compensation will be provided to partially offset probable losses from home price declines.  This will be structured as a simple cash payment on each modified loan while the loan remains active in the program. |

| | |
|---|---|
| **Payments for Short Sales and Deeds-in-Lieu:** | Compensation will be provided to servicers and borrowers in order to facilitate short sales or deeds-in-lieu in those cases in which borrowers either fail the net present value (NPV) test (described below) or fail to qualify for, or default under, the modification program. |
| **Second Lien Elimination Payments:** | To reduce the borrower's overall indebtedness and improve loan performance, additional incentives will be provided to extinguish junior liens on homes with first-lien loans that are modified under the program. |
| **Government Loan Programs:** | FHA, VA and rural housing loans will be addressed through standalone modification programs run by those agencies. FHA's Hope for Homeowners refinancing program will also be included in a parallel incentive program. |

# Net Present Value Model Parameters

| NPV Test: | An NPV Test will be required on each loan that is in Imminent Default or is at least 60 days delinquent under the MBA delinquency calculation. This NPV test will compare the net present value (NPV) of cash flows expected from a modification to the net present value of cash flows expected in the absence of modification.  If the NPV of the modification scenario is greater, the NPV result is deemed positive, and the servicer must modify the loan (absent fraud, etc.)  However, an "NPV positive" result is not necessary to qualify a loan for a Home Affordable Modification and the associated lender/investor, servicer, and borrower payments. |
|---|---|
| Standard NPV Model: | To provide a consistent and industry-wide approach to the required NPV Tests, Treasury will set forth a Standard NPV Model with parameters specified below.  Complete details on each component outlined below are forthcoming. |
| Discount Rate: | The program allows the servicer to choose the Discount Rate to use in the NPV Model, subject to a program-determined ceiling that will be sensitive to the market-determined cost of funds.  The ceiling on the allowable Discount Rate for the NPV Test is the Freddie Mac Primary Mortgage Market Survey rate (PMMS), plus a spread of 2.5 percentage points.  The PMMS is the conventional mortgage rate published in the Federal Reserve's H.15 bulletin.

The servicer may choose a different Discount Rate for loans in portfolio versus loans in investor pools, but may not otherwise apply different rates to different loans in the servicing book.  For example, it may choose to use a Discount Rate equal to the PMMS + 2.0 percent for its investor pools and a Discount Rate equal to the PMMS for its loans in portfolio. |
| Cure Rate and Redefault Rate: | The Cure Rates and Redefault Rates will be obtained from a default equation with parameters based on GSE analytics and program portfolio data except where servicers use custom parameters (see below).  Treasury, in consultation with an inter-agency team of government officials, will update these tables periodically based on incoming data. |
| Property Value: | Property value will be determined in accordance with the Guidelines. |

| Incentive Payments: | Incentive payments, including the Payment Reduction Cost Share, annual borrower performance bonus payments toward principal, and Current Borrower One-Time Bonus Incentive, will be determined in accordance with the Guidelines. |
|---|---|
| Other Parameters: | The remaining parameters will come from data sets held or produced by the Federal Housing Finance Agency: home price forecast, valuation of the house price depreciation reserve, foreclosure timelines, and foreclosure costs and REO stigma |
| NPV Test Customization: | Servicers having at least a $40 billion servicing book will have an option to substitute a set of Cure Rates and Redefault Rates estimated based on the experience of their own aggregate portfolios.  A servicer using this option should take into account, as feasible, current LTV, current DTI, current credit score, delinquency status, and other relevant variables the servicer identifies.<br><br>The Cure and Redefault Rates must be empirically validated where possible.  Servicer judgment regarding the effect of DTI is expected, given the limited data available and the likelihood that the new program will materially affect Cure and Redefault Rates.  However, all assumptions must be tested as program data become available and revised as appropriate.<br><br>A servicer who chooses to use customized Cure and Redefault Rates must apply the same assumptions for Cure and Redefault Rate to the entire servicing portfolio, without distinguishing between loans in portfolio and investor pools.<br><br>Models and assumptions will be subject to review by federal bank supervisory agencies where applicable, and in all cases by Freddie Mac as program compliance agent.<br><br>A servicer not meeting the size threshold may apply for permission to apply Cure Rates and Redefault Rates estimated based on the servicer's portfolio experience. |
| Mortgage Insurance: | For loans that have mortgage insurance (MI) coverage, the NPV Test will incorporate the value of the contingent claim payment in the event of default when evaluating projected foreclosure or modification scenarios.  If the modification does not pass the NPV Test, then it will be referred to the appropriate MI company.  The major MI companies have agreed to develop a mechanism by which they will pay partial claims where they deem appropriate to avoid foreclosure. |

**EXHIBIT 5**

**Aurora ▪ Loan Services**

00 421

2617 COLLEGE PARK ▪ P.O. BOX 1706 ▪ SCOTTSBLUFF, NE 69363-1706
PHONE: 800-550-0508 ▪ FAX: 303-728-7648

March 06, 2010

Eddie K Yau

Vista CA 92084-3318

RE:   Loan Number:   0021█████████
        Property Address: ███████████ Vista CA 92084

Dear Customer(s):

As requested, Aurora Loan Services has reviewed your mortgage loan
account for possible loan workout options.  Unfortunately, we are unable
to offer you a Home Affordable Modification for the following reason(s):

Excessive Forbearance
We are unable to offer you a Home Affordable Modification because we are
unable to create an affordable payment equal to 31% of your reported
monthly gross income without changing the terms loan beyond the
requirements of the program.
HTI exceeds HAMP max

**EQUAL HOUSING LENDER**   AURORA LOAN SERVICES LLC

**☷ Aurora ▪ Loan Services**

Loan No. 0021936349

2617 COLLEGE PARK • P.O. BOX 1706 • SCOTTSBLUFF, NE 69363-1706
PHONE: 800-550-0508 • FAX: 303-728-7648

As of the date of this letter, your request for a Home Affordable
Modification is considered closed.  To discuss the status of your loan
and any amount that may now be due, please call 800-550-0509.

You should be aware that any pending foreclosure action may be immediately
resumed from the date of this letter. No new notice of default, notice of
intent to accelerate, notice of acceleration, or similar notice will be
necessary to continue the foreclosure action. If you do not bring your
loan current immediately, any foreclosure action will resume from the
point at which it was suspended without further notice.

If you can bring your loan current or if you have any questions concerning
this letter, please contact Aurora Loan Services at the address given above
or by calling 1-800-550-0509.  Additional assistance is available by
calling the HOPE Hotline Number at 888-995-HOPE and request MHA Help.
The HOPE Hotline is available free of charge and will connect you with a
HUD-approved housing counselor.  PLEASE ACT NOW TO SAVE YOUR HOME!

Depending upon your situation, you may be eligible for other alternatives
to foreclosure. Foreclosure alternatives may include:
* Repayment Plan: allows you to repay the past due amount over a
  specified period of time
* Forbearance Plan: allows you to suspend or reduce your mortgage payments
  for a short period of time until a long term solution is available
* Loan Modification:  allows us to modify one or more of your original
  mortgage terms which will provide you with an affordable payment
  based on your current financial information
* Pre-foreclosure Sale (short sale): allows you to sell your property,
  pay off your mortgage for an amount less than total pay off to avoid
  foreclosure and minimize the damage to your credit rating
* Deed in lieu of foreclosure: allows you to voluntarily deed your
  property to Aurora Loan Services to payoff your mortgage. Taking
  this action may not save your home, but it may help your ability
  to qualify for another mortgage in the future.

To determine if you may qualify for any of the above foreclosure
alternatives, please contact our office at 1-800-550-0509.  Be prepared
to provide the following verbal information:

☐ EQUAL HOUSING LENDER   AURORA LOAN SERVICES LLC

# Aurora ▪ Loan Services

2617 COLLEGE PARK ▪ P.O. BOX 1706 ▪ SCOTTSBLUFF, NE 69363-1706
PHONE: 800-550-0508 ▪ FAX: 303-728-7648

Loan No. 0021936349

* Reason for hardship
* A detailed overview of your current financial information including;
  - Current monthly income
  - Current balance of all liquid assets including checking, savings, mutual funds, 401K, etc.
  - Current monthly payments for all outstanding liabilities
Additional information for all loan workout options is available online at www.myAuroraLoan.com.

Equal Credit Opportunity Act Notice
The federal Equal Credit Opportunity Act (ECOA) prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided that the applicant has the capacity to enter into a binding contract), because all or part of the applicant's income derives from any public assistance program, or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is:
                Office of Thrift Supervision
                Consumer Response Unit
                1700 G Street, NW
                Washington, DC 20552
Disclosure of Use of Information Obtained from an Outside Source
Our credit decision was based in whole or in part on information obtained in a report from the consumer reporting agency listed below. You have a right under the Fair Credit Reporting Act and California Civil Code Section 1785.20, if applicable, to know the information contained in your credit file at the consumer reporting agency. The reporting agency played no part in our decision and is unable to supply specific reasons why we have denied credit to you. You also have a right to a free copy of your report from the reporting agency and from any other consumer credit reporting agency which compiles and maintains files on consumers on a nationwide basis, if you request it no later than 60 days after you receive this notice. In addition, if you find that any information contained in the report you receive is inaccurate or incomplete, you have the right to dispute the matter with the reporting agency.                Kroll Factual Data
                PO Box 1676
                Loveland, CO  80539

If you have any questions, please contact one of Aurora Loan Services' Customer Service Representatives at the address on our letterhead above or by calling 800-550-0508.

Sincerely,
Loss Mitigation
Aurora Loan Services

Aurora Loan Services is a debt collector. Aurora Loan Services is attempting to collect a debt and any information obtained will be used for that purpose. However, if you are in bankruptcy or received a bankruptcy discharge of this debt, this communication is not an attempt to collect the debt against you personally, but is notice of a possible enforcement of the lien against the collateral property.

EQUAL HOUSING LENDER   AURORA LOAN SERVICES LLC

**EXHIBIT 6**

## Aurora • Loan Services

LMIT 0021936349

2617 COLLEGE PARK • P.O. BOX 1706 • SCOTTSBLUFF, NE 69363-1706
PHONE: 800-550-0508 • FAX: 303-728-7648

April 07, 2010                                      F47            00 531



Eddie K Yau

Vista CA 92084-3318

RE:   Loan No. 00219
      Property Address:              , Vista CA 92084

Dear Customer(s):

Enclosed please find two copies of a Special Forbearance Agreement which
has been prepared on your behalf. Please sign, date and return one copy
to Aurora Loan Services and retain the second copy for your records.

You have been conditionally approved for this Special Forbearance
Agreement as a result of the information that you provided to Aurora
Loan Services. Your approval for the Special Forbearance Agreement is
conditional upon Aurora Loan Services verifying the information that
you provided.

Please execute the attached Special Forbearance Agreement and return it
along with (1) the information requested in the enclosed package; (2)
the completed financial statement; and (3) your initial payment in the
amount of $4804.72. This payment as well as the requested information
must be received in our office on or before 05/01/2010.

To expedite processing of your Special Forbearance Agreement, please
fax the signed Agreement to Aurora Loan Services at 866-517-7975, and remit
the initial payment via Western Union Quick Collect. When sending funds
via Western Union, please use the Code City: BLUFF, NE and always include
your Aurora Loan Services loan number for prompt posting to your account.
Any funds received after 5:00 p.m. ET will be posted the next business
day.

Certified Funds should be made payable to Aurora Loan Services. Please
include your Aurora Loan Services loan number on the certified funds and
mail the funds separately to our Payment Processing Center at:

Overnight Delivery Services    or    U.S. Postal Delivery Services
Aurora Loan Services                 Aurora Loan Services
Attn: Cashiering Dept.               Attn: Cashiering Dept.
10350 Park Meadows Drive             P.O. Box 5180
Littleton, CO 80124                  Denver, CO  80217-5180

IMPORTANT INFORMATION ON PAGE 2



EQUAL HOUSING
LENDER    AURORA LOAN SERVICES LLC

00 532

# Aurora ▪ Loan Services

2617 COLLEGE PARK ▪ P.O. BOX 1706 ▪ SCOTTSBLUFF, NE 69363-1706
PHONE: 800-550-0508 ▪ FAX: 303-728-7648

Loan No. 0021936349                    Page 2 of 2

Please mail all correspondence, requested information and the executed
agreement to our Servicing Center at:

<u>Overnight Delivery Services</u>   or    <u>U.S. Postal Delivery Services</u>
Aurora Loan Services                    Aurora Loan Services
Attention:  Loss Mitigation             Attention:  Loss Mitigation
2617 College Park                       P.O. Box 1706
Scottsbluff, NE  69361                  Scottsbluff, NE  69363-1706

Not withstanding anything to the contrary contained in the Special
Forbearance Agreement, the parties hereto acknowledge the effect of a
discharge in bankruptcy that may have been granted to the Borrower(s)
prior to the execution hereof and that the Lender may not pursue the
Borrower(s) for personal liability.  However, the parties acknowledge
that the Lender retains certain rights, including but not limited to the
right to foreclose its lien under appropriate circumstances. The parties
agree that the consideration for this Agreement is Aurora Loan Services'
forbearance from presently exercising its rights and pursuing its
remedies under the Security Instrument as a result of the Borrower's
default of its obligations there under.  Nothing herein shall be
construed to be an attempt to collect against the Borrower(s) personally
or an attempt to revive personal liability.

Signing the attached documents in no way affects or eliminates any rights
you have been given in this letter or any correspondence attached hereto.

If you have any questions, please contact one of our Loan Counselors
at the address above or by calling 800-550-0509.

Sincerely,


Loss Mitigation
Aurora Loan Services

Enclosure


Aurora Loan Services is a debt collector. Aurora Loan Services is
attempting to collect a debt and any information obtained will be
used for that purpose. However, if you are in bankruptcy or received
a bankruptcy discharge of this debt, this communication is not an
attempt to collect the debt against you personally, but is notice
of a possible enforcement of the lien against the collateral property.



EQUAL HOUSING LENDER    AURORA LOAN SERVICES LLC

**Aurora · Loan Services**                                    00 533

2617 COLLEGE PARK • P.O. BOX 1706 • SCOTTSBLUFF, NE 69363-1706
PHONE: 800-550-0508 • FAX: 303-728-7648

WORKOUT AGREEMENT

BY AND BETWEEN AURORA LOAN SERVICES LLC

AND

Eddie K Yau

Property Address:            Loan No. 0021
Vista CA 92084

This Workout Agreement is made April 07, 2010, by and between AURORA LOAN
SERVICES LLC("Lender") located at 2617 College Park, Scottsbluff, NE   69361,
and Eddie K Yau ("Customer").

        WHEREAS, Lender is the servicing agent and/or the owner and
holder of a certain Note dated 07-06-07, executed and delivered by
Customer, in the original principal amount of $ 608,000 (the "Note").
The Note is secured by a mortgage, deed of trust or comparable security
instrument dated 07-06-07, (the "Security Instrument"), on the property
located at the address specified above (the "Property").  The Note and
Security Instrument are collectively referred to as the "Loan Documents".

        WHEREAS, Customer is in default under the Loan Documents,
has failed to make payment of monthly installments of principal,
interest, and escrow, if any, and has incurred additional expenses
authorized under the Loan Documents, resulting in a total arrearage
now due of $ 30,365.69, as more particularly set forth below:

Unpaid monthly payment(s) of PITI* from 07-01-09 through and including
04-07-10                                   $     27,291.92
Accrued Late Charges                               120.12
NSF Charges                                           .00
Legal Fees                                       1,582.50
Corporate Advances**                             1,826.34
Other Fees***                                        .00
Minus Credit (suspense balance/partial payment)   455.19
Total Amount Due (the "Arrearage")         $     30,365.69

---

   * "PITI" means the monthly payment of principal, interest, and escrows,
     required, for taxes and insurance premium installments.
  ** "Corporate Advances" include, but are not limited to, property
     inspection fees, property preservation fees, legal fees, foreclosure
     fees and costs, appraisal fees, BPO (i.e. broker price opinion) fees,
     title report fees, recording fees, and subordination fees.
 *** "Other Fees" include, but are not limited to, short payment advances
     and Speed ACH fees.

        WHEREAS, as a result of Customer's default, Lender (i) has the
right to accelerate, and to require Customer to make immediate payment in
full, all of the sums owed under the Note and secured by the Security


EQUAL HOUSING
LENDER   AURORA LOAN SERVICES LLC

## Aurora ▪ Loan Services

00 534

2617 COLLEGE PARK ▪ P.O. BOX 1706 ▪ SCOTTSBLUFF, NE 69363-1706
PHONE: 800-550-0508 ▪ FAX: 303-728-7648

Loan No. 0021███████                                    Page 2 of 5

Instrument, (ii) has so accelerated and declared due in full all such
sums, and (iii) may have already commenced foreclosure proceedings to
sell the Property.

WHEREAS, as of the date of execution of the Agreement,
Lender commenced Foreclosure proceedings to sell the property on 06/16/09
by legal filing in the county and state where the Property is located
A Foreclosure sale has been scheduled for 10/07/09.

WHEREAS, customer has requested Lender's forbearance in
exercising its rights and remedies under the default provisions of the
Loan Documents and with regard to any foreclosure action that may now
be pending.

WHEREAS, Customer has requested and Lender has agreed to allow
Customer to repay the Arrearage pursuant to a loan work-out arrangement
on the terms set forth herein.

NOW, THEREFORE, in consideration of the promises and mutual
covenants herein contained, the parties hereto agree as follows:

1. Bankruptcy.  If the Customer was discharged in a Chapter 7
proceeding subsequent to the execution of the Loan Documents, Lender
agrees that the Customer will not have personal liability on the debt
pursuant to this Agreement.

2. Term.  This Agreement shall expire on the "Expiration Date,"
as defined in Attachment A.

3. Lenders Forbearance.  Lender shall forbear from exercising any
or all of its rights and remedies now existing or arising during the
term of this Agreement under the Loan Documents, provided there is no
"Default", as such term is defined in paragraph 6.

4. Customer's Admissions.  Customer admits and agrees that any and
all postponements of a foreclosure sale, made during the term of this
Agreement or in anticipation of this Agreement, are done by mutual
consent of the Customer and Lender and that, to the extent allowed
by applicable law, any such foreclosure sale may be postponed from
time to time until the loan evidenced by the Note is fully reinstated
or the foreclosure sale is consummated.  Lender shall be under no
obligation to dismiss a pending foreclosure proceeding until such time
as all terms and conditions of this Agreement and Attachment A have been
fully performed.

5. Terms of Workout.  See Attachment A, which is made a part hereof.


EQUAL HOUSING
LENDER   AURORA LOAN SERVICES LLC

**Aurora • Loan Services**                                          00 535

2617 COLLEGE PARK • P.O. BOX 1706 • SCOTTSBLUFF, NE 69363-1706
PHONE: 800-550-0508 • FAX: 303-728-7648

Loan No. 00219█████                                          Page 3 of 5

6. **Default.** If Customer fails to make any of the payments
specified in Attachment A on the due dates and in the amount stated, or
otherwise fails to comply with any of the terms and conditions herein or
therein (any such even hereby defined as a "Default"), Lender, at its
sole option, may terminate this Agreement without further notice to
Customer. In such case, all amounts that are then owing under the Note,
the Security Instrument, and this Agreement shall become immediately due
and payable, and Lender shall be permitted to exercise any and all
rights and remedies provided for in the Loan Documents, including, but
not limited to, immediate commencement of a foreclosure action or
resumption of a pending foreclosure action without further notice to
Customer.

7. **No Waiver.** Nothing contained herein shall constitute a waiver
of any of all of the Lender's rights or remedies, including the right
to commence or resume foreclosure proceedings. Failure by Lender to
exercise any right or remedy under this Agreement or as otherwise
provided by applicable law shall not be deemed to be a waiver thereof.1

8. **Status of Default and Foreclosure.** Customer acknowledges that
if the Lender previously notified the Customer that the account was in
default, that the Note and Security Instrument are accelerated and
the debt evidenced by the Note is due in full, the account remains in
default, such Loan Documents remain accelerated, and such debt due in
full, although Customer may be entitled by law to cure such default by
bringing the loan evidenced by Note current rather than paying it in
full. Lender's acceptance of any payments from Customer which,
individually, are less than the total amount due to cure the default
described herein shall in no way prevent Lender from continuing with
collection action, or require Lender to re-notify Customer of such
default, re-accelerate the loan, re-issue any notice, or resume any
process prior to Lender proceeding with collection action if Customer
Defaults. Customer agrees that a foreclosure action if commenced by
the Lender against Customer will not be withdrawn unless Lender
determines to do so by applicable law. In the event Customer Defaults,
the foreclosure will commence, or resume from the point at which it
was placed on hold, without further notice.

9. **Limited Modification.** Except as otherwise provided in this
Agreement, the Note and Security Instrument, and any amendments
thereto, are ratified and confirmed and shall remain in full force and
effect.

─────────────────────────────────────────────────────────────────────
1 A typical example of this would be if Lender decides to accept a partial
or untimely payment from Customer instead of returning such payment or
terminating this Agreement as provided herein, Lender shall not be
precluded from rejecting a subsequent partial or untimely payment,
terminating this Agreement, or taking any other action permitted by
applicable law.



EQUAL HOUSING
LENDER   AURORA LOAN SERVICES LLC

## Aurora ▪ Loan Services

00 536

2617 COLLEGE PARK ▪ P.O. BOX 1706 ▪ SCOTTSBLUFF, NE 69363-1706
PHONE: 800-550-0508 ▪ FAX: 303-728-7648

Loan No. 002193█████                      Page 4 of 5

10. <u>Application of Payments</u>. The payments received by Lender from Customer pursuant to this Agreement shall be applied, at Lender's sole option, first to the earliest monthly payment under the Note that is due. Any amounts received by Lender that are less than the full payment under then due and owing under this Agreement shall be, at Lender's sole option, (1) returned to Customer, or (2) held by Lender in partial or suspense payment balance until sufficient sum is received by Lender to apply a full payment. If this Agreement is canceled and/or terminated for any reason, any remaining funds in this partial or suspense payment balance shall be credited towards Customer's remaining obligation owing in connection with the loan and shall not be refunded.

11. <u>Methods of Making Payments</u>. All payments made to Lender under this Agreement shall (i) contain the Lender's loan number shown above, (ii) unless otherwise agreed to by the Lender, be payable in certified funds by means of cashier's check, Western Union (code city: Bluff,NE) money order, or certified check, and (iii) be sent to AURORA LOAN SERVICES as specified in Attachment A. Any payment made other than strictly pursuant to the requirements of this paragraph 10 and Attachment A shall not be considered to have been received by Lender, although Lender may, in its sole discretion, decide to accept any non-conforming payment.

12. <u>Credit Reporting.</u> The payment status of Customer's loan in existence immediately prior to execution of this Agreement will be reported monthly to all credit reporting agencies for the duration of this Agreement and thereafter. Accordingly, Lender will report the loan subject to this Agreement as delinquent if the loan is not paid current under the Loan Documents, even if Customer makes timely payments to Lender under this Agreement. However, Lender may disclose that Customer is in a repayment or work-out plan. This Agreement does not constitute an agreement by Lender to waive any reporting of the delinquency status of loan payments.

13. <u>Property Taxes, Insurance, and Other Amounts</u>. If Customer's loan is not escrowed for taxes and insurance premium payments, it is Customer's responsibility to pay all property taxes, premiums for insurance, and all other amounts Customer agreed to pay as required under the terms of the Loan Documents. Customer's failure to pay property taxes, amounts owed on any senior lien security instrument, other amounts that may attain priority over the Security Instrument, or insurance premiums, in each case before their due date, shall constitute a Default hereunder.

14. <u> The Entire Agreement</u>. This Agreement sets forth all of the promises, covenants, agreements, conditions and understandings between the parties hereto with respect to the subject matter hereof. This Agreement supersedes all prior understandings, inducements or conditions, express or implied, oral or written, with respect thereto except as contained or referred to herein. This Agreement may not be amended, waived, discharged or terminated orally but only by an instrument in writing.



EQUAL HOUSING
LENDER   AURORA LOAN SERVICES LLC

# ▧ Aurora ▪ Loan Services                                          00 537

2617 COLLEGE PARK ▪ P.O. BOX 1706 ▪ SCOTTSBLUFF, NE 69363-1706
PHONE: 800-550-0508 ▪ FAX: 303-728-7648

Loan No. 00219⬛⬛⬛⬛                                          Page 5 of 5

15.  <u>Time is of the Essence.</u>  The Customer agrees and understands
that TIME IS OF THE ESSENCE as to all of the Customer's obligations under
this Agreement.  The grace period for monthly payments under the Loan
Documents will not apply to payment under this Agreement.  Therefore,
the Lender must receive the payments under this Agreement on or before
the Due Dates specified in Attachment A.

16.  <u>Assignment by Customer Prohibited</u>.  This Agreement shall be
non-transferable by Customer.  However, if the legal or beneficial
interest or the servicing of this loan is transferred by Lender,
this Agreement inures to the benefit of any subsequent servicer or
beneficial interest holder of the Note.

17.  <u>Severability</u>.  To the extent that any word, phrase,
clause, or sentence of this Agreement shall be found to be illegal or
unenforceable for any reason, such word, phrase, clause, or sentence
shall be modified or deleted in such a manner so as to make the
Agreement, as modified, legal and enforceable under applicable law, and
the balance of the Agreement or parts thereof shall not be affected
thereby, the balance being construed as severable and independent;
provided that no such severability shall be effective if it materially
changes the economic benefit of this Agreement to either party.

18.  <u>Execution in Counterparts</u>.  This Agreement may be executed
and delivered in two or more counterparts, each of which, when so
executed and delivered, shall be an original, but such counterparts
shall together constitute but one and the same instrument and Agreement.
Facsimile signatures shall be deemed as valid as originals.

19.  <u>Customer Contact</u>.  If Customer has any questions regarding
this matter, Customer should contact one of Lender's Loan Counselors at
the address above or by calling 800-550-0509.

IN WITNESS HEREOF, the parties hereto have caused this Agreement
to be duly executed as of the date signed.

Dated: _____        _____
                                       Eddie K Yau Borrower

Dated: _____        _____
Aurora Loan Services
Dated: _____        _____

Aurora Loan Services is a debt collector. Aurora Loan Services is
attempting to collect a debt and any information obtained will be
used for that purpose. However, if you are in bankruptcy or received
a bankruptcy discharge of this debt, this communication is not an
attempt to collect the debt against you personally, but is notice
of a possible enforcement of the lien against the collateral property.


EQUAL HOUSING
LENDER    AURORA LOAN SERVICES LLC

## Aurora • Loan Services

00 538

2617 COLLEGE PARK • P.O. BOX 1706 • SCOTTSBLUFF, NE 69363-1706
PHONE: 800-550-0508 • FAX: 303-728-7648

### ATTACHMENT A-STIPULATED PAYMENTS

a.1   For purposes of repayment of the Arrearage, Customer shall pay
a stipulated payment of $4804.72 (the "First Plan payment"), on
or before 05/01/2010.  Thereafter, Customer shall pay five (5)
consecutive stipulated monthly payments each in the amount of
$2875.00 on or before the 1st day of every month (each, a "Due
Date"), commencing 06/01/2010 and continuing through and including
10/01/2010 (the "Second Plan payment, Third Plan payment, Fourth
Plan payment, Fifth Plan payment, and Sixth Plan payment",
respectively). On or before 05/01/2010 (the "Agreement Return
Date"), Customer shall execute and return the Agreement, including
this Attachment A, in accordance with the following instructions:

| If by overnight mail service to | or | if by US Postal Services to |
| --- | --- | --- |
| Aurora Loan Services | | Aurora Loan Services |
| Attention: Loss Mitigation | | Attention: Loss Mitigation |
| 2617 College Park | | P.O. Box 1706 |
| Scottsbluff, NE 69361 | | Scottsbluff, NE 69363-1706 |

The Agreement will be of no force and effect unless Lender receives
the executed Agreement, including Attachment A, as well as the First
Plan payment by the Agreement Return Date.  Customer shall remit
to Lender the First Plan payment, in the amount specified above,
made payable to Aurora Loan Services in certified funds by
means of cashier's check, money order, Western Union (code city:
Bluff, NE), or certified check.  All Plan payments, including the
First Plan payment, shall contain the Lender's loan number shown
in the Agreement and, unless otherwise agreed to by the Lender,
shall be payable in certified funds as described above are to be
sent to Lender's Payment Processing Center in accordance with the
following instructions:

| If by overnight mail service to | or | if by US Postal Services to |
| --- | --- | --- |
| Aurora Loan Services | | Aurora Loan Services |
| Attention: Cashiering Department | | Attention: Cashiering Department |
| 10350 Park Meadows Drive | | P.O. Box 5180 |
| Littleton, CO 80124 | | Denver, CO 80217-5180 |

a.2  Plan payments are to be paid on or before the 1st day
of every month (each, a "Due Date").  Lender must receive each
Plan payment by the Due Date of each month.  The Agreement
shall expire on the Due Date of the Sixth Plan payment contemplated
by section a.1 above (the "Expiration Date").  After the Customer
makes the Second Plan payment under this Agreement, it shall be
the Customer's responsibility to provide Aurora Loan Services with
accurate and complete financial information in support of the
Customer's request for a loan modification or other workout option.
Customer must also provide Lender with a completed Borrower's
Financial Statement and proof of income (copies of Customer's
two (2) most recent pay stubs) to enable Lender to properly
evaluate Customer's current financial situation and the Customer's
request for a loan modification or other loan workout option.



EQUAL HOUSING
LENDER   AURORA LOAN SERVICES LLC

# Aurora • Loan Services

00 539

2617 COLLEGE PARK • P.O. BOX 1706 • SCOTTSBLUFF, NE 69363-1706
PHONE: 800-550-0508 • FAX: 303-728-7648

Loan No.  00219

Tender of the Sixth Plan payment shall not be deemed acceptance by
Aurora Loan Services of a workout plan or loan modification.

b.  The aggregate Plan payment will be insufficient to pay the
    Arrearage. At the Expiration Date, a portion of the Arrearage will
    still be outstanding.  Because payment of the Plan payments will not
    cure the Arrearage, Customer's account will remain delinquent.
    Upon the Expiration Date, Customer must cure the Arrearage
    through a full reinstatement, payment in full, loan modification
    agreement or other loan workout option that Lender may offer
    (individually and collectively, a "Cure Method.")   Customer's
    failure to enter into a Cure Method will result in the loan being
    disqualified from any future Lender Loss Mitigation program
    with respect to the loan evidenced by the Note, and regular
    collection activity will continue, including, but not limited to,
    commencement or resumption of the foreclosure process, as specified
    in paragraphs 6 and 8 of the Agreement.

        IN WITNESS HEREOF, the parties hereto have caused this Attachment A
    to be duly executed as of the date signed below.

Dated: _____    _____
                                   Eddie K Yau Borrower

Dated: _____    _____

Aurora Loan Services

Dated: _____    By: _____

                                   Title: _____



AURORA LOAN SERVICES LLC

# ⚡ Aurora ▪ Loan Services

00 540

2617 COLLEGE PARK ▪ P.O. BOX 1706 ▪ SCOTTSBLUFF, NE 69363-1706
PHONE: 800-550-0508 ▪ FAX: 303-728-7648

Loan No. 0021█████

Tender of the Sixth Plan payment shall not be deemed acceptance by Aurora Loan Services of a workout plan or loan modification.

b.   The aggregate Plan payment will be insufficient to pay the Arrearage. At the Expiration Date, a portion of the Arrearage will still be outstanding.  Because payment of the Plan payments will not cure the Arrearage, Customer's account will remain delinquent. Upon the Expiration Date, Customer must cure the Arrearage through a full reinstatement, payment in full, loan modification agreement or other loan workout option that Lender may offer (individually and collectively, a "Cure Method.")  Customer's failure to enter into a Cure Method will result in the loan being disqualified from any future Lender Loss Mitigation program with respect to the loan evidenced by the Note, and regular collection activity will continue, including, but not limited to, commencement or resumption of the foreclosure process, as specified in paragraphs 6 and 8 of the Agreement.

        IN WITNESS HEREOF, the parties hereto have caused this Attachment A to be duly executed as of the date signed below.

Dated: _4-24-10_____          _Eddie K Yau_____
                                         Eddie K Yau Borrower

Dated: _____          _____

Aurora Loan Services

Dated: _____          By: _____

                                         Title: _____


EQUAL HOUSING
LENDER   AURORA LOAN SERVICES LLC

# Aurora • Loan Services

00 541

2617 COLLEGE PARK • P.O. BOX 1706 • SCOTTSBLUFF, NE 69363-1706
PHONE: 800-550-0508 • FAX: 303-728-7648

Loan No. 0021███

Page 5 of 5

**15. Time is of the Essence.** The Customer agrees and understands that TIME IS OF THE ESSENCE as to all of the Customer's obligations under this Agreement. The grace period for monthly payments under the Loan Documents will not apply to payment under this Agreement. Therefore, the Lender must receive the payments under this Agreement on or before the Due Dates specified in Attachment A.

**16. Assignment by Customer Prohibited.** This Agreement shall be non-transferable by Customer. However, if the legal or beneficial interest or the servicing of this loan is transferred by Lender, this Agreement inures to the benefit of any subsequent servicer or beneficial interest holder of the Note.

**17. Severability.** To the extent that any word, phrase, clause, or sentence of this Agreement shall be found to be illegal or unenforceable for any reason, such word, phrase, clause, or sentence shall be modified or deleted in such a manner so as to make the Agreement, as modified, legal and enforceable under applicable law, and the balance of the Agreement or parts thereof shall not be affected thereby, the balance being construed as severable and independent; provided that no such severability shall be effective if it materially changes the economic benefit of this Agreement to either party.

**18. Execution in Counterparts.** This Agreement may be executed and delivered in two or more counterparts, each of which, when so executed and delivered, shall be an original, but such counterparts shall together constitute but one and the same instrument and Agreement. Facsimile signatures shall be deemed as valid as originals.

**19. Customer Contact.** If Customer has any questions regarding this matter, Customer should contact one of Lender's Loan Counselors at the address above or by calling 800-550-0509.

IN WITNESS HEREOF, the parties hereto have caused this Agreement to be duly executed as of the date signed.

Dated: 4-24-10

Eddie K Yau Borrower

Dated: _____

Aurora Loan Services
Dated: _____

Aurora Loan Services is a debt collector. Aurora Loan Services is attempting to collect a debt and any information obtained will be used for that purpose. However, if you are in bankruptcy or received a bankruptcy discharge of this debt, this communication is not an attempt to collect the debt against you personally, but is notice of a possible enforcement of the lien against the collateral property.



EQUAL HOUSING LENDER    AURORA LOAN SERVICES LLC

**EXHIBIT 7**



DOC # 2009-0328171

Recording Requested By
**ServiceLink**

Recording requested by:
Quality Loan Service Corp

When recorded mail to:
Quality Loan Service Corp.
2141 5th Avenue
San Diego, CA 92101

12416

JUN 16, 2009      4:59 PM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
DAVID L. BUTLER, COUNTY RECORDER
FEES:        15.00
                          DA:      1

**PAGES:        2**

123094

TS No.: ~~_____~~                    Loan No.: 0021~~____~~

*Space above this line for Recorder's use*

## IMPORTANT NOTICE

## <u>NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST</u>

### IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION. You

may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account (normally five business days prior to the date set for the sale of your property). No sale may be set until three months from the date this notice of default is recorded (which date of recordation appears on this notice). This amount is **$12,655.67 as of 6/15/2009** and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition of reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have the pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the three-month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

**Aurora Loan Services**
**C/O Quality Loan Service Corp.**
**2141 5th Avenue**
**San Diego, CA 92101**
**619-645-7711**

TS No.: ~~[redacted]~~
Loan No.: 00219~~[redacted]~~
**Notice of Default and Election To Sell Under Deed of Trust**

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.

Remember, **YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.**

NOTICE IS HEREBY GIVEN: That the undersigned is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary under a Deed of Trust dated 7/6/2007, executed by EDDIE K. YAU, JR. AND GLORIA A. YAU, HUSBAND AND WIFE AS JOINT TENANTS, as Trustor, to secure certain obligations in favor of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.), as beneficiary, recorded 7/17/2007, as Instrument No. 2007-0475311, in Book XXX, Page XXX of Official Records in the Office of the Recorder of SAN DIEGO County, California describing land therein: **as more fully described in said Deed of Trust.**

Said obligations including 1 NOTE(S) FOR THE ORIGINAL sum of $608,000.00, that the beneficial interest under such Deed of Trust and the obligations secured thereby are presently held by the undersigned; that a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:

The installments of principal and interest which became due on 2/1/2009, and all subsequent installments of principal and interest through the date of this Notice, plus amounts that are due for late charges, delinquent property taxes, insurance premiums, advances made on senior liens, taxes and/or insurance, trustee's fees, and any attorney fees and court costs arising from or associated with the beneficiaries efforts to protect and preserve its security, all of which must be paid as a condition of reinstatement, including all sums that shall accrue through reinstatement or pay-off. Nothing in this notice shall be construed as a waiver of any fees owing to the Beneficiary under the Deed of Trust pursuant to the terms of the loan documents.

That by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

The Beneficiary or its designated agent declares that it has contacted the borrower, tried with due diligence to contact the borrower as required by California Civil Code § 2923.5, or the borrower has surrendered the property to the beneficiary or authorized agent, or is otherwise exempt from the requirements of § 2923.5.

Dated: 6/15/2009                    **Quality Loan Service Corp., AS AGENT FOR BENEFICIARY**
                                     BY: ServiceLink-Irvine

                                     _Melissa Wagner_
                                     **MELISSA WAGNER**

If you have previously been discharged through bankruptcy, you may have been released of personal liability for this loan in which case this letter is intended to exercise the note holder's rights against the real property only.

**THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit report agency if you fail to fulfill the terms of your credit obligations.



**Quality Loan Service Corp.**
**2141 5th Avenue**
**San Diego, CA 92101**

7103 9628 5941 4009 1175

00 415





EDDIE YAU, JR.

VISTA, CA 92084

4250225

**EXHIBIT 8**

Recording requested by:

00 410 

When recorded mail to:

Quality Loan Service Corp.
2141 5th Avenue
San Diego, CA 92101
619-645-7711

Space above this line for recorders use

TS # ███████████        Order # 123094        Loan # 002█████

# Substitution of Trustee

WHEREAS, EDDIE K. YAU, JR. AND GLORIA A. YAU, HUSBAND AND WIFE AS JOINT TENANTS was the original Trustor, LAWYERS TITLE COMPANY was the original Trustee, and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR HOMECOMINGS FINANCIAL, LLC (F/K/A HOMECOMINGS FINANCIAL NETWORK, INC.) was the original Beneficiary under that certain Deed of Trust dated 7/6/2007 and recorded on 7/17/2007 as Instrument No. 2007-0475311, in book XXX, page XXX of Official Records of SAN DIEGO County, CA; and

WHEREAS, the undersigned is the present Beneficiary under said Deed of Trust, and

WHEREAS, the undersigned desires to substitute a new Trustee under said Deed of Trust in place and stead of said original Trustee, or Successor Trustee, thereunder, in the manner provided for in said Deed of Trust,

NOW, THEREFORE, the undersigned hereby substitutes QUALITY LOAN SERVICE CORPORATION ,as Trustee under said Deed of Trust.

Whenever the context hereof so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

Page 1

00 411

Substitution of Trustee - CA
TS # ████████████
Page 2

Dated: 6/15/2009

Mortgage Electronic Registration Systems, Inc.

By: **Mary Jane Sarne, Vice President**

State of ___California___ )
                            ) ss.
County of ___San Diego___ )

On __6/24/09__ before me, **Michelle Nguyen** a notary public, personally appeared **Mary Jane Sarne,** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.                    (Seal)

Michelle Nguyen

MICHELLE NGUYEN
COMM. #1665032
NOTARY PUBLIC ● CALIFORNIA
SAN DIEGO COUNTY
Comm. Exp. MAY 8, 2010

00 412

# Affidavit of Mailing
## for Substitution of Trustee By Code

TS No.: C▮▮▮▮▮▮▮▮▮
Trustor: EDDIE K. YAU, JR. AND GLORIA A. YAU, HUSBAND AND WIFE AS JOINT TENANTS

I, Connie Zinn, declare: That I am an employee of **Quality Loan Service Corp.**, an agent for beneficiary, whose business address is:

> 2141 5th Avenue
> San Diego, CA 92101

I am over the age of eighteen years and in accordance with California Civil Code Section 2934, I caused a copy of the attached Substitution of Trustee to be mailed, in the manner provided in Section 2924(b) of the Civil Code of the State of California, to the trustee of record under the Deed of Trust described in said Substitution and to all persons to whom a copy of the Notice of Default would be required to be mailed by the provisions of said section.

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed at San Diego, CA on 6/25/2009.

/s/ _____

Connie Zinn

**EXHIBIT 9**

DOC # 2009-0521567

Recording requested by:
Quality Loan Service Corp.  **ServiceLink**

When recorded mail to:
Quality Loan Service Corp.
2141 5th Avenue
San Diego, CA 92101

FII
ZP

123094

TS # C

6350

SEP 18, 2009    8:00 AM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
DAVID L BUTLER, COUNTY RECORDER
FEES:        15.00
DA:        1

PAGES:        2

## NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 7/6/2007. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

A public auction sale to the highest bidder for cash, cashier's check drawn on a state or national bank, check drawn by state or federal credit union, or a check drawn by a state or federal savings and loan association, or savings association, or savings bank specified in Section 5102 to the Financial code and authorized to do business in this state, will be held by duly appointed trustee. The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, with interest and late charges thereon, as provided in the note(s), advances, under the terms of the Deed of Trust, interest thereon, fees, charges and expenses of the Trustee for the total amount (at the time of the initial publication of the Notice of Sale) reasonably estimated to be set forth below. The amount may be greater on the day of sale.

**BENEFICIARY MAY ELECT TO BID LESS THAN THE TOTAL AMOUNT DUE.**

Trustor(s):     **EDDIE K. YAU, JR. AND GLORIA A. YAU, HUSBAND AND WIFE AS JOINT TENANTS**
Recorded:     7/17/2007 as Instrument No. 2007-0475311 in book XXX, page XXX of Official Records in the office of the Recorder of SAN DIEGO County, California;

Date of Sale:     **10/7/2009 at 10:00 AM**
Place of Sale:     **At the South entrance to the County Courthouse, 220 West Broadway, San Diego, CA 92101**
Amount of unpaid balance and other charges: **$679,157.93**
The purported property address is:

**VISTA, CA 92084**

Assessors Parcel No.:

The undersigned Trustee disclaims any liability for any incorrectness of the property address or other common designation, if any, shown herein. If no street address or other common designation is shown, please refer to the referenced legal description for property location. In the event no common address or common designation of the property is provided herein directions to the location of the property may be obtained within 10 days of the date of first publication of this Notice of Sale by sending a written request to Aurora Loan Services 327 South Inverness Drive  Englewood CO 80112

Pursuant to California Civil Code §2923.54 the undersigned, on behalf of the beneficiary, loan servicer or authorized agent, declares as follows:

[ 1 ] The mortgage loan servicer has obtained from the commissioner a final or temporary order of exemption pursuant to Section 2923.53 that is current and valid on the date the notice of sale is filed;

[ 2 ] The timeframe for giving notice of sale specified in subdivision (a) of Section 2923.52 does not apply pursuant to Section 2923.52 .

**6351**

OO 432

If the Trustee is unable to convey title for any reason, the successful bidder's sole and exclusive remedy shall be the return of monies paid to the Trustee, and the successful bidder shall have no further recourse.

If the sale is set aside for any reason, the Purchaser at the sale shall be entitled only to a return of the deposit paid. The Purchaser shall have no further recourse against the Mortgagor, the Mortgagee, or the Mortgagee's Attorney.

Date: 9/17/2009

Quality Loan Service Corp.
2141 5th Avenue
San Diego, CA 92101
619-645-7711 For NON SALE information only
Sale Line: 714-730-2727 or Login to: www.fidelityasap.com
Reinstatement Line: 619-645-7711

Quality Loan Service Corp. by: Conie Legaspi, as Authorized Agent.

If you have previously been discharged through bankruptcy, you may have been released of personal liability for this loan in which case this letter is intended to exercise the note holder's rights against the real property only.

**THIS NOTICE IS SENT FOR THE PURPOSE OF COLLECTING A DEBT. THIS FIRM IS ATTEMPTING TO COLLECT A DEBT ON BEHALF OF THE HOLDER AND OWNER OF THE NOTE. ANY INFORMATION OBTAINED BY OR PROVIDED TO THIS FIRM OR THE CREDITOR WILL BE USED FOR THAT PURPOSE.**

As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit report agency if you fail to fulfill the terms of your credit obligations.

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| Eddie Yau and Gloria Yau, on behalf of themselves and all others similarly situated | Deutsche Bank National Trust Company Americas, and Aurora Loan Services, LLC, Inclusive |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Lenore L. Albert, Esq. and Law Offices of Lenore Albert<br>7755 Center Avenue #1100<br>Huntington Beach, CA 92647 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:  JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes  ☐ No  **☐ MONEY DEMANDED IN COMPLAINT: $_____**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Intended beneficiaries to a contract with the US Government through Fannie Mae/Freddie Mac that was breached seeking specific performance 28 USC 1331.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☒ 892 Economic Stabilization Act | ☐ 196 Franchise | **REAL PROPERTY** | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | **IMMIGRATION** | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | ☐ 290 All Other Real Property | ☐ 465 Other Immigration Actions | | |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:**  Case Number:  **SACV11-6 JVS(RNBx)**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☐ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ No ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or
                 ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
                 ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                 ☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | San Diego County |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | Colorado |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
    **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | San Diego County and all other counties in the State of California |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X.  SIGNATURE OF ATTORNEY (OR PRO PER): _~Dennis L Olbert~_      Date December 30, 2010

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge James V. Selna and the assigned discovery Magistrate Judge is Robert N. Block.

The case number on all documents filed with the Court should read as follows:

## SACV11- 6 JVS (RNBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===========================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [X] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.